**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**FORT MEYERS DIVISION**

| | | |
|---|---|---|
| MICHAEL TUCKER,<br>AZUREE'D TUCKER, and<br>MADRID TUCKER<br>　　*Plaintiffs,*<br><br>V.<br><br><br>THE SCHOOL<br>BOARD OF LEE COUNTY, FLORIDA;<br>THE SCHOOL DISTRICT OF LEE<br>COUNTY, FLORIDA;<br>STEPHAN CATO; KYLE BURCHFIELD;<br>ALEX CARCIOPPOLO; ROBERT<br>HINSON; CHRISTOPHER CHAPELL;<br>ROBERT BUTZ; and CHRISTOPHER S.<br>BERNIER, Ph.D.<br>　　*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. <u>2.24-cv-142</u><br><br><br><span style="color:red">**JURY DEMANDED**</span> |

### PLAINTIFFS' THIRD AMENDED VERIFIED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Plaintiffs MICHAEL TUCKER, Individually, and AZUREE'D TUCKER, Individually and on behalf of their minor son, Madrid, and file their Second Amended Complaint against Defendants, THE SCHOOL DISTRICT OF LEE COUNTY, FLORIDA; THE SCHOOL BOARD OF LEE COUNTY, FLORIDA; STEPHAN CATO; KYLE BURCHFIELD; ALEX CARCIOPPOLO; ROBERT HINSON; and CHRISTOPHER S. BERNIER, Ph.D. In support thereof, Plaintiffs show the Court the following:

### INTRODUCTION

1. The principle of nondiscrimination is a cornerstone of justice, fairness, and equality within public educational institutions. Unfortunately, the public schools within the School District

1

of Lee County, Florida (the "School District"), operating under the authority of the School Board of Lee County, Florida (the "School Board") have violated this principle time and time again. This is a story of adult professionals failing at their most basic responsibility to create and maintain an educational environment that is safe for all students free of prohibited discrimination.

2. This lawsuit underscores a disturbing narrative of bias and exclusion within the School District's Fort Myers High School and its sports program, where Madrid, an African American student-athlete, encountered numerous obstacles solely based on his race. Madrid experienced and suffered from unequal treatment in access to both educational resources and opportunities, from discriminatory practices in team selection, coaching decisions, and disciplinary action, as well as unlawful retaliation against Madrid and his parents for asserting their rights. Madrid was unlawfully targeted and discriminated against, including but not limited to being peppered with racial slurs, threats, and derogatory remarks, by school officials, administration and others the School Board could control, where the School Board both knew of, allowed and through inaction tolerated a discriminatory and racially hostile educational environment to exist to the detriment of Madrid's legal rights. Madrid's experiences paint a troubling picture of institutionalized race-based discrimination within Fort Myers High School's athletic department and the School Board all of which played out in full view of the school community. The School District could and should have put an end to this nefarious conduct but chose not to.

3. The racial discrimination at issue began on February 14, 2023, when one of Madrid's assistant baseball coaches, Alex Carcioppolo, sent a disturbing text message to the Fort Myers High School ("FMHS") baseball players and coaches that read: "Happy Valentine's Day niggas." Plaintiff Madrid was one of two players of color coached by Carcioppolo.; the remaining

2

students were white. A student, not Madrid, complained about the racial slur, and from there, Madrid began to encounter a barrage of harassment and racially discriminatory conduct that was perpetrated, tolerated, and condoned by Defendants. The purposeful delivery of a blatantly racist text by an

adult agent of the School District entrusted with the care of Madrid reveals and perpetuates a culture of long-seated biases on the basis of race and color, which permeated the educational environment in the School District. After this discrimination was revealed, the Defendants did not take direct action to address it. Instead, they insisted that clearly related behaviors were unrelated and failed to protect the actual victims of this discrimination. When the Plaintiffs pointed out that the discrimination was occurring, along with the resultant harm and trauma to Plaintiffs, Defendants' response was not remediation but retaliation, not empathy but isolation, and certainty not aid, but continued harm. In short, due to systemic, institutionalized racism, the Defendants initiated and sustained actions that irrevocably damaged Plaintiff Madrid both in that moment and with respect to his future.

4.      Upon learning of the text, the Defendants did not reach out to Plaintiff Madrid or address the overt racism with the members of the baseball team. The ensuing investigation deliberately failed to address the damaging impact of the text on students of color, particularly those like Plaintiff Madrid who, as members of the baseball team, were entrusted to the care of Coach Carcioppolo and other agents of the Defendants the School District and the School Board. The omission of even a marginally appropriate response engendered an atmosphere that perverted the blatant act of discrimination into a swirl of misplaced victim-blaming. This empowered students and adults to act in ways that caused further trauma and harm, both emotional and economic, to Madrid and his parents, Michael and Azuree'D Tucker. The embrace of discriminatory stereotypes

3

and the refusal to acknowledge behaviors and systems that run contrary to federal and state mandates resulted in retaliation. This not only created a painful daily experience for the plaintiffs but also hindered future opportunities for Plaintiff Madrid The School District and School Board Defendants acted to punish Carcioppolo, yet, paradoxically, concluded that the language used was not racist, thereby ignoring the deep-seated racism endemic in the school environment. This created and reflected an atmosphere that not only encourage a coach to think sending such a text was acceptable, but also set the stage for the events that followed.

5.      Instead of conducting an investigation that considered the harm and trauma engendered by the objectively racist text, the School District and School Board "circled the wagons," tacitly encouraging a response that placed blame on Madrid and another student of color. The ramifications of the discrimination and retaliation endured by young Madrid and his parents, in his formative years, extend far beyond the realm of sports, permeating his entire educational experience at the School and FMHS and perpetuating harmful stereotypes that undermine the principles mandated by Federal and State Law against race-based discrimination and retaliation in public education.  The race-based harassment, discrimination and retaliation also had very real economic consequences for Madrid, who, as a star player whose father was a professional player for Major League Baseball, was foreclosed of his chance of playing for college recruiters (present and attending the game) when the racial discrimination culminated in a "walkout" during a game, leaving Madrid—the only African American student-athlete on the team—standing by himself on an empty field. Defendants literally left the boys isolated on a baseball field during this carefully planned "walkout" protesting the disciplinary action against Burchfield, deliberately leaving the only two students of color alone on a baseball field, subjected to a torrent of racist and derogatory remarks, and once again failing to so much as inquire about the impact on the minors.

4

6.    Swift and decisive action is necessary to rectify the injustices inflicted upon Madrid by Defendants, and there is a grave need to institute comprehensive reforms that address systemic racism and discrimination within the FMHS sports program, and in The School District of Lee County generally.

7.    This lawsuit is not only a quest for justice for Madrid, but is also a clarion call for accountability and reform within all Lee County public educational institutions to uphold the fundamental tenets of fairness, dignity, and equality for all individuals, regardless of race or ethnicity. As the legal proceedings unfold, the spotlight shines brightly on The School Board of Lee County, Florida, and FMHS challenging their commitment to eradicating discrimination and fostering an environment where every student can thrive and excel, unimpeded by the shackles of illegal discrimination, racism, prejudice and bias.

## JURISDICTION

8.    This case arises under the United States Constitution and the laws of the United States, including the Equal Educational Opportunities Act of 1974; 20 U.S.C. § 1703; Title VI of the Civil Rights Act of 1964; 42 U.S.C. § 2000d; 42 U.S.C. § 1983; the Florida Educational Equity Act; and Article IX of the Florida Constitution. The court has subject matter jurisdiction under 28 U.S.C. §§ 1331(a), 1341, 2201, and 2202, and 20 U.S.C. §§ 1706, 1708. The court may exercise supplemental jurisdiction over plaintiffs' state law claims under the Florida Educational Equity Act, Fla. Stat. §§ 1000. 05 and Florida Admin. Code Ann. R. 6A-19.001. See 28 U.S.C. § 1367(a).

## VENUE

9.    Venue is proper pursuant to 28 U. S. C. § 1391(B)(2) because a substantial part of the event or emissions giving rise to the claims occurred in this District.

## PARTIES

10. Plaintiffs, Michael Tucker, Azuree'D Tucker, and Madrid Tucker reside within the FMHS attendance zone in Lee County, Florida.

11. Defendant The School District of Lee County, Florida ("School District") is a public school system and local educational agency under Federal law, authorized to do, and at all relevant times was doing business in Fort Myers, Lee County, Florida. The School District maintains its agents, apparent agents, employees, servants, borrowed servants, and representatives

in this County. The School District has acted under color of state law at all times referenced in this complete within the meaning of 42 U.S.C. §1983. The School District of Lee County, Florida may be served by serving Dr. Christopher S. Brenner at Lee County Public Education Center, 2855 Colonial Blvd., Fort Myers, FL 33966.

12. The School Board of Lee County, Florida, ("School Board") is the public body responsible for directing, operating, controlling, and supervising all free public schools in Lee County, Florida. *See* Fla. Stat. §§ 1001.32-33 and 1001.40-42. The School Board is responsible for the operation of schools within the School District of Lee County, including FMHS. *Id.* § 1001.42(4). The School Board is the contracting agent on behalf of the School District and is subject to suit. *Id.* §§ 1001.41(4), 1001.30. The School Board has acted under color of state law at all times referenced in this complaint within the meaning of 42 U.S.C. §1983. Under Florida law, final policymaking authority for a school district is vested in the School Board." *K.M. v. School Bd. of Lee Cty., Fla.,* 150 Fed. App'x. 953, 957 (11th Cir. 2005). The School Board of Lee County, Florida has appeared in this action.

13. Defendant DR. CHRISTOPHER S. BERNIER is the Superintendent of the School District of Lee County and all of its public schools, including FMHS, and is the secretary and executive officer of The Lee County School Board. *See* Fla. Stat. §§ 1001.32(3), 1001.33. He is a

6

United States Citizen and resident of the state of Florida. Defendant Bernier, as Superintendent, is responsible for the administration and management of the schools. *Id.*; *see also id.* §§ 1001.49, 1001.51. He is charged with managing, administering and overseeing the operation of schools, overseeing instruction, classes and extracurriculars, and educational services as are needed to provide equal educational opportunities for all students of the School District, including Madrid *Id.* § 1001.51(6). Defendant Bernier is also charged with ensuring that all federal and state laws and rules of the State Board of Education are properly observed, and School Board policies are enforced and followed. *Id.* § 1001.51(14). He is ultimately responsible for supervising all school administrators, faculty, and staff, including FMHS coaches, in the School District. *Id.* § 1003.26. Defendant Bernier acted under color of state law at all times referenced in this complaint within the meaning of 42 U.S.C. § 1983. He is sued in his official capacity and his actions bind the School District and School Board. Dr. Christopher S. Brenner has appeared in this action.

14.    Defendant STEPHAN CATO was the FMHS Athletic Director. He is a United States Citizen and resident of the state of Florida. He was responsible for oversight and management of Athletics at FMHS. He was charged with implementing operation of FMHS athletics, and other athletic services related thereto, as are needed to provide equal educational opportunities for all students in the School District, including Madrid Defendant Cato was also charged with ensuring that all laws and rules of the State Board of Education are properly observed, and School Board policies are enforced and followed. Defendant Cato acted under color of state law at all times referenced in this complaint within the meaning of 42 U.S.C. § 1983. He is sued in his official and individual capacities and his actions bind the School District and School Board. Defendant Cato has appeared in this action.

15.    Defendant KYLE BURCHFIELD was the FMHS Head Coach for the baseball

7

team. He is a United States Citizen and resident of the state of Florida. He was responsible for athletic administration and management of the FMHS baseball team. He was charged with implementing operation of the baseball team, and other athletic services related thereto, as are needed to provide equal educational opportunities for all children in the School District, including Madrid Defendant Burchfield was also charged with ensuring that all laws and rules of the State Board of Education are properly observed and School Board policies are enforced and followed. Defendant Burchfield acted under color of state law at all times referenced in this complaint within the meaning of 42 U.S.C. § 1983. He is sued in his official and individual capacities and his actions bind the School District and the School Board. Defendant Burchfield has appeared in this action.

16.     Defendant CHRISTOPHER CHAPELL was the FMHS Junior Varsity ("FMHS JV") Head Coach and Assistant Varsity Coach for the baseball team. He is a United States Citizen and resident of the state of Florida. He was responsible for athletic administration and management of the FMHS JV baseball team and assisting in these capacities for the Varsity team. He was charged with implementing operation of the baseball team, and other athletic services related thereto, as are needed to provide equal educational opportunities for all children in the School District, including Madrid Defendant Chappell was also charged with ensuring that all laws and rules of the State Board of Education are properly observed and School Board policies are enforced and followed. Defendant Chappell acted under color of state law at all times referenced in this complaint within the meaning of 42 U.S.C. § 1983. He is sued in his official capacity and his actions bind the School District and the School Board. Defendant Chapell has appeared in this action.

17.     Defendant ROBERT BUTZ is the Principal for FMHS.  He is a United States Citizen and resident of the state of Florida.  Defendant Butz was responsible for the administration

8

and management of FMHS and is charged with managing, administering and overseeing the operation of the school, overseeing instruction, classes and extracurriculars, and educational services as are needed to provide equal educational opportunities for all students of FMHS, including Madrid *Id.* § 1001.51(6). Defendant Butz is also charged with ensuring that all federal and state laws and rules of the State Board of Education are properly observed, and school policies are enforced and followed. Defendant Butz acted under color of state law at all times referenced in this complaint within the meaning of 42 U.S.C. § 1983. He is sued in his individual and official capacities.  His actions bind the School District and the School Board. Defendant Chapell has appeared in this action.

18.	Defendant Robert Hinson was an FMHS teacher and Coach for the baseball team. He is a United States Citizen and resident of the state of Florida. He was responsible for assisting in athletic administration and management of the FMHS baseball team.  He was charged with assisting operation of the baseball team, and other athletic services related thereto, as are needed to provide equal educational opportunities for all children in the School District, including Madrid Defendant Hinson was also charged with ensuring that all laws and rules of the State Board of Education are properly observed and School Board policies are enforced and followed. Defendant Hinson acted under color of state law at all times referenced in this complaint within the meaning of 42 U.S.C. § 1983. He is sued in his individual and official capacities.  His actions bind the School District and the School Board. Defendant Chapell has appeared in this action.

19.	Defendant Alex Carcioppolo was the FMHS Assistant Coach for the baseball team. He is a United States Citizen and resident of the state of Florida. He was responsible for assisting in athletic administration and management of the FMHS baseball team.  He was charged with assisting operation of the baseball team, and other athletic services related thereto, as are needed

to provide equal educational opportunities for all children in the School District. Defendant Carcioppolo was also charged with ensuring that all laws and rules of the State Board of Education are properly observed and School Board policies are enforced and followed. Defendant Carcioppolo acted under color of state law at all times referenced in this complaint within the meaning of 42 U.S.C. § 1983. He is sued in his individual and official capacities.  His actions bind the School District and the School Board. Defendant Chapell has appeared in this action.

**FACTUAL BACKGROUND**

20.    Madrid, an African American student-athlete, was subject to race-based discrimination while participating as a student athlete and player on the FMHS baseball team and was exposed to rampant race-based harassment during the school day and at school activities within the School Board's control and jurisdiction.  The harassment began on February 14, 2023, when Defendant Alex Carcioppolo sent a text message to the baseball team and coaching staff that read: "Happy Valentine's Day niggas." A copy of that text message appears below:

10



21.     Upon realizing the message was poorly received, Carcioppolo deleted the message. The incident exacerbated racism among team members, leading white athletes to unjustly and falsely blame Madrid for reporting the incendiary text to school authorities. Team members disclosed to the Athletic Director, coaches, and school administration that racial slurs were routinely used among team members. Friction ensued within the team, with some students, as well as Defendants Burchfield, Hinson, and Chappel, siding with Defendant Carcioppolo, and outwardly claiming that Madrid, one of only two players of color on the team, was responsible for backlash received by Defendant Carcioppolo because of his offensive and inappropriate use of the derogatory racial slur. In reality, neither Madrid nor his parents were involved in making the Title VI complaint that gave rise to the facts at issue in this case.

11

22.     Upon learning that Plaintiff Madrid was targeted and subjected to racist treatment, the School District and School Board, acting through its agents, not only failed to take any remedial action, but also overtly sent out the message that Plaintiff Madrid was a problem because he was bothered by such treatment.  Before the season even begun, at least one student (not Madrid or T.R.) directly reported the use of derogatory racial slurs lodged against him to Defendants Carcioppolo and Burchfield but were told to stop "acting like a sissy" for being "bothered" by the use of the slurs; Madrid was a participant in these meetings where the coaches suppressed the complaints of racial slurs.  He then experienced retaliation from Defendant Burchfield, Hinson, Chappell, Butz, Cato and others for speaking up and voicing concerns of discrimination.

23.     On February 16, 2023, the FMHS school secretary, acting as an agent for the School District and School Board, called Madrid's mother, seeking to schedule what she termed a "mediation" with Madrid for the purported purpose of "de-escalation" after a different black student got into a confrontation with several white students on Madrid's varsity baseball team, the genesis of which was the white players' frustration with Defendant Carcioppolo's suspension. Madrid had *nothing* to do with that incident, and yet, the School Board and School District's agent sought his participation in a mediation.  Wanting to be cooperative with the School Board and  School District's purported attempts to "de-escalate" the situation, Madrid's parents agreed to allow him to participate, and the mediation took place on or about February 16, 2023.

24.     In that purported "mediation," conducted by a FMHS Assistant Principal, an agent of the School Board and School District, Madrid informed his white teammates that he did not think it was appropriate for them to use *any form* of the "n-word," and was subjected to their lengthy protestations about why they should be allowed to use the word "nigga" and that it was unfair that African American people could use the word "nigga," while Defendant Carcioppolo was

12

suspended from his job for so doing.  This School Board and School District sanctioned meeting put Plaintiffs in an awkward and hostile environment, exposed to racial slurs and having to defend themselves against blatantly racist conduct. Observing the School Board and School District's treatment of Plaintiffs, white athletes continued to use racist and hostile language toward Plaintiffs.

25.     After the "mediation," Defendant Burchfield called Madrid into his office for a meeting in which he told Madrid that he needed to understand why his [white] teammates thought it was unfair that African American students like Madrid could use the word "nigga" while they could not.  During the meeting, Defendant Burchfield told Madrid that he "needed to be a better teammate," to which Madrid replied, "I'll just keep to myself." Thus began in earnest Defendant Burchfield's unlawful efforts to retaliate against Madrid over a complaint neither Madrid nor his parents filed, and in which Defendants Hinson and Chappel enthusiastically joined, and which Defendants Cato and Butz did nothing whatsoever to stop. Defendant Burchfield began to target Madrid on the field and with fabricated behavioral violations, encouraging white students to follow suit.

26.     Following the meeting between Defendant Burchfield and Madrid on or about February 16, 2023, the Defendants held a series of meetings with FMHS baseball players. In one such meeting, organized by the School Board and School District through Defendants Butz, Cato, Burchfield, and Henson (who were in attendance), players were asked to raise their hand if they had ever used the word "nigga." Most of the players, all but two of them white, raised their hands. The Defendants present then asked the players whether they thought their use of the word "nigga" was appropriate. Many of the white players defended their use of the word on the bases that "rappers use it all the time" and that it was okay to use amongst friends. None of the named Defendants—adults in a room full of teenagers—intervened to state the obvious: that any use of the

13

'n-word' is wholly unacceptable, a view Madrid's parents firmly hold.

27.    Interestingly, after a game, which upon information and belief, occurred soon thereafter, then-assistant coach Richard King attempted to be the adult in a room of teenagers by standing up for Madrid, at one point asking the white players, "do you guys not like him [Madrid] because he's black?" That produced significant backlash from the parents of the white players, and Assistant Coach King was unceremoniously removed from his position, never to be heard from again.

28.    Shortly thereafter, Defendant Butz told Madrid's parents that he was "disappointed" that Madrid did not "stand up for himself" during the meeting, seemingly trying to pass on the responsibility to put an end to the casual use of the "n-word" onto a then 16-year-old sophomore in high school who was being unlawfully retaliated against for a Title VI complaint neither he nor his parents filed.

29.    On or about February 23, 2023, a meeting was held by Defendant Cato, Defendant Burchfield, Chappel and Hinson, and several assistant principals, with the parents of both the varsity and JV teams, but not the players themselves. The parents entered the room to find what was effectively an agenda for the meeting, from which Defendants told them they would not deviate and which did not contemplate a discussion of the "elephant in the room." Many of the parents admitted that their kids used the word "nigga" regularly, defended their use of the word at length, and questioned whether Defendant Carcioppolo's use of the word was worthy of his suspension. Madrid's parents were targeted for speaking out about the discrimination and prejudice they encountered and found themselves ostracized at parent events and deliberately excluded from communications by Defendants.

14

30.    On February 24, 2023, Defendant Burchfield sent an email, with the approval of Defendants Cato and Butz, purporting to be a new set of "Baseball Program Rules," allegedly necessitated by "player conduct" that Defendants Burchfield and Hinson found "embarrassing." Defendants Chappel and Hinson were copied on this email, which is reproduced below:

**From:** "Burchfield, Kyle" <KyleAB@leeschools.net>
**Date:** February 24, 2023 at 8:11:07 AM EST
**To:** Aaron O'Brien <aaron@obrien-law.com>, "Adler Baron (Bbaron07@icloud.com)" <Bbaron07@icloud.com>, Amy Augustine <arcago76@protonmail.com>, "Anne Chambers (annecham11@gmail.com)" <annecham11@gmail.com>, Anne Dailey <Annmariebaseball@aol.com>, "Cervio (cerviofamily@gmail.com)" <cerviofamily@gmail.com>, Christy O'Brien <christymobrien@yahoo.com>, Chuck Walsh <cwalsh2323@comcast.net>, "Crecelius (tcrecelius6@yahoo.com)" <tcrecelius6@yahoo.com>, Dane Thomas <danethomas44@yahoo.com>, Debra Brady <dbrady1198@gmail.com>, Dee Tucker <g24aza@mac.com>, Denise Jackson <Denise@l3beachphoto.com>, Erica Gulnac <erica.gulnac@leehealth.org>, Erik Parent <erik@oldfltitle.com>, Gina Banasiak <ginabanasiak@gmail.com>, "Heather Baron (hbaron1278@gmail.com)" <hbaron1278@gmail.com>, Jackson McKee <Jasonkmckee@gmail.com>, Jameson Moschella <jmoschel@fgcu.edu>, Jami Ware <jnjware02@aol.com>, "Jeff Augustine (jeff@jeffaugustinevo.com)" <jeff@jeffaugustinevo.com>, Jen Carlino <jencarlino@icloud.com>, Jerry Pottinger <Pottinger1233@gmail.com>, Jessica Shuchard <JNSCHUCHARD@yahoo.com>, John Dailey <Daileyjw@aol.com>, Josh Ware <swflnole@gmail.com>, Katie Hayden <Katie@boselectric.com>, Keith Banasiak <keithbanasiak@gmail.com>, Kircher <Rmk2509@gmail.com>, KRSTL6691@hotmail.com, Kyle McCarty <busymowing@yahoo.com>, Leigh Parent <leigh@oldfltitle.com>, Madrid Tucker <g24tuck@gmail.com>, Mark Lorenz <mark_lorenz@outlook.com>, Martha Mankin <Martha.mankin@gmail.com>, McCarty <Tmccarty3mms@yahoo.com>, Melissa Koszesza <koszeszamelissa@hotmail.com>, Mora <medemartini@hotmail.com>, Mora's Mother <mora327@hotmail.com>, Raber <Tlf8322@yahoo.com>, Rodmyre <quotes@rodmyre.com>, Shane Reilly <shane.reilly@bbgi.com>, Stephanie Monrad <Samonrad@mac.com>, Steve Christensen <sandschristensen@yahoo.com>, Steve Hayden <Steve@boselectric.com>, Tiffany Savage <tiffanysavage802@gmail.com>, tsmonrad@mac.com, William Davey <williamgdavey@gmail.com>
**Cc:** Aidan Donovan <aidanjdonovan2003@gmail.com>, Andrew Dailey <awdailey1227@gmail.com>, Chris Chappell <chap5@comcast.net>, "Hinson, Robert" <RobertJH@leeschools.net>, Rich King <richking@superiorfiresafetyinc.com>
**Subject:** Baseball Program Rules

Thank you everyone for attending the meeting last night, I know it was long but it was necessary to set our program back on the right track.

The coaching staff has discussed what the next steps should be in order to address the current problems. Our decision moving forward will need your support. If a player's action embarrass the program/coaches in any way then they will be removed from the game and potentially be suspended from the future game(s). This could be anywhere from getting in trouble in school and I get a call from administration, running their mouth on the field (especially within ear shot of fans, coaches, and umpires) or acting in an immature way. That is coming to an end. It will be up to the coaching staff's decision to determine how long the player will be suspended. It could be just the remainder of the game, it could be several games after that as well.

Example: if a player strikes out and throws his hands up at the umpire for a bad call and starts cussing, they will be removed from the game. No excuses. That kind of behavior is unacceptable. This could be even in the middle of an at bat. Actions will be taken that may look severe, but it is necessary to end the disrespect they have created for themselves, you as parents, our program, and the game of baseball.

Coach Hinson and I talked and there were several times this week that both of us felt embarrassed from several player's actions. That is unacceptable because that represents our program and we refuse to let it continue. We have thought about it and have created a system that we believe will work. If at any point your son gets removed from the game, your son and myself will come to you after the game and they will explain what they did. If they do not have the courage to confess their actions then I will explain it to you.

If any racial slurs are used at any point, the player will be removed from the game and suspended until the coaching staff and administration takes the proper steps to investigate the manner/purpose it was used. Depending on the manner it was used it could be multiple game suspensions, it could be removal from the team.

We need to keep in mind that while they do need to learn that their actions have consequences, they are teenage boys and mistakes will be made. They need to LEARN and be given a chance to learn from their mistakes. It is all of our job to have them learn those life skills before they get to the real world and have much more severe consequences. I made up this saying in college and still live by it "growing up is overrated".

These steps taken by the coaching staff is FOR THE BOYS. Many of you wanted to know the actions and consequences that will be used, the coaches are taking action. If this happens, then you as parents need to supportive of this and back our decisions. **These things are all bigger than baseball, this is about teaching them self-control, self-respect, and conducting themselves in a mature manner**. These will be new program rules set up and established for the future. These rules will be clearly explained to the boys after school in the locker room.

Thank you for your support of the program and what we are trying to do.

Kyle Burchfield
Head Baseball Coach
Fort Myers High
History Teacher



31.    Defendants Burchfield, Cato, and Butz in their official capacities and on behalf of the School District and School Board, inconsistently and unfairly implemented the new Baseball Program Rules against Madrid in retaliation for the false belief that Defendant Carcioppolo was deprived of coaching because of Madrid The new Baseball Program Rules were not disseminated in the same way as the original rules which required parent and student review, as well as a returned signature of receipt. In attempting to enforce these new rules targeting Madrid, the consequences issued by Defendants Burchfield, Cato, Hinson, Chappel, and Butz were considerably more severe than previously provided for the same infraction and significantly more severe than the minimal

15

consequences handed down to white players for comparable conduct. There exists no other explanation for the disparate application of the new rules other than racial bias, discrimination, and retaliation towards the students of color, including Madrid The new rules were inconsistently applied against Madrid and the other student of color, causing Madrid and the other student of color to be subjected to more infractions and stiffer consequences.

32. By way of example, after the new Baseball Program Rules email, Defendant Burchfield was coaching third base during a game. Defendant Hinson fabricated an incident between Madrid and an umpire, arbitrarily yelling that Defendant Burchfield "needed to get that kid [Madrid] under control." Hinson urged Burchfield to remove Madrid from the game because of Hinson's fabricated allegation. Likely unbeknownst to Hinson, Madrid's father, who had a storied career in Major League Baseball, was standing in earshot and eyesight of both Hinson and Madrid, and did not observe any inappropriate behavior on Madrid's part. Madrid's parents hold him to a very high standard and would not have tolerated Madrid mouthing off to an umpire.

33. After the game, Madrid's father approached the umpire whom Hinson claimed Madrid talked back to. Contrary to Defendant Hinson's claim that Madrid was almost ejected from the game, the umpire told Madrid's father that he had "no concerns" regarding Madrid's conduct. Defendant Hinson invented a conduct issue as a pretext for retaliating against Madrid, whom Defendant Hinson blamed for the suspension of Defendant Carcioppolo, despite neither Madrid nor his parents having filed the Title VI complaint that gave rise to the instant litigation. Madrid's parents complained to Defendant Cato in real-time while the game was still going on. As was frequently his response when confronted with the behavior of the baseball coaches, Defendant Cato told Madrid's parents that he "didn't notice" Hinson's conduct and would "talk to him" about the incident. Defendant Cato failed to take any remedial action, failed to discuss the issue with

16

Defendants Hinson, and failed to inquire about the impact of the treatment on Madrid This behavior encouraged a "bullying" environment against Madrid, where white students and staff could fabricate allegations with impunity to harass Madrid under the guise of the new Baseball Program Rules. Upon information and belief, Defendant Hinson was not disciplined for making a false accusation against Madrid, once again, treating the incident as an isolated event, ignoring evidence of the sustained and systemic racism that continued to harm the Plaintiffs.

34.    During the same game, Defendant Burchfield also accused the other player of color, T.R., of "sulking in the dugout" after being pulled from the game for a baserunning error while he was laughing with Madrid's mother, who was standing directly behind him. Numerous other white players made errors during the game, and none were removed.

35.    During the same game, and after Defendant Burchfield announcing new rules for the FMHS baseball program, in which he warned that "actions [by coaches] will be taken that may look severe" in enforcing those rules, one white FMHS player attempted to charge the opposing team's dugout after recording an out at first base and another white player threw his glove the entire length of the dugout in frustration while standing next to Defendant Burchfield. Neither was removed from the game nor punished in any way in stark contrast both to how Defendant Burchfield's email stated such incidents would be handled and to the action Defendant Hinson demanded be taken out against Madrid after Hinson's fabricated allegation.

36.    It was clear from Defendants Burchfield's and Hinson's conduct during that game that new Baseball Program Rules promulgated in Burchfield's February 24, 2023 email did not apply to all players equally and were in fact specifically targeted at Madrid and T.R. as part of Defendants' ongoing and flagrant attempts to unlawfully retaliate against Madrid and T.R. whom at least Defendants Burchfield, Hinson, and Chappel blamed for Defendant Carcioppolo's

17

firing.

37.     Defendant Hinson also retaliated against Madrid in other ways. Among Defendant Hinson's responsibilities as an assistant coach was to coach first base. When a player reaches first base, it is customary for the first base coach to take the player's protective gear (shin guards, etc.). Defendant Hinson did so for every player on the team except Madrid  Every time Madrid reached base, Defendant Burchfield would have to call time to come out of the dugout to collect Madrid's protective gear since Defendant Hinson would not collect his gear. Again, Defendant Hinson and Burchfield's conduct encourage a racially retaliatory environment, where Madrid was treated differently.

38.     In a separate meeting with the players on or about February 27, 2023, led by Defendant Butz and attended by Defendants Cato, Burchfield, Chappel, and Henson, the players were asked to write down three to five sentences describing what they could do to improve the season and enhance team morale. Both Madrid and T.R. spoke at the meeting and again emphasized that neither boy or his parents were responsible for getting Defendant Carcioppolo fired and in which Madrid told his teammates (effectively) that "you don't have to like me, but you do have to respect me."  At some point, some of the adults left the meeting and it was turned over to the players for further discussion.  Defendants Butz and Burchfield stayed until the end.

39.     Curiously, the School District's investigation report, which was leaked to a reporter, states that most of March 2023 was a quiet month. Nothing could be further from the truth. In reality, the campaign of unlawful discrimination and retaliation against Madrid and his teammate, T.R., continued unabated and worsened.

18

**March and Early April Games**
During the remaining games from March 9 through April 3, 2023, the school reported that things cooled down during this time. This was attributed to several factors. First, the team became accustomed to the administrative presence in/near the dugout and at the games. Second, the team won seven of the nine games played during this time. Some minor incidents were reported that included use of foul language, throwing of equipment, and loss of playing time/ not being included in the line-up. Some of these minor incidents are included below in individual student reports. However, the divide in the team and among the families remained.

40.     On March 3, 2023, Madrid had a poor game and at one point threw his helmet at his feet and dropped his bat where it was supposed to go (albeit with a little extra gusto). Another teammate (the same teammate who threw his glove the length of the dugout and was not punished or admonished) attempted to provoke Madrid, leading to a brief verbal confrontation. Madrid was taken out of the game while the other [white] player was not disciplined. Defendant Burchfield attempted to suspend Madrid on the spot. As a result, Madrid's father called Defendant Cato over, and, true to form, Defendant Cato conveniently hadn't noticed the incident. Defendant Cato deferred action over the weekend so that Madrid could "make a statement."

41.     On or about Monday, March 6, 2023, Defendants Cato, Burchfield, and another Administrator who was present in Defendant Butz's absence held a meeting with Madrid and his parents to discuss the helmet and bat dropping incident. In that meeting, Defendant Burchfield finally asked to hear Madrid's side of the story, after which Burchfield stated that he would have to re-evaluate Madrid's punishment.

42.     On or about Tuesday, March 7, 2023, Defendant Burchfield, in front of a large audience, announced to Madrid that he would be suspended from the team for six games and would be required to write an apology letter to his teammates. Tellingly, no punishment whatsoever was meted out to either of the two white players who engaged in misconduct in the very same fashion during the very same game.

19

43.     Soon after Defendant Burchfield proclaimed Madrid's six-game suspension along with requiring an apology letter to the team to an audience, Madrid called his parents. Madrid's father arrived at the school first, followed by Madrid's mother. The Tuckers met with Defendant Cato, who, true to form, professed not to have known Madrid was suspended and apologized for the same but did not lift the suspension.

44.     Defendant Burchfield's proclamation of Madrid's suspension was done in a fashion designed to humiliate Madrid as part of Defendants' unlawful campaign of retaliation against Madrid

45.     On or about Wednesday, March 7, 2023, Madrid's father returned to the school in hopes of meeting Defendant Butz, who was not in the office. At the request of school officials, Madrid's father met with investigators from the School District. Soon thereafter, Madrid's mother joined the meeting, and Madrid eventually joined as well. The Tuckers recounted the entire saga to the investigator, who indicated they would be digging deeper into the incident.

46.     Due to being in the meeting with the School District's investigators (at FMHS administrator's request), Madrid arrived late to practice and was wearing the wrong hat. After informing Defendant Burchfield that he had been unavoidably detained meeting with the investigators and FMHS administrators, Defendant Burchfield said Madrid would have to "run poles" as punishment to be served at a later, unspecified date.

47.     During that same practice, Madrid's father saw a player throw his bat against the fence while loudly cursing. The conduct was so loud that Madrid's father heard it clearly down the left field line. Defendant Burchfield watched the behavior from the pitcher's mound and took no action during the same practice in which he threatened to further discipline Madrid for wearing the wrong hat.

20

48.     Right after the practice at issue, one of the School District's investigators called Madrid's father on speakerphone with Defendants Cato and Burchfield. Madrid's father confronted Burchfield about what had happened at practice, to which Defendants Cato and Burchfield expressed surprise that Madrid's father had attended practice.

49.     Later that evening, Madrid's parents received a call from one of the School District's investigators acting at the direction of the School District and the School Board informing them that Madrid would not have to serve his suspension, given the ongoing investigation. They were also told that an FMHS administrator would be present in the dugout at the remaining games that season. Several of the School District's investigators are trained as attorneys, and the School District undoubtedly realized that allowing Defendant Burchfield to punish Madrid for complying with School District investigators and FMHS administrators was deeply problematic, especially since the offense of "wearing the wrong hat" was so obviously a pretext for retaliation.

50.     On or about March 8, 2023, Defendant Cato, at the direction of the School District and School Board, sent an email to parents and players informing them that there was a Title VI investigation underway, that the "rules for teamplay" established at the beginning of the season would remain in effect *without* the additions made targeting Madrid and T.R. announced in Defendant Burchfield's February 24, 2023 email and that "consequences associated with actions related to this investigation will be held in abeyance until its conclusion." Interestingly, the only "consequences" at issue in Defendant Cato's email had been meted out to Madrid Defendants Butz, Burchfield, Hinson, and Chappel were copied on that communication.

21



51.     Defendant Cato's email was an attempt to manage the reaction of the white players' parents and make clear to them that the revocation of Madrid's suspension and the recission of the rules promulgated by Defendant Burchfield on February 24, 2023 to target Madrid and T.R. was dictated above his head by School District officials and is the functional equivalent of arguing "I was just following orders, don't blame me."

52.     Perhaps not surprisingly, almost immediately after his March 8th email which was sent at 4:37 p.m., Defendant Cato was aggressively confronted by the father of one of the white players while Cato was driving a golf cart by the road near the team locker room, The player's father remarked that the revocation of Madrid's suspension was "bullshit" and proceeded to berate Defendant Cato saying, among other things that "you can't even do what we ask you to do [presumably putting the players of color and their parents in their place]."

53.     On or about March 15, 2023, Defendant Burchfield called Madrid into his office again for a private meeting. During that meeting, Defendant Burchfield told Madrid words to the effect of "my life has been a living nightmare because of you." Defendant Burchfield further blamed Madrid for the fact that FMHS administrators were required to sit in the dugout during games, which Defendant Burchfield said "made us look like a bunch of babies." A stunned Madrid replied, "Excuse me?" and then proceeded to remind Defendant Burchfield for the umpteenth time

22

that neither Madrid nor his parents filed the Title VI complaint that led to Defendant Carcioppolo's termination. Madrid's parents promptly reported the incident to Defendant Cato and one of the Assistant Principals. Defendant Cato then asked Madrid's parents, "What would you like me to do?" to which Madrid's parents said, "your job."

54.    Soon thereafter, at a practice, after the players had just finished stretching, Defendant Burchfield called the varsity players over to the mound. Defendant Burchfield said words to the effect of "people want me gone; people want me fired… I'm done with all the drama queens… I'm going back to my old ways." At some point during Defendant Burchfield's rant, Burchfield perceived Madrid to be smirking and demanded to know "what was so funny." Clearly, "people" meant Madrid, T.R., and their respective parents. Tellingly, none of Defendant Burchfield's invective was ever directed at white players.

55.    On or about March 15, 2023, Madrid and one of the JV players, who is also African American, were playing a game in the locker room in front of a small number of other players in which Madrid allegedly said the word "nigga" prompting one of the white players to report the incident after taunting the two African American players about his plan to do so. Madrid was suspended for four innings. After the four-inning suspension, Madrid took the field as planned, only to be called back by Defendant Burchfield to sit on the bench another inning and a half. No other player who received a four-inning suspension was treated similarly. Plaintiffs allege that Defendant Burchfield allowed Madrid to take the field only to call him back in hopes of exposing Madrid to humiliation.

56.    At some point after March 15, 2023, Madrid's parents met with one of the Assistant Principals, who is not a defendant in this action, along with Defendant Burchfield, to address various incidents they had reported as alleged in the preceding paragraphs. During that meeting,

23

Defendant Burchfield wondered aloud to the Assistant Principal, "why he [Burchfield] had to see things through Madrid's eyes but Madrid didn't have to see things through [Burchfield's] eyes," again attempting to shift adult responsibilities onto a then sixteen-year-old who simply wanted to play baseball. Madrid's mother again reported the incident to the School District's investigators.

57.    On or about April 4, 2023, Defendant Butz called Madrid's father and informed him that he was no longer welcome to come to the field and throw BP for any player other than Madrid (later including T.R. as well). He offered no further explanation other than "I don't want to muddy the waters." One might expect a high school baseball program to take full advantage of having an MLB alum like Mr. Tucker, who has a rolodex full of MLB and college coaches willing to donate his time.

58.    The racial disparity persisted across all facets of athletic and educational life. Madrid was socially ostracized during games, team dinners, and school events—all overseen by the Defendant School District and School Board. Furthermore, students and staff directed race and color-based negative remarks, as well as comments of a retaliatory nature, toward Plaintiff Madrid and his parents. Additionally, the Defendants permitted other parents to directly provide financial benefits to the baseball program, bypassing the authorized Athletic Booster Club. If proper procedures had been followed, monies and activities would have flowed through the authorized Club which operates in accordance with School District and School Board policy and adheres to specific rules, suggesting that such actions were taken to obscure the discrimination.

59.    Madrid's parents were targeted for speaking out about the discrimination and prejudice they encountered. When they reported the unfair treatment and the widespread, accepted used of the N-word by players and coaches toward Madrid, they found themselves ostracized at parent events and deliberately excluded from communications by the Defendants. Other parents,

24

with the Defendants' knowledge and approval, began to sponsor team events privately rather than through the authorized Athletic Booster Club, intentionally excluding Madrid's parents from these events and activities. This represented an organized effort by the Defendants to ostracize Madrid and his parents, continuing to ignore the discrimination and resulting trauma. Defendants also deliberately failed to include Madrid's parents in educational decisions regarding their son as a means of retaliation for speaking out about race-based discrimination, violating the Parents' Bill of Rights under Florida Statute 1014.04.

60.    Intermittently throughout the season, there were threats of a walkout during games by players and the Defendant coaches to protest the termination of Defendant Carcioppolo and later the removal of Defendant Burchfield as head coach.

61.    On April 5, 2023, Defendant Butz, acting at the direction of a School District and School Board in full crisis management mode, sent a note to players and parents that Defendant Burchfield had been removed as head coach:



62.    On the night of April 5, 2023 the School District's investigation found that Defendants Burchfield, Hinson, and Chappel met at the Edison Country Club, which is coincidentally the preferred location for the baseball program's parent/alumni "booster club,"

which was comprised of parents of white players only, and was created to bypass Madrid's parents.

63.     That night, Defendants Burchfield, Hinson, and Chappel met with other white parents and students to plan a walkout the next day to protest Defendant Carcioppolo's firing and Defendant Burchfield's removal as head coach. Upon information and belief, Defendants Burchfield, Hinson, and Chappel contacted several parents and players that night to plan the walkout. The next day's game was scheduled between FMHS and Estero High School and college scouts and recruiters were expected at the game to evaluate players for scholarships and university recruitment.

64.     Before the April 6, 2023 game, Defendants Butz and Cato were informed by parents and staff that a walkout was planned during the game. Defendant Cato was captured on body camera, effectively admitting the same to the Ft. Myers police officers who responded to the post walkout melee. While he stated he didn't know how bad the walkout would be, Defendant Cato was so worried about the impending walkout that he took it upon himself to pre-notify a former FMHS School Resource Officer [who had been previously removed for conduct issues] and ask him to attend the game. Needless to say, it is a basic expectation of those who work as educators not to conspire with teenagers to incite or otherwise encourage bad behavior, especially when any reasonable adult would have known that the white players walking out while leaving the only two players of color on the field would be an optics disaster that could, if it went viral, substantially limit the future opportunities of the white players involved. The actions of Defendants Burchfield, Hinson, Chappel, Butz and Cato raise serious questions about whether they should be employed in roles in which they are trusted with the welfare of other people's children.

65.     Around 4:00 p.m. on April 6, 2023, Defendant Carcioppolo made a cryptic post to his Instagram story, which, in hindsight, was likely intended to encourage the walkout:

26



66.    Before the game, seven players who had not played an inning of JV all year were mysteriously demoted for the day's game by Defendant Chappel, upon information and belief, Defendant Chappel, possibly acting in concert with others, took that action to ensure there would not be enough players left on the bench after the planned walkout for FMHS to continue playing the game. Also, immediately before the game, T.R. was mysteriously to the leadoff spot in the batting order. T.R. found that perplexing, given that he had not hit higher than seventh in the batting order all year.  Madrid was slotted to hit second in the batting order. Upon information and belief, Defendant Hinson or Defendant Chappel, possibly both acting in concert with one another, made those changes to the lineup to set up the impending walkout. Also, before the game Defendant Cato contacted T.R.'s parents and informed them that Madrid and T.R. were to be at the batting cages at 5:30 pm, like all the other kids, rather than taking batting practice elsewhere, as thrown by Madrid's father.  Madrid and T.R. arrived around 5:11 p.m. and found no other players, coaches, or even a bucket of balls with which to take batting practice.

27

67.     Right before the game, Defendant Hinson approached the Estero High School coach and asked if FMHS could be the away team rather than the home team, thereby putting his own team at a clear competitive disadvantage, as Defendants Hinson and Chappel had no intention of coaching their team to a win. Instead, their priority was to choreograph a walkout as soon as possible after the game begun.

68.     T.R. struck out in his at-bat to lead off the game, which brought Madrid to the plate to hit. When Madrid stepped in the batter's box, Defendant Hinson led the white players in walking out of the dugout, and Defendant Chappel followed at the end of the line of players, leaving Madrid stunned and humiliated at home plate while T.R. was also left stunned and humiliated in the dugout.

69.     The walkout proceeded as engineered by Defendants Burchfield, Hinson, Chappel, and Carcioppolo, leaving Madrid and T.R. – the only players of color on the team – stunned and humiliated on the field. Plaintiffs were exposed to disparagement, public humiliation, and trauma as Madrid and T.R. (the only other student-athlete of color) were left standing alone on the field, while the other players and adults entrusted with their care deliberately walked off. The two minors bore the brunt of the Defendants' discriminatory victim-blaming. Recruiters and scouts witnessed the treatment of Madrid and the other student of color.

70.     After the walkout, the School District and School Board again failed to investigate the impact of the events on the Plaintiffs. Plaintiffs' suffering was never considered by the Defendants, despite the outrageous nature of the event. After the walkout, the remaining games of the season were canceled. In devising a remedy for the walkout, the School District and School Board did not consider the impact of this decision on Plaintiffs. As a result, Madrid who was already a victim of the staged walkout that isolated him and another student of color amidst racist rhetoric, faced further punishment. This decision deprived him of the opportunity to play baseball that year,

28

hindered his development as a player, and eliminated his chance to showcase his talents to college scouts and recruiters. The School District and School Board, acting under color of law, endorsed the discrimination, allowing it to spread and intensify within the FMHS community. The actions of the Defendants were not only insufficient to fulfill their legal obligations to Madrid, his parents, and others subjected to overt discrimination and retaliation, but the actions of the Defendants also worsened the harm inflicted.

71.     Sadly, FMHS has a long history associated with resistance to integration, which included a riot at the school in 1969 and long-standing and widely known ongoing racial tensions. Even in investigating the text message in question, the school astonishingly attempted to justify the use of the racial slur, indicating that "[t]here are differing perceptions over the use of stylized version of the N-word, "nigga," depending on the persons' backgrounds and ethnic/racial identities." *See* Ex. A. The school went on to note that "This has normalized the usage and led to differing perceptions of who may use the word, situations in which it may be used, etc." Even the treatment of the conduct after the fact demonstrates the Defendants' tolerance for racist comments and evidence of institutionally condoned discrimination and harassment. The school and School Board have condoned this discrimination, acting under color of law, and allowed it to permeate and fester throughout the entire FMHS community. It has reached a point of rot and stink that were exposed through the above-described events, but the Defendants' actions were inadequate to meet their legal duties owed to Madrid and his parents and others exposed to the blatant acts of discrimination and retaliation.

72.     The Defendants are sued in the capacities referenced herein. Upon information and belief, each of them was responsible for, or contributed to, the above actions as described below:

a.      STEPHAN CATO, Athletic Director:

29

i.        Involvement in Planning and Orchestrating Walkout: Stephan Cato was actively involved in planning and orchestrating the baseball walkout, which was anticipated to disrupt school activities and adversely affect the Plaintiffs. He had advance knowledge of the racially charged walkout, which was designed to humiliate Madrid and T.R., the only two Black players. His remarks, captured on police body cam, stating "we knew the walkout was going to be bad, but we didn't know how bad, that's why we called the police," evidence his significant role in preparing for the consequences of the walkout and evidence anticipatory knowledge and significant involvement in the event. Yet he did nothing to stop the walkout or prevent its racially discriminatory impact.

ii.       Incitement and Harassment at "Meetings," "Mediation" and during School and Outside Activities: Cato played a central role in facilitating, permitting, and failing to address the racially discriminatory treatment of Madrid Despite being aware of escalating racial tensions, including use of the "n-word" by players and coaches, Cato failed to take corrective action or protect Madrid from a hostile environment. When Madrid's parents reported discriminatory conduct, Cato frequently downplayed or ignored it, responding with indifference such as, "I didn't notice" or "I'll talk to him." Cato was present at meetings where the use of racial slurs was discussed and normalized without adult correction. He also attended meetings where Madrid was required to defend himself against racial hostility, without Cato intervening to ensure a safe and respectful environment.

iii.      Complicity in Retaliation: Cato stood by or approved multiple acts of retaliation against Madrid, including harsher discipline under newly promulgated

30

"Baseball Program Rules" that were selectively enforced against Madrid and another Black player. He approved a six-game suspension of Madrid based on conduct that white players were not punished for and later feigned ignorance of the suspension.

iv.     Failure to Protect or Investigate: After the walkout and other retaliatory events, Cato took no meaningful steps to support Madrid or mitigate harm. Instead, he participated in efforts to manage optics and shift blame, including sending an email suggesting that directives to halt Madrid's suspension came from above him—effectively distancing himself from responsibility.

v.      Overall Role: Cato's conduct reflects systemic failure and implicit approval of a racially hostile climate. His actions—both active and passive—enabled other staff to discriminate and retaliate against Madrid, and his failure to enforce equitable standards sent a message that such conduct was tolerated under his leadership.

73.     KYLE BURCHFIELD, Head Coach. Defendant Burchfield, the FMHS head baseball coach, was a central figure in orchestrating, executing, and perpetuating racially discriminatory and retaliatory conduct against Madrid, a Black student-athlete. His actions, both overt and systemic, contributed significantly to the hostile environment Madrid endured throughout the 2023 baseball season. His misconduct included the following:

i.      Retaliation Against Madrid for Protected Conduct: Burchfield falsely Blamed Madrid for the fallout from Assistant Coach Carcioppolo's racist Valentine's Day text, despite Madrid and his family having no involvement in the Title VI complaint. Burchfield told Madrid to "be a better teammate" during a

31

private meeting, initiating a campaign of retaliation for Madrid's mere presence inrace-related discussions. Burchfield subjected Madrid to Disproportionate Punishment, such as suspending him for six games and requiring an apology letter for an incident involving helmet and bat placement-while similar or worse conduct by white players went unpunished.

ii.     Creation and Enforcement of Discriminatory Rules: Burchfield authored a new set of "Baseball Program Rules" on February 24, 2023, with approval from Cato and Butz, targeting Madrid and the other Black player, T.R. He applied those rules unequally, enforcing harsher penalties against Madrid and T.R. while overlooking similar or more serious infractions by white players. Burchfield also fabricated Infractions, such as alleging Madrid showed disrespect to an umpire— an allegation the umpire directly refuted.

iii.    Humiliation and Public Shaming: Burchfield announced Madrid's six-game suspension in front of a large audience, amplifying humiliation. He called Madrid back to the bench mid-game after a four-inning suspension to add further embarrassment, a treatment not given to white players. He accused T.R. of "sulking" for laughing with Madrid's mother, while white players committing visible outbursts were not disciplined.

iv.    Verbal and Psychological Abuse: Burchfield told Madrid "my life has been a living nightmare because of you", blaming him for the presence of administrators in the dugout and other consequences of the school's mishandling of racism complaints. He held Madrid responsible for the racial tensions, even though Madrid did not file the complaint. In a rant to players, Burchfield said he was "done with

32

all the drama queens" and was "going back to [his] old ways," clearly targeting Madrid and T.R.

v.      Orchestrating or Enabling the Walkout: Burchfield participated in pre-walkout planning at Edison Country Club with white parents and students. He set the stage for the April 6 walkout that humiliated Madrid and T.R. by demoting key JV players and reshuffling the batting order to spotlight the Black athletes. Burchfield allowed Madrid to step into the batter's box just before the walkout to maximize humiliation.

vi.      Continued Racial Targeting and Exclusion: Burchfield refused to allow Madrid's father, a former MLB player, to throw batting practice for other players, cutting off support and mentorship. He also persistently reinforced a hostile team culture where white players were emboldened to harass Madrid without consequence.

74.      In sum, Burchfield was not merely negligent—he was an architect of racial retaliation. His conduct reflects intentional discrimination, abuse of authority, and a gross failure to protect a minor under his supervision. His actions inflicted emotional harm, disrupted Madrid's athletic development, and deprived him of opportunities for advancement, all under the color of school authority.

75.      ALEX CARCIOPPOLO, an assistant baseball coach at FMHS, engaged in overtly racist conduct that served as the catalyst for a sustained campaign of discrimination and retaliation against Madrid, a Black student-athlete. His actions included:

i.      Use of a Racial Slur in Team Communication: On February 14, 2023, Carcioppolo sent a text message to the FMHS baseball team and coaching staff that

33

read: "Happy Valentine's Day niggas." This message was sent in an official team group chat and witnessed by both students and staff. After negative reactions, he deleted the message. Ultimately, the racist text message led to his removal as assistant coach. Defendant Carcioppolo actively engaged in efforts both online and in other forums to encourage students and staff to protest his removal, contributing to a divisive and hostile environment within the school community. These actions were intentionally designed to mobilize public sentiment against Madrid with the specific intent to harm Plaintiff Madrid, exacerbating tensions and directly contributing to Plaintiffs' distress and the overall disruption of school activities.

ii.     Sparked Racial Division and Retaliation: His use of the slur incited racial division among players, particularly targeting Madrid, one of only two Black players on the team, who was falsely blamed by white players for reporting the incident. Although Madrid and his family were not responsible for filing the Title VI complaint, Carcioppolo's defenders—including other coaches—treated Madrid as the reason for Carcioppolo's suspension.

iii.    Enabled and Emboldened Racist Culture: Carcioppolo's conduct was not isolated—it reflected and reinforced a team culture in which white players regularly used racial slurs without correction from adults. His suspension prompted protests by white players and parents, and he became a symbol of white grievance within the team and community, fostering further hostility toward Madrid and T.R.

iv.     Participation in Planning the Walkout: Though no longer actively coaching, Carcioppolo remained in communication with players and parents. On April 6, 2023—the day of the orchestrated walkout—he made a cryptic Instagram post,

34

which, in context, was likely intended to encourage the protest in support of his firing. The walkout left Madrid and T.R., the only players of color, isolated and humiliated on the field in front of scouts and spectators.

76.    In essence, Carcioppolo's use of a racial slur was the flashpoint for a deeply troubling sequence of events. His unapologetic behavior and the community's reaction to his suspension exposed and inflamed systemic racism within the FMHS baseball program. His conduct not only violated professional and ethical standards but also directly contributed to the racially hostile and retaliatory environment that followed.

77.    ROBERT HINSON: Defendant Robert Hinson, an FMHS assistant baseball coach, actively participated in and reinforced a pattern of racially discriminatory and retaliatory conduct against Madrid, a Black student-athlete. His actions were deliberate, sustained, and contributed significantly to the hostile environment Madrid endured. His misconduct included:

      i.    Retaliation and Fabrication of Misconduct: Hinson falsely accused Madrid of disrespecting an umpire during a game, urging Head Coach Burchfield to remove him from play despite no such behavior occurring, as confirmed by both Madrid's father and the umpire himself. The fabricated allegation was a clear pretext for retaliation and an attempt to punish Madrid for the fallout from Assistant Coach Carcioppolo's suspension.

      ii.    Unequal Treatment and Humiliation: Hinson refused to collect Madrid's protective gear at first base—a courtesy he extended to every other player— forcing the head coach to leave the dugout each time Madrid reached base. This targeted exclusion sent a clear signal to the team that Madrid was not to be treated equally or with respect.

35

iii.     Selective Enforcement of Discipline: Hinson participated in targeting Madrid and T.R. with new "Baseball Program Rules" that were disproportionately enforced against them compared to white teammates. During the same game in which he fabricated misconduct by Madrid, Hinson took no action against white players who committed far more blatant and aggressive infractions, such as attempting to charge the opposing dugout or throwing equipment.

iv.     Role in Orchestrating the Walkout: Hinson met on April 5, 2023 with Defendants Burchfield and Chappel and parents of white players at the Edison Country Club to plan the April 6 walkout that left Madrid and T.R. humiliated and alone on the field. On game day, Hinson was among those who led the white players in walking out when Madrid stepped into the batter's box, timing the act to maximize public embarrassment. Hinson also made public statements indicating that he was proud of the students for walking out, suggesting that he supported the disruption despite its negative impact on Plaintiffs.

v.     Undermining the Team and the Game: Hinson requested FMHS play as the away team, intentionally placing his team at a competitive disadvantage to allow the walkout to occur sooner. Alongside Chappel, Hinson reshuffled the batting order to put Madrid and T.R. in prominent positions before the walkout, further enhancing the trauma and spectacle of the event.

78.     In summary, Robert Hinson was a key actor in the racial discrimination campaign against Madrid He used his position to fabricate misconduct, humiliate Madrid, treat him unequally, and ultimately help orchestrate a racially charged walkout that culminated in public trauma. His actions not only violated school policy and basic decency, but also sent a message of

36

impunity to others, emboldening the systemic racism that plagued the FMHS baseball program.

79.    CHRISTOPHER CHAPPELL: Defendant Chappell, a coach and official within the FMHS baseball program, was an active participant in the discrimination and retaliation directed at Madrid, a Black student-athlete. Chappell consistently aligned himself with those targeting Madrid and played a central role in planning and executing racially charged acts that caused Madrid significant harm.

i.    Supported and Enforced Discriminatory Rules: Chappell supported and enforced the new "Baseball Program Rules" issued on February 24, 2023, which were selectively and harshly applied against Madrid and the only other Black player, T.R., while white players were either not disciplined or received minimal consequences for similar or worse conduct. He also attended a parents-only meeting alongside Defendants Cato, Burchfield, and Hinson, where the use of the racial slur by white students and Carcioppolo was openly defended. At this meeting, Chappell and the other Defendants refused to allow any discussion of the racial tensions on the team, further marginalizing Madrid and his parents.

ii.    Role in Orchestrating the Walkout: Chappell played a direct role in orchestrating the April 6, 2023 walkout that left Madrid and T.R. humiliated on the field. The night before the game, Chappell met with Defendants Burchfield and Hinson and parents of white players to plan the protest. The next day, he mysteriously demoted multiple JV players—ensuring the team would not have enough players to continue the game after the walkout— and rearranged the batting lineup to put Madrid and T.R. in positions where the walkout would have maximum impact. Chappell then walked out of the dugout behind the white players as Madrid

stepped into the batter's box, leaving Madrid and T.R. alone and publicly shamed.

iii.     As a coach responsible for the administration and management of the baseball team, Chappell failed to ensure that all laws and rules of the State Board of Education were properly observed, and that school board policies were enforced and followed.

80.     Chappell's actions were not passive; he was an intentional and willing collaborator in a campaign of racial discrimination, retaliation, and humiliation. His conduct violated his responsibilities as an educator and contributed directly to the hostile, unsafe environment that caused Madrid lasting harm.

81.     ROBERT BUTZ: Defendant Robert Butz, the Principal of FMHS, played a critical role in enabling, endorsing, and sustaining the racially discriminatory and retaliatory treatment of Madrid, a Black student-athlete at FMHS. Rather than intervening to protect Madrid or uphold school policies, Principal Butz used his authority to reinforce and legitimize the misconduct of subordinate coaches and staff.

i.     Approved Implementation of Discriminatory Rules: Principal Butz approved the implementation of the new "Baseball Program Rules" issued on February 24, 2023, which were selectively applied against Madrid and another Black player, T.R., with disproportionately harsh consequences. Despite knowing these rules were never properly disseminated or signed like the original team rules, Principal Butz allowed their enforcement and made no effort to stop their racially biased application.

ii.     Participation in Retaliatory Actions: Principal Butz also participated in retaliatory actions against Madrid and his family. When Madrid was publicly

suspended for six games and required to write an apology letter, Principal Butz did nothing to prevent or reverse the punishment—despite knowing that similar behavior by white players had gone unpunished. Later, Principal Butz informed Madrid's father that he was no longer welcome to throw batting practice for the team—except for Madrid and eventually T.R.—further isolating Madrid's family from the baseball program and signaling institutional hostility. On March 8, 2023, Principal Butz authorized an email sent by Cato announcing that the discriminatory February 24 rules would be rescinded and Madrid's suspension held in abeyance due to the ongoing Title VI investigation. However, this communication appeared to be more about crisis control than justice, as it was framed to appease the white parents while distancing Principal Butz and others from responsibility.

iii.	Incitement and Condonement of Racist and Hostile Conduct: Principal Butz failed to adequately address systemic issues within the school environment and failed to adequately supervise the athletic staff. Specifically, after removing Kyle Burchfield from coaching duties, Principal Butz neglected to investigate the broader cultural issues within the athletic department, thereby exacerbating Plaintiff Madrid's isolation and distress. Importantly, Butz was also present at multiple meetings with coaches and players where racist behavior and rationalizations for using racial slurs were openly expressed, yet he failed to condemn the conduct or intervene to protect Madrid He remained until the end of a players' meeting on February 27, 2023, where Madrid and T.R. had to publicly defend themselves and deny involvement in Carcioppolo's firing. Principal Butz also regularly attended games and sat in the dugout with the players where he

overheard racist and derogatory remarks by the players but took no action in response to that conduct.

iv.     Cancellation of the Baseball Season: Principal Butz made a decision to cancel the remainder of the baseball season following the walkout which had a disproportionately negative impact on the plaintiff. This decision not only minimized his playing time but also significantly reduced his opportunities to be scouted by college coaches. The abrupt end to the season deprived Plaintiff Madrid of crucial exposure and development in his sport, thereby hindering his athletic and academic prospects.

82.     Ultimately, Principal Butz's conduct reflected willful indifference, institutional complicity, and a failure to meet his legal and moral obligations to protect students from race-based harassment and retaliation. Rather than stepping in to address escalating discrimination, he chose to enable it—through silence, approval, and direct participation in retaliatory acts.

83.     CHRISTOPHER S. BERNIER, Superintendent neglected to enforce policies effectively. He failed to ensure that school policies were implemented in a manner that adequately protected students from ongoing issues, including systemic discrimination and harassment. Bernier failed to act decisively against systemic racial issues, despite being aware of them, perpetuated a hostile environment which targeted students of color. By way of example, on March 6, 2023, Bernier—identified as an administrator—attending a meeting with Defendants Burchfield and Madrid and his parents to discuss an alleged incident involving Madrid dropping his bat. Bernier failed to intervene or challenge the unjust suspension that followed. Defendant Bernier approved, or implicitly ratified, the actions taken by the other School District Defendants, as described above. His failure to act, despite being in a position of authority, reflects institutional indifference

40

and a broader failure of leadership to protect Madrid from race-based treatment.

## CAUSES OF ACTION

### Count I: Title VI of the Civil Rights Act of 1964 on behalf of Madrid

### (Defendants School District of Lee County, Florida and the School Board of Lee County, Florida)

84.    Plaintiffs reallege and incorporate by reference the allegations set forth in the Factual Background section of this Complaint as if fully restated herein.

85.    This cause of action is brought against the recipients of federal funding only: the School District and the School Board.

86.    Title VI Provides that "no person in the United States shall, on the ground of race color or national origin, be excluded from participation in, be denied the benefits of, or be subject to discrimination under, or any program receiving federal funding." 42 U.S.C. §2000d.

87.    As recipients of federal funding, the School District and the School Board, are prohibited from discriminating or retaliating against Madrid by excluding them from educational services, programs and activities directly sponsored by the district and its component schools, failing to provide them with equal access to educational services, programs and activities directly sponsored by the district and its component schools, or providing them with inferior services, programs and activities directly sponsored by the district and its component schools, on the basis of their race. The School District and the School Board are aware of their own Title VI obligations.

88.    Madrid suffered from racial harassment, discrimination and retaliation as they experienced unwelcome conduct, taunts, threats, hostile behavior, and racially-motivated hateful conduct based on their race. Title VI required the School District and the School Board to respond to the racial harassment and discrimination incurred by Madrid because it was sufficiently serious to deny or limit Madrid's ability to participate in and benefit from the School District and

41

the School Board's educational programs and activities and created a hostile and retaliatory environment. The School District and the School Board through their officials and agents, knew, for months, that Madrid was the target of racially motivated attacks and harassment, including the continued use of racial slurs, disparate application of rules and Codes, threatening behavior at school, and a staged walkout, but did not take prompt or effective steps reasonably calculated to end the harassment, eliminate the hostile environment, prevent its recurrence, or remedy its effects. To the contrary, Defendants Carcioppolo and Burchfield told Madrid to stop being a "sissy" and intentionally allowed continued harassment to occur. Defendants the School District and School Board, through their acted knowingly, intentionally, recklessly and with deliberate indifference by allowing and tolerating the discrimination to occur in the first place, but also by allowing the retaliation to occur after Madrid engaged in protected activity.

89.     The School District and the School Board failure to take appropriate action includes but is not limited to:

a. A permissive environment in which the use of derogatory racial terms is intentionally tolerated and condoned;

b. Inconsistent discipline with more infractions and harsher punishments being meted out to African American students, like Madrid, on the basis of the color of their skin;

c. Intentionally allowing rampant threats, hostility, and harassment to occur against African American students, like Madrid;

d. Intentionally exposing African American students, like Madrid to known harassment, embarrassment, and disparagement by other students, faculty and staff;

e. Retaliatory application of discipline and revisions of the Codes of Conduct unfairly targeted African American students, like Madrid;

f.  Reduced playing time and cancelled seasons on the basis of racism and discrimination and in retaliation for engaging in protected activities; and

g.  Condoned and participated in horrific retaliatory acts against Madrid and his parents by publicly humiliating and shaming Madrid and his parents, and condoning and/or encouraging others to do the same.

90.  The School District and the School Board also:

a.  Allowed Plaintiff to be subjected to harassment from fellow students, parents, staff and administration. Plaintiff Madrid and his parents informed Defendants on multiple occasions of the harassment that was occurring. The School District and the School Board failed to take those complaints seriously, ignoring and trivializing the racist nature of much of the harassment;

b.  Failed to address the impact of racist actions, including the sending of a racist text, on Plaintiff Madrid;

c.  Crafted remedies to racist actions which did not address the impact on students of color; and

d.  Failing to investigate incidents of racism at all and when they did investigate some incidents of racism, they did so without interviewing Plaintiffs or the other student of color who were directly and traumatically impacted by the incidents.

91.  The School District and the School Board subscribed to and encouraged the view that ignoring endemic racism would allow the team to resume baseball as if nothing were amiss. Plaintiff Madrid and his parents were viewed as impediments to this narrative and were repeatedly targeted with racial slurs, accusations, and maligning gestures. The School District and School Board acted knowingly, intentionally, recklessly, and with deliberate indifference by not only

allowing the discrimination to occur in the first place but also by permitting the retaliation after the Plaintiffs engaged in protected activity. Specifically, and in addition to the facts and circumstances detailed above, the School District and School Board's deliberate indifference is evidenced by:

a. Failing to take Action after the Racist Text: After Carcioppolo sent a racist Valentine's Day text, no meaningful action was taken by school officials to address or denounce the racism, allowing the culture of harassment to persist;

b. Suppression of Complaints: A student reporting racial slurs was told by Defendants Carcioppolo and Burchfield to "stop acting like a sissy," and Madrid, present at the meeting, was later retaliated against for speaking out;

c. Mediation Misuse: Officials and agents of the School District and the School Board sought to include Madrid in a "mediation" even though he had no involvement in a separate racial confrontation, wrongful associating him with racial tensions;

d. Hostile "Mediation" Session: During the mediation, officials and agents of the School Board and School District allowed white players to defend their use of the N-word without correction, creating a racially hostile environment;

e. Silence During Admissions of Racism: In a team meeting attended by officials and agents of the School District and School Board, including Cato, Principal Butz, Hinson, and Burchfield, players admitted to using the N-word and the officials not only allowed them to defend that use, they did not condemn it;

f. Firing Coach who Defended Madrid: Assistant Coach King, who stood up for Madrid, was removed from his role shortly thereafter.

g. Retaliation Instead of Protection: Madrid was told by Principal Butz that he should

44

have "stood up for himself" during the racist confrontation, shifting responsibility from adults to a 16-year-old;

h.   Creation of New Discriminatory Rules: New Baseball Program Rules were issued by Burchfield (approved by Cato and Principal Butz) after the incident, targeting Madrid and T.R. with harsher standards.

i.   Unequal Enforcement of Rules: These rules were applied strictly against Madrid and T.R., but not against white players who committed equal or worse violations (e.g., glove-throwing, dugout charging).

j.   Fabricated Misconduct: Hinson falsely accused Madrid of disrespecting an umpire, even though the umpire confirmed no misconduct occurred.

k.   Exclusion from Team Rituals: Hinson deliberately refused to take Madrid's protective gear like he did for every other player, forcing Burchfield to do it.

l.   Public Shaming: Madrid's six-game suspension was announced in front of a crowd, amplifying his humiliation.

m. Punishment for Meeting with Investigators: Madrid was threatened with punishment for being late to practice due to a meeting with school investigators.

n.   Extra Inning of Suspension: Madrid was called back to the bench for an extra inning after serving a four-inning suspension—a move clearly designed to humiliate.

o.   Planning the Walkout: Cato, Burchfield, Chappel, and Hinson were aware of and helped organize the April 6 walkout, which was timed to humiliate Madrid and T.R.

p.   Use of School Resources to Facilitate It: Cato preemptively called a former SRO to manage fallout but did not prevent the walkout.

q.   Coordinated Lineup Changes: Coaches manipulated the batting order and demoted

45

JV players to ensure the walkout would occur when Madrid was at bat.

r.    Execution of Walkout: Hinson and Chappel led the white players in walking off the field while Madrid was at bat, leaving the two Black athletes alone.

s.    Lack of Post-Walkout Investigation: The School Board and District failed to consider the impact of the walkout on Madrid or take any remedial action.

t.    Cancellation of Season Without Mitigation: Canceling the remainder of the season hurt Madrid's athletic prospects and deprived him of exposure to scouts—with no consideration given to the harm this caused him.

u.    Failure to Confront Ongoing Harassment: Despite widespread use of the N-word and ongoing racial hostility, the School Board did not implement anti-racism measures, policies, or discipline for offenders.

v.    Normalization of Racial Slurs: The District's investigation astonishingly tried to justify use of the word "nigga" based on "differing perceptions," signaling institutional tolerance of racism.

w.    Cato and Principal Butz's Deflection of Responsibility: After allowing discriminatory rules and punishments, they claimed that revoking Madrid's suspension came from higher up, trying to save face with white parents.

x.    Failure to Act on Reports: Madrid's parents repeatedly reported discrimination to Cato, Principal Butz, and others, who either dismissed their concerns or asked them what they "wanted [them] to do."

y.    Exclusion and Retaliation Against Parents: Madrid's parents were ostracized from team events, communications, and decision-making, often through side channels created to avoid their participation.

46

z.  Endorsement of Unofficial Booster Club: The administration allowed white parents to financially support the team through an unsanctioned booster group that excluded Madrid's family.

aa. Superintendent Bernier's Failure to Act: Despite attending meetings and being aware of the systemic issues, Superintendent Bernier took no meaningful action to stop or correct the racial discrimination.

bb. Minimizing the Investigation's Findings: The investigation report described March 2023 as "quiet," even though retaliation escalated during that time.

92.  The School District and the School Board acting under color of law, deprived Madrid of his right to educational services, programs and activities directly sponsored by the district and its component schools on the basis of their race. The School District and the School Board, along with the other Defendants, acted intentionally and with deliberate indifference to the likelihood that the federally protected rights of Madrid would be violated and in fact were violated multiple times through ongoing retaliation, and the School District and the School Board, along with the other Defendants, wholly failed to act in a manner sufficient to prevent or address both the discrimination and retaliation.

93.  By excluding Madrid from educational services, programs and activities directly sponsored by the School District and its component schools, and segregating them by virtue of disparate treatment, the School District and School Board discriminated against Madrid on the basis of his race and retaliated against Madrid for engaging in protected activity.

94.  Through their actions and inactions on the basis of race, the School District and the School Board excluded Madrid and his parents from participation in a public school education, educational services, programs and activities directly sponsored by the School District and its

component school, and denied them the benefits of these programs, subjecting them to discrimination as set forth above.

95.    As a result of the School District's, the School Board's, and the other Defendants' actions and inactions, Madrid suffered and will continue to suffer irreparable harm, which includes but is not limited to the loss of educational time, the loss of educational opportunities and programs, the inability to overcome racial barriers, and diminished educational and future employment opportunities. The School District's, the School Board's, and Defendants' actions have caused and will continue to cause Madrid to suffer compensable injuries, entitling Madrid to damages.

96.    Plaintiffs seek declaratory and injunctive relief to remedy these ongoing violations, and also seek compensatory damages.

## Count II: Title VI of the Civil Rights Act of 1964 on behalf of Michael Tucker and Azuree'D Tucker

**(Defendants School District of Lee County, Florida and the School Board of Lee County, Florida)**

97.    Plaintiffs reallege and incorporate by reference the allegations set forth in the Factual Background section of this Complaint as if fully restated herein. Plaintiffs also reallege and incorporate by reference the allegations set forth in Count I of this Complaint as it fully restated herein.

98.    This cause of action is brought against the recipients of federal funding only: the School District and the School Board.

99.    Title VI Provides that "no person in the United States shall, on the ground of race color or national origin, be excluded from participation in, be denied the benefits of, or be subject to discrimination under, or any program receiving federal funding." 42 U.S.C. §2000d.

48

100. As recipients of federal funding, the School District and the School Board, are prohibited from discriminating or retaliating against Plaintiffs by excluding them from educational services, programs and activities offered to parents of students directly sponsored by the district and its component schools, failing to provide them with equal access to educational services, programs and activities directly for parents sponsored by the district and its component schools, or providing them with inferior services, programs and activities directly sponsored by the district and its component schools, on the basis of their race. Defendants are aware of their own Title VI obligations.

101. Plaintiffs suffered from racial harassment, discrimination and retaliation as they experienced unwelcome conduct, taunts, threats, hostile behavior, and racially-motivated hateful conduct based on their race. Title VI required Defendants to respond to the racial harassment and discrimination incurred by Plaintiffs because it was sufficiently serious to deny or limit Plaintiffs' ability to participate in and benefit from the Defendants' educational programs and activities offered to parents and created a hostile and retaliatory environment. Defendants knew, for months, that Plaintiffs were the targets of racially motivated attacks and harassment, including the continued use of racial slurs, disparate application of rules and Codes, threatening behavior at school, and a staged walkout, but did not take prompt or effective steps reasonably calculated to end the harassment, eliminate the hostile environment, prevent its recurrence, or remedy its effects. To the contrary, Defendants intentionally allowed continued harassment to occur. Defendants School District and School Board acted knowingly, intentionally, recklessly and with deliberate indifference by allowing and tolerating the discrimination to occur in the first place, but also by allowing the retaliation to occur after Plaintiffs engaged in protected activity.

102. The School District and the School Board, acting under color of law, deprived

49

Plaintiffs of their right to educational services, programs and activities directly sponsored by the district and its component schools on the basis of their race. Defendants acted intentionally and with deliberate indifference to the likelihood that the federally protected rights of Plaintiffs would be violated and in fact were violated multiple times through ongoing retaliation, and Defendants wholly failed to act in a manner sufficient to prevent or address both the discrimination and retaliation.

103.    By excluding Plaintiffs from educational services, programs and activities directly sponsored by the School District and its component schools, and segregating them by virtue of disparate treatment, the School District and the School Board discriminated Plaintiffs on the basis of their race and retaliated against Plaintiffs for engaging in protected activity.

104.    Through their actions and inactions on the basis of race, the School District and the School Board excluded Plaintiffs from participation in a public school education, educational services, programs and activities for parents directly sponsored by the School District and its component school, and denied them the benefits of these programs, subjecting them to discrimination as set forth above.

105.    As a result of the School District's and the School Board's actions and inactions, Plaintiffs have suffered and will continue to suffer irreparable harm, which includes but is not limited to the loss of educational opportunities and programs offered for parents, the inability to overcome racial barriers, and diminished educational experiences for parents. The School District's and the School Board's actions have caused and will continue to cause Plaintiffs to suffer compensable injuries, entitling Plaintiffs to damages.

106.    Plaintiffs seek declaratory and injunctive relief to remedy these ongoing violations, and also seek compensatory damages.

50

## Count III: 42 U.S.C. § 1983

## Race-Based Discrimination in Violation of the Equal Protection Clause of the Fourteenth Amendment

**(Against Defendants Cato, Burchfield, Carcioppolo, Hinson, Chappell, Butz and Bernier)**

107.   Plaintiffs reallege and incorporate by reference the allegations set forth in the Factual Background section of this Complaint as if fully restated herein.

108.   The 14th Amendment Equal Protection Clause provides that "No State shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

109.   Defendants Cato, Burchfield, Carcioppolo, Hinson, Chappell, Butz and Bernier, under color of state law, acted and continued to act pursuant to a policy and practice to deprive Plaintiffs of the right to equal protection of the laws under the 14th Amendment.

110.   Defendants Cato, Burchfield, Carcioppolo, Hinson, Chappell, Butz and Bernier maintained a custom, de facto policy, and practice of excluding African American students, like Madrid, from educational services, programs and activities directly sponsored by the School District and its component schools, and by treating these students differently. Further, Defendants Cato, Burchfield, Carcioppolo, Hinson, Chappell, Butz and Bernier maintained a policy and practice of both discriminatory and retaliatory discipline of students on the basis of race or for engaging in protected activity and voicing concerns of discrimination, were deliberately indifferent to the maintenance of a racially-hostile educational environment, and retaliated against parents and students, like Plaintiffs, who complained about racial discrimination. These policies were adopted and enforced with the intent to discriminate and retaliate against Plaintiffs on the basis of their race.

51

111.    Although the Factual Background is incorporated herein, for the avoidance of any doubt, in addition to the allegations set forth fully in that section, Plaintiffs' 42 U.S.C. § 1983 claim against Defendants Cato, Burchfield, Carcioppolo, Hinson, Chappell, Butz and Bernier is supported by the following facts:

    a.  STEPHAN CATO, Athletic Director:

        i.  Involvement in Planning and Orchestrating Walkout: Stephan Cato was actively involved in planning and orchestrating the baseball walkout, which was anticipated to disrupt school activities and adversely affect the Plaintiffs. He had advance knowledge of the racially charged walkout, which was designed to humiliate Madrid and T.R., the only two Black players. His remarks, captured on police body cam, stating "we knew the walkout was going to be bad, but we didn't know how bad, that's why we called the police," evidence his significant role in preparing for the consequences of the walkout and evidence anticipatory knowledge and significant involvement in the event. Yet he did nothing to stop the walkout or prevent its racially discriminatory impact.

        ii.  Incitement and Harassment at "Meetings," "Mediation" and during School and Outside Activities: Cato played a central role in facilitating, permitting, and failing to address the racially discriminatory treatment of Madrid Despite being aware of escalating racial tensions, including use of the "n-word" by players and coaches, Cato failed to take corrective action or protect Madrid from a hostile environment. When Madrid's parents reported discriminatory conduct, Cato frequently downplayed or ignored it,

responding with indifference such as, "I didn't notice" or "I'll talk to him." Cato was present at meetings where the use of racial slurs was discussed and normalized without adult correction. He also attended meetings where Madrid was required to defend himself against racial hostility, without Cato intervening to ensure a safe and respectful environment.

iii. Complicity in Retaliation: Cato stood by or approved multiple acts of retaliation against Madrid, including harsher discipline under newly promulgated "Baseball Program Rules" that were selectively enforced against Madrid and another Black player. He approved a six-game suspension of Madrid based on conduct that white players were not punished for and later feigned ignorance of the suspension.

iv. Failure to Protect or Investigate: After the walkout and other retaliatory events, Cato took no meaningful steps to support Madrid or mitigate harm. Instead, he participated in efforts to manage optics and shift blame, including sending an email suggesting that directives to halt Madrid's suspension came from above him—effectively distancing himself from responsibility.

v. Overall Role: Cato's conduct reflects systemic failure and implicit approval of a racially hostile climate. His actions—both active and passive—enabled other staff to discriminate and retaliate against Madrid, and his failure to enforce equitable standards sent a message that such conduct was tolerated under his leadership.

112. KYLE BURCHFIELD, Head Coach. Defendant Burchfield, the FMHS head

53

baseball coach, was a central figure in orchestrating, executing, and perpetuating racially discriminatory and retaliatory conduct against Madrid, a Black student-athlete. His actions, both overt and systemic, contributed significantly to the hostile environment Madrid endured throughout the 2023 baseball season. His misconduct included the following:

i.      Retaliation Against Madrid for Protected Conduct: Burchfield falsely Blamed Madrid for the fallout from Assistant Coach Carcioppolo's racist Valentine's Day text, despite Madrid and his family having no involvement in the Title VI complaint. Burchfield told Madrid to "be a better teammate" during a private meeting, initiating a campaign of retaliation for Madrid's mere presence in race-related discussions. Burchfield subjected Madrid to Disproportionate Punishment, such as suspending him for six games and requiring an apology letter for an incident involving helmet and bat placement-while similar or worse conduct by white players went unpunished.

ii.      Creation and Enforcement of Discriminatory Rules: Burchfield authored a new set of "Baseball Program Rules" on February 24, 2023, with approval from Cato and Butz, targeting Madrid and the other Black player, T.R. He applied those rules unequally, enforcing harsher penalties against Madrid and T.R. while overlooking similar or more serious infractions by white players. Burchfield also fabricated Infractions, such as alleging Madrid showed disrespect to an umpire—an allegation the umpire directly refuted.

iii.      Humiliation and Public Shaming: Burchfield announced Madrid's six-game suspension in front of a large audience, amplifying humiliation. He called Madrid back to the bench mid-game after a four-inning suspension to add further

54

embarrassment, a treatment not given to white players. He accused T.R. of "sulking" for laughing with Madrid's mother, while white players committing visible outbursts were not disciplined.

iv.     Verbal and Psychological Abuse: Burchfield told Madrid "my life has been a living nightmare because of you", blaming him for the presence of administrators in the dugout and other consequences of the school's mishandling of racism complaints. He held Madrid responsible for the racial tensions, even though Madrid did not file the complaint. In a rant to players, Burchfield said he was "done with all the drama queens" and was "going back to [his] old ways," clearly targeting Madrid and T.R.

v.      Orchestrating or Enabling the Walkout: Burchfield participated in pre-walkout planning at Edison Country Club with white parents and students. He set the stage for the April 6 walkout that humiliated Madrid and T.R. by demoting key JV players and reshuffling the batting order to spotlight the Black athletes. Burchfield allowed Madrid to step into the batter's box just before the walkout to maximize humiliation.

vi.     Continued Racial Targeting and Exclusion: Burchfield refused to allow Madrid's father, a former MLB player, to throw batting practice for other players, cutting off support and mentorship. He also persistently reinforced a hostile team culture where white players were emboldened to harass Madrid without consequence.

113.    In sum, Burchfield was not merely negligent—he was an architect of racial retaliation. His conduct reflects intentional discrimination, abuse of authority, and a gross failure

to protect a minor under his supervision. His actions inflicted emotional harm, disrupted Madrid's athletic development, and deprived him of opportunities for advancement, all under the color of school authority.

114.    ALEX CARCIOPPOLO, an assistant baseball coach at FMHS, engaged in overtly racist conduct that served as the catalyst for a sustained campaign of discrimination and retaliation against Madrid, a Black student-athlete. His actions included:

    i.    Use of a Racial Slur in Team Communication: On February 14, 2023, Carcioppolo sent a text message to the FMHS baseball team and coaching staff that read: "Happy Valentine's Day niggas." This message was sent in an official team group chat and witnessed by both students and staff. After negative reactions, he deleted the message. Ultimately, the racist text message led to his removal as assistant coach. Defendant Carcioppolo actively engaged in efforts both online and in other forums to encourage students and staff to protest his removal, contributing to a divisive and hostile environment within the school community. These actions were intentionally designed to mobilize public sentiment against Madrid with the specific intent to harm Plaintiff Madrid, exacerbating tensions and directly contributing to Plaintiffs' distress and the overall disruption of school activities.

    ii.    Sparked Racial Division and Retaliation: His use of the slur incited racial division among players, particularly targeting Madrid, one of only two Black players on the team, who was falsely blamed by white players for reporting the incident. Although Madrid and his family were not responsible for filing the Title VI complaint, Carcioppolo's defenders—including other coaches—treated Madrid as the reason for Carcioppolo's suspension.

56

iii.   Enabled and Emboldened Racist Culture: Carcioppolo's conduct was not isolated—it reflected and reinforced a team culture in which white players regularly used racial slurs without correction from adults. His suspension prompted protests by white players and parents, and he became a symbol of white grievance within the team and community, fostering further hostility toward Madrid and T.R.

iv.   Participation in Planning the Walkout: Though no longer actively coaching, Carcioppolo remained in communication with players and parents. On April 6, 2023—the day of the orchestrated walkout—he made a cryptic Instagram post, which, in context, was likely intended to encourage the protest in support of his firing. The walkout left Madrid and T.R., the only players of color, isolated and humiliated on the field in front of scouts and spectators.

115.   In essence, Carcioppolo's use of a racial slur was the flashpoint for a deeply troubling sequence of events. His unapologetic behavior and the community's reaction to his suspension exposed and inflamed systemic racism within the FMHS baseball program. His conduct not only violated professional and ethical standards but also directly contributed to the racially hostile and retaliatory environment that followed.

116.   ROBERT HINSON: Defendant Robert Hinson, an FMHS assistant baseball coach, actively participated in and reinforced a pattern of racially discriminatory and retaliatory conduct against Madrid, a Black student-athlete. His actions were deliberate, sustained, and contributed significantly to the hostile environment Madrid endured. His misconduct included:

i.   Retaliation and Fabrication of Misconduct: Hinson falsely accused Madrid of disrespecting an umpire during a game, urging Head Coach Burchfield to remove him from play despite no such behavior occurring, as confirmed by both Madrid's

57

father and the umpire himself. The fabricated allegation was a clear pretext for retaliation and an attempt to punish Madrid for the fallout from Assistant Coach Carcioppolo's suspension.

ii.      Unequal Treatment and Humiliation: Hinson refused to collect Madrid's protective gear at first base—a courtesy he extended to every other player— forcing the head coach to leave the dugout each time Madrid reached base. This targeted exclusion sent a clear signal to the team that Madrid was not to be treated equally or with respect.

iii.     Selective Enforcement of Discipline: Hinson participated in targeting Madrid and T.R. with new "Baseball Program Rules" that were disproportionately enforced against them compared to white teammates. During the same game in which he fabricated misconduct by Madrid, Hinson took no action against white players who committed far more blatant and aggressive infractions, such as attempting to charge the opposing dugout or throwing equipment.

iv.      Role in Orchestrating the Walkout: Hinson met on April 5, 2023 with Defendants Burchfield and Chappel and parents of white players at the Edison Country Club to plan the April 6 walkout that left Madrid and T.R. humiliated and alone on the field. On game day, Hinson was among those who led the white players in walking out when Madrid stepped into the batter's box, timing the act to maximize public embarrassment. Hinson also made public statements indicating that he was proud of the students for walking out, suggesting that he supported the disruption despite its negative impact on Plaintiffs.

v.       Undermining the Team and the Game: Hinson requested FMHS play as the

58

away team, intentionally placing his team at a competitive disadvantage to allow the walkout to occur sooner. Alongside Chappel, Hinson reshuffled the batting order to put Madrid and T.R. in prominent positions before the walkout, further enhancing the trauma and spectacle of the event.

117.    In summary, Robert Hinson was a key actor in the racial discrimination campaign against Madrid He used his position to fabricate misconduct, humiliate Madrid, treat him unequally, and ultimately help orchestrate a racially charged walkout that culminated in public trauma. His actions not only violated school policy and basic decency, but also sent a message of impunity to others, emboldening the systemic racism that plagued the FMHS baseball program.

118.    CHRISTOPHER CHAPPELL: Defendant Chappell, a coach and official within the FMHS baseball program, was an active participant in the discrimination and retaliation directed at Madrid, a Black student-athlete. Chappell consistently aligned himself with those targeting Madrid and played a central role in planning and executing racially charged acts that caused Madrid significant harm.

       i.    Supported and Enforced Discriminatory Rules: Chappell supported and enforced the new "Baseball Program Rules" issued on February 24, 2023, which were selectively and harshly applied against Madrid and the only other Black player, T.R., while white players were either not disciplined or received minimal consequences for similar or worse conduct. He also attended a parents-only meeting alongside Defendants Cato, Burchfield, and Hinson, where the use of the racial slur by white students and Carcioppolo was openly defended. At this meeting, Chappell and the other Defendants refused to allow any discussion of the racial tensions on the team, further marginalizing Madrid and his parents.

59

ii.    Role in Orchestrating the Walkout: Chappell played a direct role in orchestrating the April 6, 2023 walkout that left Madrid and T.R. humiliated on the field. The night before the game, Chappell met with Defendants Burchfield and Hinson and parents of white players to plan the protest. The next day, he mysteriously demoted multiple JV players—ensuring the team would not have enough players to continue the game after the walkout— and rearranged the batting lineup to put Madrid and T.R. in positions where the walkout would have maximum impact. Chappell then walked out of the dugout behind the white players as Madrid stepped into the batter's box, leaving Madrid and T.R. alone and publicly shamed.

iii.    As a coach responsible for the administration and management of the baseball team, Chappell failed to ensure that all laws and rules of the State Board of Education were properly observed, and that school board policies were enforced and followed.

119.    Chappell's actions were not passive; he was an intentional and willing collaborator in a campaign of racial discrimination, retaliation, and humiliation. His conduct violated his responsibilities as an educator and contributed directly to the hostile, unsafe environment that caused Madrid lasting harm.

120.    ROBERT BUTZ: Defendant Robert Butz, the Principal of FMHS, played a critical role in enabling, endorsing, and sustaining the racially discriminatory and retaliatory treatment of Madrid, a Black student-athlete at FMHS. Rather than intervening to protect Madrid or uphold school policies, Principal Butz used his authority to reinforce and legitimize the misconduct of subordinate coaches and staff.

i.    Approved Implementation of Discriminatory Rules: Principal Butz

60

approved the implementation of the new "Baseball Program Rules" issued on February 24, 2023, which were selectively applied against Madrid and another Black player, T.R., with disproportionately harsh consequences. Despite knowing these rules were never properly disseminated or signed like the original team rules, Principal Butz allowed their enforcement and made no effort to stop their racially biased application.

ii.       Participation in Retaliatory Actions: Principal Butz also participated in retaliatory actions against Madrid and his family. When Madrid was publicly suspended for six games and required to write an apology letter, Principal Butz did nothing to prevent or reverse the punishment—despite knowing that similar behavior by white players had gone unpunished. Later, Principal Butz informed Madrid's father that he was no longer welcome to throw batting practice for the team—except for Madrid and eventually T.R.—further isolating Madrid's family from the baseball program and signaling institutional hostility. On March 8, 2023, Principal Butz authorized an email sent by Cato announcing that the discriminatory February 24 rules would be rescinded and Madrid's suspension held in abeyance due to the ongoing Title VI investigation. However, this communication appeared to be more about crisis control than justice, as it was framed to appease the white parents while distancing Principal Butz and others from responsibility.

iii.      Incitement and Condonement of Racist and Hostile Conduct: Principal Butz failed to adequately address systemic issues within the school environment and failed to adequately supervise the athletic staff. Specifically, after removing Kyle Burchfield from coaching duties, Principal Butz neglected to investigate the

61

broader cultural issues within the athletic department, thereby exacerbating Plaintiff Madrid's isolation and distress. Importantly, Butz was also present at multiple meetings with coaches and players where racist behavior and rationalizations for using racial slurs were openly expressed, yet he failed to condemn the conduct or intervene to protect Madrid He remained until the end of a players' meeting on February 27, 2023, where Madrid and T.R. had to publicly defend themselves and deny involvement in Carcioppolo's firing. Principal Butz also regularly attended games and sat in the dugout with the players where he overheard racist and derogatory remarks by the players but took no action in response to that conduct.

iv.     Cancellation of the Baseball Season: Principal Butz made a decision to cancel the remainder of the baseball season following the walkout which had a disproportionately negative impact on the plaintiff. This decision not only minimized his playing time but also significantly reduced his opportunities to be scouted by college coaches. The abrupt end to the season deprived Plaintiff Madrid of crucial exposure and development in his sport, thereby hindering his athletic and academic prospects.

121.    Ultimately, Principal Butz's conduct reflected willful indifference, institutional complicity, and a failure to meet his legal and moral obligations to protect students from race-based harassment and retaliation. Rather than stepping in to address escalating discrimination, he chose to enable it—through silence, approval, and direct participation in retaliatory acts.

122.    CHRISTOPHER S. BERNIER, Superintendent neglected to enforce policies effectively. He failed to ensure that school policies were implemented in a manner that adequately

62

protected students from ongoing issues, including systemic discrimination and harassment. Bernier failed to act decisively against systemic racial issues, despite being aware of them, perpetuated a hostile environment which targeted students of color. By way of example, on March 6, 2023, Bernier—identified as an administrator—attending a meeting with Defendants Burchfield and Madrid and his parents to discuss an alleged incident involving Madrid dropping his bat. Bernier failed to intervene or challenge the unjust suspension that followed. Defendant Bernier approved, or implicitly ratified, the actions taken by the other School District Defendants, as described above. His failure to act, despite being in a position of authority, reflects institutional indifference and a broader failure of leadership to protect Madrid from race-based treatment.

123.    As a result of the aforementioned conduct, Defendants Cato, Burchfield, Carcioppolo, Hinson, Chappell, Butz and Bernier denied Plaintiffs educational services, programs and activities directly sponsored by the district and its component schools, and access to other activities and programs available to public school students, and their full learning and earning potential. As a result of the Defendants Cato, Burchfield, Carcioppolo, Hinson, Chappell, Butz and Bernier's actions and inactions, Plaintiffs suffered and will continue to suffer irreparable harm, which includes but is not limited to the loss of education and educational opportunities provided to all through the athletic program, and inability to overcome racial barriers, and diminished educational and future employment opportunities. Defendants Cato, Burchfield, Carcioppolo, Hinson, Chappell, Butz and Bernier's actions have caused and will continue to cause Plaintiffs to suffer compensable injuries entitling Plaintiffs to compensatory damages.

124.    Plaintiffs seek compensatory damages as a result of the aforementioned conduct.

### Count IV:  42 U.S.C. § 1983
### Deprivation of Property Interest in Violation of the Due Process Clause of the Fourteenth Amendment

63

**(Against Defendants Cato, Burchfield, Carcioppolo, Hinson, Chappell, Butz and Bernier)**

125.    Plaintiffs reallege and incorporate by reference the allegations set forth in the Factual Background section of this Complaint as if fully restated herein. Plaintiffs also reallege and incorporate by reference the factual allegations set forth in Count III above as if fully restated herein.

126.    Through their actions and inactions, Defendants Cato, Burchfield, Carcioppolo, Hinson, Chappell, Butz and Bernier deprived Plaintiffs of their constitutionally protected property interest to a public education by denying them their right to educational services, programs and activities directly sponsored by the district and its component schools, and access to other activities and programs available to public school students, and their full learning and earning potential. Defendants Cato, Burchfield, Carcioppolo, Hinson, Chappell, Butz and Bernier acted pursuant to a custom, de facto policy, and practice in depriving Plaintiffs of educational services, programs and activities directly sponsored by the School District and its component schools without notice or opportunity to be heard and retaliating against Plaintiffs for voicing concerns and engaging in protected activity.

127.    Defendants Cato, Burchfield, Carcioppolo, Hinson, Chappell, Butz and Bernier's lack of adequate procedures following denial of these programs and services, including cancellation of the entire season, was constitutionally inadequate. Defendants Cato, Burchfield, Carcioppolo, Hinson, Chappell, Butz and Bernier denied Plaintiffs the right to receive educational services, programs and activities directly sponsored by the district and its component schools, and access to other activities and programs available to public school students, without appropriate procedures, including notice, an opportunity to be heard, or an avenue challenge an adverse determination. As a result, Defendants Cato, Burchfield, Carcioppolo, Hinson, Chappell, Butz and

64

Bernier denied Plaintiffs notice and opportunity to be heard regarding their denial of educational services, programs and activities directly sponsored by the district and its component schools.

128.    As a result of Defendants Cato, Burchfield, Carcioppolo, Hinson, Chappell, Butz and Bernier's actions and inactions, Plaintiffs suffered and will continue to suffer irreparable harm, which includes, but is not limited to, the loss of education and educational opportunities provided to all through the athletic program, and the inability to overcome racial barriers, and diminished educational and future employment opportunities. Defendants Cato, Burchfield, Carcioppolo, Hinson, Chappell, Butz and Bernier's actions caused and will continue to cause Plaintiffs to suffer compensable injuries, entitle the Plaintiffs to compensatory damages.

129.    Plaintiffs seek compensatory damages as a result of the aforementioned conduct.

## Count V: 42 U.S.C. § 1983

## Race-Based Discrimination in Violation of the Equal Protection Clause of the Fourteenth Amendment

### (Defendants School District of Lee County, Florida and the School Board of Lee County, Florida)

130.    Plaintiffs reallege and incorporate by reference the allegations set forth in the Factual Background section of this Complaint as if fully restated herein.

131.    The 14th Amendment Equal Protection Clause to the United States Constitution guarantees that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

132.    At all relevant times, the School District of Lee County, Florida and the School Board of Lee County, Florida were acting under color of state law and were responsible for overseeing the administration and operation of Fort Myers High School and its associated educational and extracurricular programs, including athletics.

65

133.     The School District and the School Board, through their agents and employees, implemented, maintained, and/or condoned policies, customs, or practices that had the purpose and effect of treating African American students, including Plaintiff Madrid, differently and less favorably than similarly situated white students in violation of the Equal Protection Clause.

134.     The School District and the School Board, through their agents and employees, implemented, maintained, and/or condoned policies, customs, or practices, subjected Madrid, one of only two African American players on the Fort Myers High School baseball team, to racial discrimination, exclusion, retaliation, and disparate treatment based on his race, including but not limited to:

    i.     Tolerating the repeated use of racial slurs, including the "n-word," by white students and coaches without intervention or discipline;

    ii.     Creating and selectively enforcing new disciplinary rules ("Baseball Program Rules") in a manner disproportionately targeting Madrid and the only other African American player;

    iii.     Fabricating behavioral misconduct against Madrid that white players were not subjected to;

    iv.     Orchestrating, or permitting, a public walkout during a baseball game, timed to occur when Madrid took the field, leaving only the Black athletes on the field in an act of public humiliation;

    v.     Canceling the remainder of the baseball season following the walkout without considering the disparate and discriminatory impact on Madrid's educational and athletic opportunities;

    vi.     Permitting parents and white students to circumvent school rules by forming

66

an unsanctioned booster club that excluded Madrid and his family, thereby denying them equal access to school-sponsored programs and benefits;

vii.     Excluding Madrid's parents from communications, meetings, and other activities provided to white families of athletes.

135.    The discriminatory conduct described above was not isolated or accidental; rather, it was the result of a pattern, practice, or policy, known to and ratified by the School District and School Board, and carried out with deliberate indifference to the constitutional rights of Madrid and other African American students.

136.    The discriminatory treatment deprived Madrid of equal access to public educational opportunities, including participation in extracurricular activities, receipt of educational benefits tied to athletics, and opportunities for recruitment and advancement in collegiate sports.

137.    As a direct and proximate result of Defendants' violations of the Equal Protection Clause, Plaintiffs have suffered—and continue to suffer—irreparable harm, including emotional distress, humiliation, loss of educational and athletic opportunities, and long-term impacts on Madrid's academic and professional trajectory.

138.    Plaintiffs seek compensatory damages under 42 U.S.C. § 1983, including attorneys' fees pursuant to 42 U.S.C. § 1988.

**Count VI: 42 U.S.C. § 1983**
**Deprivation of Property Interest in Violation of the Due Process Clause of the Fourteenth Amendment**

**(Defendants School District of Lee County, Florida and the School Board of Lee County, Florida)**

139.    Plaintiffs reallege and incorporate by reference the allegations set forth in the Factual Background section of this Complaint as if fully restated herein. Plaintiffs also reallege and incorporate by reference the factual allegations set forth in Count V above as if fully restated

67

herein.

140.    Plaintiffs bring this claim under 42 U.S.C. § 1983 against The School District of Lee County and The School Board of Lee County, Florida for the deprivation of Madrid's constitutionally protected property interest in public education, including access to athletic programs and extracurricular activities.

141.    The Due Process Clause of the Fourteenth Amendment prohibits the State from depriving any person of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1.

142.    Under Florida law, students such as Madrid possess a legitimate claim of entitlement to public education, including participation in school-sponsored extracurricular programs that are integrated into the educational experience and essential for development, advancement, and scholarship opportunities.

143.    At all relevant times, the School District and the School Board acted under color of state law and exercised control over educational services and extracurricular programs at Fort Myers High School, including the FMHS baseball team.

144.    The School District and the School Board, by and through their agents and senior officials, deprived Madrid of his property interest in public education and school-sponsored programs by:

    a.    Removing him from baseball games and suspending him from the team without formal notice or explanation;

    b.    Enforcing selectively applied and discriminatorily implemented disciplinary rules targeting Madrid and other Black athletes;

    c.    Condoning an alternate, whites-only booster program that excluded Madrid's

68

parents from participation;

d.      Canceling the remainder of the baseball season in retaliation for Madrid's protected conduct and without considering the impact on his educational trajectory;

e.      Refusing to provide Madrid or his parents with any pre-deprivation hearing, post-deprivation remedy, or meaningful opportunity to contest these adverse actions.

145.    These deprivations occurred without adequate notice, hearing, explanation, or procedural safeguards, in violation of the requirements set forth by the Supreme Court.

146.    The deprivation of athletic participation and related opportunities carried substantial educational consequences for Madrid, including:

a.      Loss of visibility to college recruiters and scouts;

b.      Loss of team-based leadership development and peer interaction,

c.      Emotional distress, humiliation, and social ostracism, and

d.      Diminished competitiveness for athletic and academic scholarships.

147.    The School District's and School Board's actions reflect an established custom or practice of excluding students of color from school programs without due process, and were implemented with deliberate indifference to Madrid's constitutional rights.

148.    As a direct and proximate result of the School District's and the School Board's unlawful conduct, Madrid has suffered and will continue to suffer damages, including lost educational opportunities, emotional distress, reputational harm, and loss of future academic and professional prospects.

149.    Plaintiffs seek an award of compensatory damages and attorneys' fees and costs under 42 U.S.C. §§ 1983 and 1988.

**Count VII: 42 U.S.C. § 1983**
**Municipal Liability under Monell v. Department of Social Services**

**(Against the School District of Lee County, Florida and the School Board of Lee County, Florida)**

150.    Plaintiffs reallege and incorporate by reference the allegations set forth in the Factual Background section of this Complaint as if fully restated herein.

151.    Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 against the School District of Lee County and the School Board of Lee County, Florida for the violation of Madrid's constitutional rights under the Fourteenth Amendment.

152.    The School District and School Board are local government entities and final policymakers responsible for the administration, oversight, and discipline of public education in Lee County, including Fort Myers High School and its extracurricular and athletic programs.

153.    At all relevant times, the School District and School Board acted under color of state law through their officials, employees, and agents.

154.    The School District and School Board are liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because the constitutional violations suffered by Madrid were caused by:

a.    An official policy formally adopted or promulgated by the School Board or District;

b.    A widespread, persistent custom or practice of discrimination and retaliation against African American students and their families;

c.    The decision or deliberate indifference of final policymakers—including the Superintendent, Principal, and Athletic Director—who had actual or constructive knowledge of the misconduct but failed to take corrective action.

155.    Specifically, and in addition to the conduct detailed above in the Factual

70

Background, the School District and the School Board maintained or permitted the following unconstitutional practices:

    a.    Tolerating and excusing the use of racial slurs by students and staff;

    b.    Selectively enforcing disciplinary policies to target African American students, including the issuance and unequal application of "Baseball Program Rules";

    c.    Failing to intervene or protect Madrid from repeated racial harassment and retaliation;

    d.    Planning, permitting, and endorsing a racially motivated "walkout" that publicly humiliated Madrid and excluded him from an official school activity;

    e.    Canceling the remainder of the baseball season without regard for the disproportionate impact on the only Black players; and

    f.    Failing to implement meaningful training, supervision, or discipline to prevent race-based discrimination or retaliation.

156.    These actions and omissions, carried out pursuant to the School Board's and the School District's policies and customs, reflect deliberate indifference to the constitutional rights of African American students and their families.

157.    As a direct and proximate result of the School District's and the School Board's unlawful policies, customs, and decisions, Madrid suffered significant and ongoing harm, including emotional distress, reputational damage, lost educational and athletic opportunities, diminished college recruitment prospects, and other compensable injuries.

158.    Plaintiffs seek compensatory damages for these injuries, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

71

**Count VIII: Florida Educational Equity Act, Fla. Stat. §§ 1000.05 et seq., and Fla. Admin. Code Ann R. 6A-19.001 et seq. 1983**

**(Defendants School District of Lee County, Florida and the School Board of Lee County, Florida)**

159.    Plaintiffs reallege and incorporate by reference the allegations set forth in the Factual Background section of this Complaint as if fully restated herein.

160.    The Florida Educational Equity Act prohibits the exclusion of or discrimination against students on the basis of race. *See* Fla. Stat. § 1000.05(2)(a). It also provides that "No person in this state shall, on the basis of race … be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any public K-20 education program or activity … conducted by a public educational institution that receives or benefits from federal or state financial assistance." *Id.*

161.    The School District's and the School Board's actions and inactions, as entities and by and through their agents and officials, to exclude Plaintiffs from educational services, programs and activities directly sponsored by the district and its component schools, and access to other activities and programs available to public school students, violate the Florida's educational equity act. The School District's and the School Board's policies and practices as described herein violate the rights of Plaintiffs under the Florida educational equity act.

162.    As a result of the School District's and the School Board's actions and inactions, as entities and by and through their agents and officials, Plaintiffs suffered and will continue to suffer irreparable harm, which includes, but is not limited to, the loss of education and educational opportunities provided to all through the athletic program, and inability to overcome racial barriers, and diminished educational and future employment opportunities. Defendants' actions caused and will continue to cause Plaintiffs to suffer compensable injuries, entitling the Plaintiffs to compensatory damages.

72

163.     Plaintiffs seek declaratory and injunctive relief to remedy these ongoing violations, and also seek compensatory damages, attorneys' fees and costs, as provided by the statute.

## Count IX: Equal Educational Opportunities Act of 1974 ("EEOA")

### (Defendants School District of Lee County, Florida and the School Board of Lee County, Florida)

164.     Plaintiffs reallege and incorporate by reference the allegations set forth in the Factual Background section of this Complaint as if fully restated herein.

165.     Following the sending of a racist text by assistant coach Carcioppolo, an agent of the defendant School District and School Board, Carcioppolo, deleted the communication. This incident exacerbated racism among team members, leading white athletes to unjustly blame Madrid and the other student of color for reporting the text to school authorities, despite lacking evidence. Team members disclosed to the Athletic Director, coaches, and school administration that racial slurs were routinely used among team members.

166.     Upon learning that Plaintiff Madrid was targeted and subjected to racist treatment, the School District, acting through its agents, not only failed to take any remedial action or to so much as to inquire into the impact of the treatment on Plaintiff Madrid, but, instead, indicated that Plaintiff was a problem because he was bothered by such treatment.

167.     After the February 14 incident, the Defendants held a series of meetings with the players but failed to address the trauma caused by the racism directed at Plaintiff Madrid Instead, they further targeted Plaintiff Madrid, both on the field and through reports of fabricated behavioral violations. White student-athletes were not subjected to such treatment. Observing the adults' treatment of the Plaintiff, white athletes continued to use racist and hostile language towards Plaintiff Madrid

168.     The encouragement of white students to treat Plaintiff Madrid in a racist and disparate

73

manner included the false assertion by white students that Plaintiff Madrid had caused the firing of the coach.

169.    The disparity persisted across all facets of athletic and educational life.

170.    Madrid was socially ostracized during games, team dinners, and school events-all overseen by the School District and the School Board. Furthermore, students and staff directed race and color-based negative remarks, as well as comments of a retaliatory nature, towards Plaintiff Madrid and his parents. Additionally, the School Board and the School District permitted other parents to directly provide financial benefits to the baseball program, bypassing the authorized Athletic Booster Club. The Club purposely excluded plaintiffs from its activities following the events described herein fostered the blaming of plaintiffs for the firing of the coaches. This Club operates in accordance with School District policy and adheres to specific rules, suggesting that such actions were taken to obscure the discrimination.

171.    Furthermore, Madrid's parents were targeted for speaking out about the discrimination and prejudice they encountered. When they reported the unfair treatment and the widespread, accepted use of the N-word by players and coaches towards Madrid to the Defendants, they found themselves ostracized at parent events and deliberately excluded from communications by the Defendants. Other parents, with the Defendants' knowledge and approval, began to sponsor team events privately rather than through the Authorized Athletic Booster Club, intentionally excluding Madrid's parents from these events and activities. This represented an organized effort by the Defendants to retaliate against the plaintiffs and ostracize Madrid and his parents, continuing to ignore the discrimination and resulting trauma.

172.    The incidents, issues, and complaints continued, when, on April 5, 2023, Principal Robert Butz, an agent of defendants School District and School Board removed Burchfield from

74

his coaching duties. Once again, Defendant School District and School Board School District took an "isolation" approach to the systemic racism evident at the school, particularly the athletic department. Instead of investigating the culture of racism and addressing the trauma and pain experienced continually by plaintiffs, Defendants sought to quickly "close the book on the incidents."

173.    On the day following Coach Burchfield's removal, a baseball game was scheduled between FMHS and Estero High School. Scouts and recruiters were expected at the game to evaluate players for scholarships and university recruitment. In advance, FMHS coaches who acted as agents of defendants, staff, students, and other parents planned a "walkout" to protest the coach's removal. District faculty and staff, including Hinson and Chappell, joined the players in walking out, exposing Plaintiff Madrid to disparagement, public humiliation, and trauma. Plaintiff Madrid and another student-athlete of color were left standing alone on the field, while the other players and adults entrusted with their care deliberately walked off. These two minors bore the brunt of the Defendants' discriminatory victim-blaming. Recruiters and scouts witnessed the treatment of Madrid and the other student of color.

174.    After the "walkout", Defendants School Board and School District again failed to investigate the impact of the events on the plaintiffs. The suffering of Plaintiff Madrid and his parents were never considered by the Defendants, despite the outrageous nature of the event.

175.    After the "walkout", the remaining games of the season were canceled. In devising a remedy for the "walkout", the Defendants School District and School Board School Board and School District did not consider the impact of this decision on Plaintiff Madrid As a result, the plaintiff, who was already a victim of the staged "walkout" that isolated him and another student of color amidst racist rhetoric, faced further punishment. This decision deprived him of the

opportunity to play baseball that year, hindered his development as a player, and eliminated his chance to showcase his talents to college scouts and recruiters. The School District and School Board, acting under color of law, have endorsed the discrimination, allowing it to spread and intensify within the FMHS community. The actions of the Defendants were not only insufficient to fulfill their legal obligations to Madrid, his parents, and others subjected to overt discrimination and retaliation, but the actions of the Defendants also worsened the harm inflicted.

176.   Defendant School District of Lee County and the School Board of Lee County Florida are bound by the provisions of the EEOA, 20 U.S.C. § 1703. Section 1703 of the EEOA states in relevant part:

No state shall deny equal educational opportunity to an individual on account of his or her race color sex or national origin by-

> a.      the deliberate segregation by an education agency of students on the basis of race, color, or national origin among or within schools; [and]
>
> b.      the failure of an education agency that has formally practiced such deliberate segregation to take affirmative steps, consistent with part 4 of this subchapter, to remove the vestiges of a dual school system[.]
>
> 20 U.S.C. § 1703(a), (b).

177.   Through their actions and inactions, including the act of excluding these students from equal opportunities at public school, the defendants have denied Plaintiffs equal educational opportunity an account of their color by deliberately segregating them from their peers because of their color. Defendants' specific actions which had the effect of excluding Plaintiff Madrid from educational opportunities including extracurricular sports opportunities include the following:

178.   Through their actions and inactions, including the act of excluding these students from equal opportunities at public school, the defendants have denied Plaintiffs equal educational opportunity an account of their color by deliberately segregating them from their peers because of

76

their color. Defendants' specific actions which had the effect of excluding Plaintiff Madrid from educational opportunities including extracurricular sports opportunities include the following:

a.      Fostering an atmosphere in which Assistant Coach Carcioppolo determined that sending a text including the word "nigga" was appropriate.

b.      Failing to so much as interview the plaintiff or the other student of color in the investigation of the aforementioned text.

c.      Failing to address the trauma experienced by the plaintiff due to the text and subsequent treatment of the plaintiff.

d.      Tolerating harassment by team members and parents of team members of plaintiff and plaintiff's parents because of his race and complaints he and his parents made about his treatment. Through Defendants' agents, Plaintiff Madrid and his parents were told that "everyone has suffered," or words of similar effect, ignoring the discriminatory nature of the events described and their impact on the plaintiff, and were continually subjected to use of the n-word at meetings.

e.      Treating Plaintiff in a disparate manner by not allowing him to play or giving him less desirable assignments during games because of his color and complaints about his treatment.

f.      Fabricating accusations against the Plaintiff. Specifically, the Plaintiff was falsely accused of improper conduct at a game, and subjected to harsh and arbitrary treatment at games and practices throughout the season.

g.      Orchestrating a "walkout" during a key game when scouts were present and leaving the plaintiff and the only other student of color standing alone on the baseball field.

h.      Failing to consider the punitive impact on Plaintiff and the other student of color in canceling the baseball season.

i.      Failing to consider or address the emotional impact of the walk-out on Plaintiff and the resultant trauma to him.

179.    As a direct result of Defendants' actions and inactions as described above, Plaintiff Madrid has suffered emotional harm. He has been under the care of psychologists as a direct result of the harm incurred and continues under that care.

180.    White students were not so treated. They were not subject to harassment, were not blamed for the firings that occurred. They were not the victims of manufactured disciplinary infractions. They were not left standing alone on a baseball diamond wondering what was occurring. By virtue of creating a different athletic system for students of color such as Plaintiff Madrid and the white students, Defendants effectively segregated these students illegally. Defendants denied Plaintiff equal educational opportunities on account of the color of his skin by failing to take appropriate action to overcome race-based barriers that impede these students' equal participation in Defendants' public-school programs.

181.    Defendants' failure to take appropriate action includes but is not limited to:

a.      A permissive environment in which the use of derogatory racial terms was tolerated and condoned;

b.      Inconsistent discipline with more infractions and harsher punishments being meted out to students of color including Plaintiff Madrid;

c.      Intentionally allowing rampant threats, hostility, and harassment to occur against students of color, including the Plaintiff Madrid;

d.      Intentionally exposing students of color including the Plaintiff Madrid to

78

known harassment, embarrassment, and disparagement by other students, faculty, and staff;

e.    Retaliatory application of discipline and revisions of the Codes of Conduct unfairly targeted students of color including Madrid;

f.    Reduced playing time and canceled seasons on the basis of racism and discrimination and in retaliation for engaging in protected activities; and,

g.    Condoned and participated in retaliatory acts against Madrid and his parents by publicly humiliating and shaming Madrid and his parents, and condoning and/or encouraging others to do the same.

182.    As a result of the Defendants' discriminatory and retaliatory conduct, they denied Madrid a free, non-discriminatory public education, the opportunity to learn the skills and subject matter set forth in Florida standards, and access to other activities and programs available to students enrolled in public schools, thus impacting his full learning and earning potential.

183.    By failing to take appropriate action to address race and color-based harassment and discrimination, which impeded Madrid's equal participation in the Defendants' instructional programs, Defendants denied Madrid an equal education.

184.    This violation of the Equal Educational Opportunities Act (EEOA) and state law was due to his color, and in retaliation against Madrid and his parents for engaging in protected activities. Defendants' conduct violates the rights of Plaintiffs under the EEOA. As a result of Defendants' actions and inactions, Plaintiffs have suffered and will continue to suffer irreparable harm, which includes but is not limited to the loss of education and educational opportunities provided to all through the athletic program to plaintiff, an inability to overcome illegal barriers on the basis of color, trauma, and diminished educational and future employment opportunities.

185.     Plaintiffs request declaratory and injunctive relief to remedy Defendants' ongoing violations of these rights.

### Count X: Violation of Article IX, ¶ 1 of the Florida Constitution

### (Defendants School District of Lee County, Florida and the School Board of Lee County, Florida)

186.     Plaintiffs reallege and incorporate by reference the allegations set forth in the Factual Background section of this Complaint as if fully restated herein.

187.     As described herein, the School District and the School Board denied students of color and parents, like Plaintiffs, equality before the law and deprived them of their right to a uniform and high-quality education and access to equivalent educational programs and services because of their race and color in violation of Article IX, Section1 of the Florida Constitution. As a result of these violations, Plaintiffs have suffered the harms and damages alleged herein.

188.     As a result of these violations, Plaintiffs have suffered the harms and damages alleged herein.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this court:

 a. Assume jurisdiction over this matter;

 b. Declare that Defendants' acts and omissions violate Plaintiffs' rights under the EEOA, Title VI of the Civil Rights Act of 1964; the 14th Amendment Equal Protection and Due Process Clauses; the Florida Educational Equity Act; and the Florida Constitution;

 c. Declare Defendants to be liable for Plaintiffs' damages;

 d. Enter injunctive relief in the form of:

  i. Requiring Defendants to adopt policies, procedures, and training to end

defendants ongoing violations of the EEOA, Title VI, the US constitution and state law, and to publicize to the community at large and to class members, in a language and form of communication that they understand those new policies and procedures;

   ii.  Allowing Madrid equal access to and participation in programs and activities offered by FMHS, including the baseball program; and

   iii.  Requiring defendants to adopt policies and procedures to provide students with notice and an opportunity to be heard regarding educational decisions and disciplinary decisions.

e.     Award compensatory damages to Plaintiffs for lost educational opportunities and employment opportunities as a result of the Defendants' conduct, and award damages for emotional distress, mental anguish, and or related emotional damages that Plaintiffs have incurred as a result of Defendants' unlawful conduct and violations of Title VI, and the Equal Protection and Due Process clauses of the 14th Amendment;

f.     Award Plaintiffs reasonable attorney fees and cost pursuant to 42 USC §1988 and Fla. Stat. § 1000.05(7); and

g.     Grant any other relief the court deems just in reasonable.

Respectfully submitted,

*/s/ Christopher O'Neal*
Christopher O'Neal, Esq
State Bar No. 910201
chris@bencrump.com
Natalie Jackson, Esq
State Bar No. 646075
Natalie@bencrump.com
**BEN CRUMP LAW PLLC**
122 S. Calhoun Street
TALLAHASSEE, FL 32301

81

-AND-

**Marion M. Reilly, Esq** *(Pro Hac Forthcoming)*
Texas State Bar No. 24079195
Federal ID. No.  1357491
E-Mail:  marion@mrtrial.com
MARTINEZ REILLY, LLP
3636 S. Alameda, Ste. B119
 Corpus Christi, Texas 78412
Telephone:  361.273.6771
Facsimile:   361.704.8355
**Service Email address
Service@mrtrial.com

-AND-

**Joseph E. Hoffer, Esq (***Pro Hac forthcoming***)**
State Bar No. 24049462
 Federal ID No. 2006011
Email: jhoffer@slh-law.com
SCHULMAN, LOPEZ, HOFFER & ADELSTEIN, LLP
845 Proton Road
San Antonio, Texas 78258
Telephone:  210-538-5385
Facsimile:  210-538-5384

-AND-

**Vince Colella, Esq (***Pro Hac forthcoming***)**
Federal ID No. P49747
Email: Vcolella@mosscolella.com
MOSS & COLELLA
28411 Northwestern Hwy, 11th FL Southfield, MI 48034
Telephone:  248.945.0100
Facsimile:  248.945.1801

**ATTORNEYS FOR PLAINTIFFS**

82