**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**FORT MEYERS DIVISION**

| | | |
|---|---|---|
| MICHAEL TUCKER, Individually & | § | |
| AZUREE'D TUCKER, Individually & on | § | |
| behalf of M.T., a Minor Child | § | |
|     *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. <u>2:24-cv-142</u> |
| | § | |
| THE SCHOOL | § | |
| BOARD OF LEE COUNTY, FLORIDA; | § | |
| STEPHAN CATO; KYLE BURCHFIELD; | § | |
| ALEX CARCIOPPOLO; ROBERT | § | |
| HINSON; CHRISTOPHER CHAPELL; | § | |
| ROBERT BUTZ; and CHRISTOPHER S. | § | |
| BERNIER, Ph.D. | § | |
|     *Defendants.* | § | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Plaintiffs MICHAEL TUCKER, AZUREE'D TUCKER, and MADRID TUCKER, and file their Response to Defendants', The School Board of Lee County, Florida, Stephan Cato, Kyle Burchfield, Alex Carcioppolo, Robert Hinson, Christopher Chapell, Robert Butz; and Christopher S. Bernier, Motion to Dismiss Plaintiffs' Third Amended Complaint. In support thereof, Plaintiffs would respectfully show the Court the following:

## INTRODUCTION

1.    The principle of nondiscrimination is a cornerstone of justice, fairness, and equality within public educational institutions. Doc. 72 ¶ 1. Unfortunately, the public schools within The School District of Lee County, Florida (the "School District") and under the authority of the School Board of Lee County, Florida (the

1

"School Board") violate this principal time and time again. *Id.* This lawsuit underscores a disturbing narrative of race-based and racially motivated bias and exclusion within the School District's Fort Myers High School and its sports program, where Madrid Tucker, an African American student-athlete, encountered numerous obstacles solely based on his race. *Id.* Madrid experienced and suffered from unequal treatment in access to both educational resources and opportunities, from discriminatory practices in team selection, coaching decisions, and disciplinary action as well as unlawful retaliation against both Madrid and his parents for asserting their rights. *Id.* Madrid was unlawfully targeted and discriminated against, including but not limited to being peppered with racial slurs, threats, and derogatory remarks, by school officials, administration and others the School Board could control, where the School Board both knew of, allowed and through inaction tolerated and even fostered a discriminatory and racially hostile educational environment to the detriment of Madrid's legal rights. *Id.* Madrid experienced institutionalized race-based discrimination through the Fort Myers High School's athletic department and the School Board. *Id.*

## **AUTHORITIES AND ARGUMENTS**

2.　Under Rule 8 and *Twombly/Iqbal*, a complaint survives dismissal if its well-pleaded facts, accepted as true, plausibly show entitlement to relief. Detailed evidence is unnecessary at this stage; Plaintiffs must only allege enough facts to allow a reasonable inference of liability. FED. R. CIV. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 57 (2007)).

**I.      THE THIRD AMENDED COMPLAINT SATISFIES FED. R. CIV. P. 8(a) & 10(b)**

3.      Defendants' allegation that the Third Amended Complaint, Doc. 73, ("TAC") constitutes a "shotgun pleading" is incorrect. First, the TAC organizes each cause of action into its own distinct count. Each count identifies the specific Defendant(s) to whom it applies and limits incorporation to the general Factual Background and the allegations relevant to that claim, *see, e.g.,* TAC ¶¶ 84, 107, 130, 150, 159, 164, 186, except where specific factual allegations from certain Counts are necessarily incorporated because they enhance the allegations or are derivative causes of action, *see, e.g.,* TAC ¶¶ 97, 139. This structure eliminates any ambiguity regarding which facts support each cause of action. This elimination of ambiguity is not a "shotgun pleading" approach.

4.      Second, the TAC does not lump all Defendants together. Instead, it clearly delineates who the claim is asserted by and who it is asserted against and spells out the actions of the respective Defendants sufficient to give Defendants "adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015) (citing *Sledge v. Goodyear Dunlop Tires N. Am., Ltd.*, 275 F.3d 1014, 1018 n.8 (11th Cir. 2001); *see, also* TAC pg. 41, 48, 51, 63-64, 65, 67, 69-70, 72. The counts, claims, defendants, and relevant paragraph citations are summarized in the following table for convenience and ease:

| Count | Claim | Defendant | Relevant Paragraphs |
|---|---|---|---|
| Count I | Title VI for Madrid | School District and School Board | 81-96 |

| Count II | Title VI for Michael and Azuree'D | School District and School Board | 81-83, 97-106 |
|---|---|---|---|
| Count III | 1983 Equal Protection | Cato | 14, 22, 25, 26, 29- 31, 33, 38, 40, 41, 43, 48, 64, 66, 50-53, 72, 107-111, 123 |
| Count III | 1983 Equal Protection | Burchfield | 5, 15, 21-23, 25, 26, 29-69, 73, 107-110, 112, 113, 123 |
| Count III | 1983 Equal Protection | Carcioppolo | 3, 4, 19, 20-24, 29-33, 36, 38, 53, 60, 63, 65, 69, 75, 76, 107-110, 114, 115, 123 |
| Count III | 1983 Equal Protection | Hinson | 18, 21, 22, 25, 29-38, 50, 62-64, 67-69, 77, 78, 107-110, 116, 117, 123 |
| Count III | 1983 Equal Protection | Chappell | 16, 22, 79, 80, 107-110, 118, 119, 122, 123 |
| Count III | 1983 Equal Protection | Butz | 17, 22, 25, 26, 28, 30, 31, 32, 33, 38, 41, 45, 50, 57, 61, 64, 81, 82, 107-110, 120, 121, 123 |
| Count III | 1983 Equal Protection | Bernier | 13, 83, 84, 107-110, 122, 123 |
| Count IV | 1983 Due Process | Cato | 14, 22, 25, 26, 29- 31, 33, 38, 40, 41, 43, 48, 64, 66, 50-53, 72, 125-128 |
| Count IV | 1983 Due Process | Burchfield | 5, 15, 21-23, 25, 26, 29-69, 73, 125-128 |
| Count IV | 1983 Due Process | Hinson | 18, 21, 22, 25, 29-38, 50, 62-64, 67-69, 77, 78, 125-128 |
| Count IV | 1983 Due Process | Chappell | 16, 22, 79, 80, 125-128 |
| Count IV | 1983 Due Process | Butz | 17, 22, 25, 26, 28, 30, 31, 32, 33, 38, 41, 45, 50, 57, 61, 64, 81, 82, 125-128 |
| Count V | 1983 Equal Protection | School District and School Board | 13, 17, 22, 25, 26, 28, 30, 31, 32, 33, 38, 41, 45, 50, 57, 61, 64, 81, 82, 83, 84, 130-138 |
| Count VI | 1983 Due Process | School District and School Board | 13, 17, 22, 25, 26, 28, 30, 31, 32, 33, 38, 41, 45, 50, 57, 61, 64, 81, 82, 83, 84, 139-149 |
| Count VII | 1983 Monell | School District and School Board | 13, 17, 22, 25, 26, 28, 30, 31, 32, 33, 38, 41, 45, 50, 57, 61, 64, 81, 82, 83, 84, 150-158 |
| Count VIII | Florida Educational Equity Act | School District and School Board | 13, 17, 22, 25, 26, 28, 30, 31, 32, 33, 38, 41, 45, 50, 57, 61, 64, 81, 82, 83, 84, 159-163 |

| Count IX | EEOA | School District and School Board | 13, 17, 22, 25, 26, 28, 30, 31, 32, 33, 38, 41, 45, 50, 57, 61, 64, 81, 82, 83, 84, 164-185 |
| Count X | Florida Constitution | School District and School Board | 13, 17, 22, 25, 26, 28, 30, 31, 32, 33, 38, 41, 45, 50, 57, 61, 64, 81, 82, 83, 84, 86-188 |

5.    These allegations identify, in detail, the conduct of each individual defendant—including the words they spoke, the acts they took, the retaliatory decisions they made, and their personal involvement in the April 6 walkout and its aftermath. *See supra* ¶ 17. This satisfies the Eleventh Circuit's requirement that a complaint provide each defendant with fair notice of their specific actions.

6.    The TAC also resolves the concerns highlighted by the Magistrate Judge's Report and Recommendations regarding the prior complaint. For example, the Magistrate Judge observed "there [was] no indication that the School District is a party in any way to this case." Doc. 54 at 10. The TAC eliminates this ambiguity by expressly naming *both* the School District and the School Board as defendants and by setting forth detailed, defendant-specific allegations that clarify their respective roles and responsibilities. TAC ¶¶ 1, 11, 84-106.[1]

7.    The Magistrate Judge further noted "for a school district to be liable for damages, an 'appropriate person' must have had actual notice of the

---

[1] Although Defendants ask the Court to disregard the claims against the School District, despite the Magistrate Judge's statements suggesting inclusion is necessary, Florida Statutes §§ 1001.41, 1001.42, and 1001.43 do not insulate the District from suit. These provisions simply recognize that the School Board is a corporate body capable of being sued; they do not eliminate the District as a proper party. Courts in both state and federal jurisdictions have long permitted claims to proceed against Florida school districts. *See, e.g., Parsons v. Okaloosa Cty. Sch. Dist.*, No. 3:09-cv-254, 2010 WL 1753152 (N.D. Fla. Mar. 30, 2010); *Oaks Farms Food & Distribution Servs., LLC v. Sch. Dist. of Lee Cty.*, 541 F. Supp. 3d 1334 (M.D. Fla. 2021). At a minimum, the well-pleaded factual allegations directed at the District must be accepted as true as for the Board and cannot be swept aside at this stage.

harassment and an opportunity to rectify any violation." *Brooks v. Skinner,* 139 F. Supp. 3d 869, 883 (S.D. Ohio 2015) (*citing Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 290 (1998)). An "'appropriate person' is an official 'who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [school district's] behalf.'" *Id.* (*quoting Gebser,* 524 U.S. at 290). "In applying *Gebser,* appellate courts have required actual knowledge by the school board itself, the school superintendent, or a school principal." *Id.* The TAC corrects any deficiencies and details the factual allegations and knowledge of the School Board and School District, and adds a plethora of specific facts regarding Principal Butz and Superintendent Bernier. *See, e.g.,* TAC ¶¶ 81(i)-(iv), 82, 83, 88, 89 (a)-(g), 90(a)-(d), 91(a)-(aa), 92, 93, 94, 95. Likewise, the TAC clarifies the § 1983 counts, identifying the particular defendants and the specific claims lodged against them, also correcting any deficiencies noted with the previous complaint. *Supra* ¶ 17.

8.      Third, the TAC identifies the specific policies, customs, retaliatory decisions, and failures to act that form the basis of the claims against the School District and School Board. TAC ¶¶ 81, 82, 83, 89, 91. It alleges with particularity how the relevant policymakers had actual notice of racial harassment, discrimination, and retaliation, and how they failed to take corrective steps. *Id.*

9.      The TAC satisfies the Federal Rules and is not a shotgun pleading under *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313 (11th Cir. 2015).

## II.    THE THIRD AMENDED COMPLAINT STATES SUFFICIENT FACTS TO ESTABLISH LIABILITY AGAINST THE SCHOOL BOARD.

### A.    There are Sufficient Allegations of the School Board's Discriminatory Intent and Deliberate Indifference.

10. Defendants argue that there are no operative facts alleged against the School Board for deliberate indifference. This is categorically untrue. Notably, this claim is brought only for the School Board where it is waived as to the School District.

11. Federal courts have consistently recognized that deliberate indifference to racial harassment can constitute intentional discrimination under Title VI of the Civil Rights Act of 1964. Multiple circuit courts have found sufficient allegations of deliberate indifference where plaintiffs demonstrate: (1) actual knowledge by school officials of racial harassment, (2) severe, pervasive, and objectively offensive harassment that deprives students of educational access, (3) school authority to address the harassment, and (4) a clearly unreasonable response or lack thereof. *See, e.g., Ricketts v. Wake County Public School Sys.*, 125 F.4th 507 (4th Cir. 2025) (election-related racial harassment and inadequate administrative response survived dismissal); *DJ by and through Hughes v. Board of Henrico Cnty.*, 488 F.Supp.3d 307 (E.D. Va. 2020) (race-driven assaults and minimal corrective action established viable claims).

12. Circuit courts nationwide reached consensus that deliberate indifference constitutes intentional discrimination under Title VI. *See., e.g., Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655 (2d Cir. 2012); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247 (3d Cir. 2014); *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398 (5th Cir. 2015); *Ricketts v. Wake County Public School Sys.*, 125 F.4th 507 (4th Cir. 2025); *Mungai v. University of Minnesota*, 141 F.4th 507 (8th Cir. 2025). The rationale

is sound: when school administrators with authority to address discrimination "are made aware of egregious forms of intentional discrimination and make the intentional choice to sit by and do nothing, they can be held liable under § 601" because "choice implicates intent." *Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty, Ok.,* 334 F.3d 928, 933 (10th Cir. 2003); *Ricketts v. Wake County Public School Sys.,* 125 F.4th 507 (4th Cir. 2025) ((reversing dismissal where school officials had repeated notice of race-based harassment and responded unreasonably).

13.    Here, the TAC alleges that both the School Board and the School District received ongoing, detailed notice for months through multiple channels, including their own Title VI investigators, school administrators acting as their agents, emails and calls from Plaintiffs, and direct reports from staff. TAC ¶¶ 22–24, 26, 29-33, 50.  The TAC alleges that Athletic Director Cato, Principal Butz, Superintendent Bernier, and other administrators received repeated reports of racial slurs, retaliation, fabricated allegations, and hostile conduct toward Madrid and other Black students. See TAC ¶¶ 24–26, 30–37, 72–83. These officials are "appropriate persons" under *Gebser v. Lago Vista Independent School District* with authority to address and correct the misconduct. 524 U.S. 274 (1998).

14.    In *Doe v. School Board of Broward County, Florida,* 604 F.3d 1248 (11th Cir. 2010), the court determined that a school principal was an "appropriate person" to receive actual notice under Title IX. A principal, "as the highest-ranking school official on site" was "'high enough on the chain-of-command' to impute liability to the School Board.'" *Id.* (*citing Davis v. Monroe County Bd. of Educ.,* 526 U.S, 629, 653-54 (1999)).  The *Doe v. School Board of Broward County, Florida* court

there emphasized that an "appropriate person" "could initiate corrective action" or place "other restrictions" on an offending teacher," "even if he could not take final adverse employment actions such as terminating the teacher." *Id.* The allegations as to Superintendent Bernier, Principal Butz, and Athletic Director Cato create, at a bare minimum, a question of fact sufficient to deny the motion to dismiss at this stage. TAC ¶¶ 22–24, 26, 29-33, 50, 72-83, 154.

15.     The School Board and School District were also formally notified as early as February 2023 when the FMHS secretary and assistant principals—acting expressly as School District/School Board agents—initiated a "mediation" with Madrid, demonstrating School District-level involvement and awareness. TAC ¶¶ 22–24. The School District's investigators then repeatedly met with Madrid and his parents regarding racial retaliation and fabricated discipline, TAC ¶¶ 45–50, giving the School District real-time, first-hand knowledge of escalating discrimination.

16.     The School Board likewise received notice through the formal Title VI investigation it initiated, TAC ¶ 50, through communications involving its Principal and Athletic Director, and through administrators who reported upward. TAC ¶¶ 25, 26, 28, 30-33, 41. The TAC further pleads that the Board and School District were informed before the walkout that it was planned and racially charged, as evidenced by School District personnel alerting a former SRO to standby for anticipated "trouble." TAC ¶ 64. Thus, unlike *Ricketts*, where administrators simply ignored external complaints, the TAC alleges that the School Board and School District had direct institutional knowledge of ongoing

discrimination and were repeatedly informed by their own employees—but chose to take no corrective action.

17.     The TAC's allegations similarly surpass the notice standard found sufficient in *DJ by and through Hughes v. Board of Henrico Cnty.*, 488 F. Supp. 3d 307, 320 (E.D. Va. 2020), focusing on what the District and Board themselves knew. In *Hughes*, actual notice existed because harassment occurred "in plain view" of school staff and officials were aware of prior race-based incidents. 488 F. Supp. 3d at 320. Here, the School District and School Board had far more explicit notice, including repeated direct reports of racial slurs, retaliation, and fabricated misconduct that were conveyed to the Principal (the School Board's agent), the Athletic Director (the School District's agent), and formal District Title VI investigators. TAC ¶¶ 20-24, 26, 28-33, 49, 50, 58, 61, 70, 71, 81-83.

18.     These officials consistently reported up the administrative chain and acted within their authority as agents of the School Board and School District, thereby imputing knowledge to both. The District's own official investigative report acknowledged widespread racial tensions and use of slurs, rendering any claim of ignorance implausible. TAC ¶¶ 39, 71.[2] Moreover, the District and Board received explicit notice—before the April 6 walkout—that a coordinated action was planned, TAC ¶¶ 62–64. The body-camera statement from Defendant Cato that "we knew the walkout was going to be bad" reflects not only individual

---

[2] Although Defendants attempt to skew this Report in a positive light, the TAC's allegations cannot be ignored wholesale, and all factual inferences must be drawn in the light most favorable to the Plaintiffs at this stage of the proceeding. *Ashcroft*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

knowledge, but institutional awareness attributable to the District and Board. TAC ¶ 72(a)(i). Unlike *Hughes*, where teachers merely witnessed misconduct, here the District and Board were not only aware of racially hostile behavior, but were informed of its escalation, informed of its retaliatory intent, involved in both, and placed on direct notice through Title VI processes, and notified of the impending walkout, and nevertheless allowed it to proceed.

19.    Discriminatory intent is sufficiently pled. Courts within the Eleventh Circuit apply the *Arlington Heights* factors to establish discriminatory intent through circumstantial evidence. As explained in *City of Fort Lauderdale v. Scott,* "possible indicia of discriminatory intent include a clear pattern of disparate impact, unexplainable on grounds other than race; the historical background of the challenged decision or the specific events leading up to the decision; procedural or substantive departures from the norm[.]" 88 F.Supp.2d 1279 (11th Cir. 2012). The discriminatory purpose standard requires that race be "a motivating factor in the decision," not necessarily the sole or primary factor. As recognized in *Baker v. City of Kissimmee*, discrimination occurs when race "has been a motivating factor in the decision," and "discriminatory intent is simply not amenable to calibration. It either is a factor that has influenced a [] choice or it is not." 645 F. Supp. 571 (11th Cir. 1986) (citing *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256 (1979), and *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252 (1977)). These factors are sufficiently alleged:

**Clear Pattern of Disparate Impact:**

11

- **TAC ¶¶ 16, 20–22** – Only two Black players; pervasive use of racial slurs; coaches telling complainant to "stop acting like a sissy."

- **TAC ¶¶ 31–38** – New "Baseball Program Rules" selectively enforced against Madrid; fabricated infractions; harsher penalties than to white players.

- **TC ¶¶ 35–36** – White players engaged in misconduct (charging dugout, throwing gloves) without any punishment.

- **TAC ¶¶ 40–42** – Madrid suspended six games while white players committing identical conduct were not disciplined.

- **TAC ¶¶ 55–56** – Additional inning of suspension given only to Madrid; no comparable treatment of white players.

- **TAC ¶¶ 58–59** – Social exclusion of Madrid; white-only parent booster activities excluding his family.

- **TAC ¶¶ 69–70** – Walkout effectuated leaving only the Black players on field.

- **TAC ¶¶ 170–181** – Pattern of disparate treatment: unequal discipline, segregation, cancellation of season harming only the Black players.

**Historical Background of Racial Discrimination:**

- **TAC ¶ 71:** FMHS's historical association with resistance to integration, 1969 riots, and ongoing well-known racial tensions.

**Procedural and Substantive Departures from Normal Practice:**
- **TAC ¶¶ 23–24** – "Mediation" arranged despite Madrid having no involvement; used to confront him about racial slurs.

- **TAC ¶¶ 25–26** – Administrators allow white students to defend use of N-word without correction.

- **TAC ¶ 29** – Parent meeting run under a pre-set agenda that excluded any discussion of racism—"no deviation allowed."

- **TAC ¶ 30–31** – New rules created without required parent/student signatures; not issued according to policy.

- **TAC ¶¶ 39–41** – Investigation falsely claiming March was "quiet"; Madrid's side ignored until after punishment already issued.

- **TAC ¶¶ 44–50** – Suspension announced publicly without procedure; rescinded only after District attorneys intervened.

- **TAC ¶¶ 64–67** – Advance knowledge of walkout; contacted ex-SRO rather than stopping it; lineup manipulation.

- **TAC ¶ 70** – District cancels the remainder of the season—no individualized review of impact on students of color.

- **TAC ¶¶ 90–91, 176–184** – Repeated failures to investigate racism; failure to interview victims; normalization of slur; suppression of complaints.

- **TAC ¶¶ 32–38** – Fabricated allegations to justify discipline; infractions invented only for Black players.

- **TAC ¶¶ 55–56** – Extending punishment beyond the stated rule.

- **TAC ¶¶ 68–69** – Purposeful staging of walkout to humiliate only the Black players—an extreme departure from normal coaching conduct.

- **TAC ¶¶ 174–176** – Canceling entire season without considering harm to Black players (recruiting, development).

**Contemporary Statements Indicating Racial Motive:**

- **TAC ¶ 3** – Racial slur text message sent by coach.

- **TAC ¶¶ 22–28** – White players and coaches insist they should be "allowed" to use the word "nigga."

- **TAC ¶ 25** – Burchfield tells Madrid he must understand why white teammates believe it is "unfair" that Black people can say "nigga."

- **TAC ¶ 27** – Coach King asks if players dislike Madrid "because he's Black."

- **TAC ¶ 53** – Burchfield tells Madrid: "my life has been a living nightmare because of you," blaming him for fallout from racial complaint.

13

- **TAC ¶ 54** – Burchfield calls the players "drama queens" and says he's "going back to [his] old ways"—directed only at Black players.

- **TAC ¶ 64** – Cato admits foreknowledge of walkout—racially charged protest.

- **TAC ¶¶ 170–172** – Students and parents openly blame Madrid for Carcioppolo's punishment because he is Black.

20.     Further, the TAC links the discrimination directly to Madrid's race, satisfying the standards articulated in *Baker v. City of Kissimmee*, 645 F. Supp. 571 (11th Cir. 1986), *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256 (1979), and *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). Specifically:

- **TAC ¶¶ 20–21** – Only two Black players; racist slur leads to targeting Madrid.

- **TAC ¶¶ 22, 24–28** – Madrid singled out for objecting to racial slurs; forced to defend himself for opposing racist conduct.

- **¶¶ 31–38** – New rules disproportionately applied only to Black players.

- **¶¶ 53–56** – Retaliation directed at Madrid because of racial controversy.

- **¶¶ 68–70** – Walkout intentionally timed to leave Black players standing alone.

- **¶¶ 71, 90–92, 170–184** – Systemic, institutional racial bias; repeated acts motivated by race.

21.     In sum, when the allegations are analyzed from the perspective of what the School Board and School District, as institutions, knew, the TAC pleads a stronger notice record than both *Ricketts* and *Hughes*. The School Board and School District received notice through (1) direct complaints by Plaintiffs, (2) formal District Title VI investigations, (3) repeated interventions by District administrators, (4) meetings where racial slurs were defended in their presence or

in the presence of their agents, (5) explicit warnings of an impending racially motivated walkout, and (6) their own documented investigative findings acknowledging racial tensions. While the officials in *Ricketts* and *Hughes* merely failed to respond, the TAC alleges the School Board and School District not only failed to act but ratified, participated in, and/or permitted discriminatory and retaliatory conduct to continue. Under any fair application of *Ricketts* and *Hughes*, the TAC's allegations against the School Board and School District more than satisfy the pleading standards for notice, deliberate indifference, and discriminatory intent.

22. Further, Plaintiffs allege that they were deprived of meaningful access to an educational program. The baseball program was school-sponsored, integrated into the educational experience, and connected to college recruitment opportunities. TAC ¶¶ 63, 68, 70, 81, 91, 120, 136, 146, 157, 173. The TAC alleges the cancellation of the season had a disparate impact on Madrid, who was denied a substantial educational benefit. TAC ¶¶ 63, 68, 70, 81, 91, 120, 136, 146, 157, 173.

**B.     There are Sufficient Allegations for the Retaliation Claim.**

23. Additionally, "Title VI's prohibition on racial discrimination is also construed as prohibiting retaliation for complaining about discrimination." *Farrukh v. Univ. of S. Fla. Bd. of Trustees*, 2002 WL 3973703, at *3 (11th Cir. Sept. 1, 2022). To plead retaliation under Title VI, "a plaintiff must plausibly allege [he] engaged in statutorily protected activity; (2) [he] suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action." *Little v. CSRA, Inc.*, 834 F. App.'x 495, 499 (11th Cir. 2020); *see*

15

*Farrukh v. Univ. of S. Fla. Bd. of Trustees,* 2002 WL 3973703, at *3. **Defendants do not challenge these elements of retaliation and accordingly cannot prevail on dismissal for this claim**. Nevertheless, and out of an abundance of caution, Plaintiffs demonstrate how they satisfy each element.

24.     Plaintiffs plausibly plead that Madrid was engaged in statutorily protected activity and that he suffered a materially adverse action. An action is materially adverse if it "would dissuade a reasonable person from making or supporting a charge of discrimination." *Bowers v. Bd. of Regents of Univ. Sys. of Ga.,* 509 F. App'x 906, 911 (11th Cir. 2013); *Posey v. Atlanta Public Schools,* 722 F. Supp. 3d 1350, 1359 (N.D. Ga. 2024). Namely, Plaintiffs plead:

- Burchfield "retaliate[ed] against Madrid for Protected Conduct" by "falsely blam[ing] Madrid for the fallout from Assistant Coach Carcioppolo's racist Valentine's Day text" TAC ¶73(i);
- "Burchfield told Madrid to 'be a better teammate' during a private meeting, initiating a campaign of retaliation for Madrid's mere presence in race-related discussions. Burchfield subjected Madrid to disproportionate punishment, such as suspending him for six games and requiring an apology letter for an incident involving helmet and bat placement—while similar or worse conduct by white players went unpunished." TAC ¶73(i);
- Madrid "experienced retaliation from Defendant Burchfield, Hinson, Chappell, Butz and Cato and others for speaking up and voicing concerns of discrimination." TAC ¶¶ 22; 25
- When Madrid was forced to explain why white teammates using the word "nigga" was offensive, he was chastised and felt the need to remain silent, starting "Burchfield's unlawful efforts to retaliate against Madrid . . . in which Defendants Hinson and Chappel enthusiastically joined, and which Defendants Cato and Butz did nothing whatsoever to stop." Burchfield "began to target Madrid on the field and with fabricated behavioral violations, encouraging white students to follow suit." TAC ¶ 25;
- "Defendants Burchfield, Cato, and Butz, in their official capacities and on behalf of the School District and School Board, inconsistently and unfairly implemented the new Baseball Program Rules against Madrid in retaliation" TAC ¶ 31;

16

- "Defendant Hinson invented a conduct issue as a pretext for retaliating against Madrid" TAC ¶ 33;
- "Defendant Burchfield's proclamation of Madrid's suspension was done in a fashion designed to humiliated Madrid as part of Defendants' unlawful campaign of retaliation against Madrid." TAC ¶ 44;
- "Defendants also deliberately failed to include Madrid's parents in educational decisions regarding their son as means of retaliation for speaking out about race-based discrimination, violating the Parents' Bill of Rights under Florida Statute 1014.04." TAC ¶ 59;
- "Retaliation and Fabrication of Misconduct: Hinson falsely accused Madrid of disrespecting an umpire during a game, urging Head Coach Burchfield to remove him from play despite no such behavior occurring" TAC ¶ 77;
- Other allegations in the complaint further support the claim for retaliation. TAC ¶¶ 36, 37, 39, 49, 58, 70, 71, 72, 73, 74, 75, 76, 77, 79, 80, 81, 82, 87, 88, 89, 90, 91, 92, 93, 100-103, 110, 111, 112, 114, 115, 116, 118, 119, 120, 121, 122, 126, 134, 146.

25.    The allegations set forth above further demonstrate that Plaintiffs were subjected to adverse action because of their protected activity. In *Posey v. Atlanta Public Schools,* 722 F. Supp. 3d 1350, 1359 (N.D. Ga. 2024), the court, relying on Eleventh Circuit precedent, refused to dismiss a retaliation complaint on the causation grounds because "The Eleventh Circuit has held . . . that 'very close temporal proximity' between a protected activity and an adverse action is enough to establish causation at the pleading stage." *Id.* (*citing Fonte v. Lee Mem'l Health Sys.,* 2021 WL 5368096, at *6 (11th Cir. Nov. 18, 2021)). Here, the causal connection is not merely plausible—it is unmistakable. The retaliatory conduct began almost immediately. Within two days of Madrid's protected text, and immediately after the first "mediation" in which he voiced his concerns, Madrid was summoned to Burchfield's office and the campaign of retaliation commenced. TAC ¶¶ 24–29. In just eight days after speaking up, Defendants drafted and

imposed an entirely new set of discriminatory "Rules" aimed squarely at Madrid. TAC ¶¶ 30–32.

26.     Courts have repeatedly held that far longer gaps suffice to establish causation. In *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999), a seven-week interval was enough to satisfy prima facie causation—at the summary judgment stage. If seven weeks is sufficient on a developed evidentiary record, then a matter of days is unquestionably more than adequate at the pleading stage. The temporal proximity here is so tight that causation is not just plausible; it is compelling.

## C.     There are Sufficient Allegations for *Monell* Liability.

27.     Defendants' assertion that Plaintiffs fail to allege a policy, custom, or practice attributable to the School Board is incorrect and ignores the extensive, detailed, and specific *Monell* allegations contained throughout the TAC. The TAC does not rely on vicarious liability or isolated employee misconduct; rather, it pleads exactly what *Monell* requires: (1) official policies, (2) widespread customs and practices, and (3) actions of final policymakers—the School Board and Superintendent—whose decisions directly caused the constitutional violations.

28.     Notably, Defendants argue only that the allegations are "insufficient to impose liability on the School Board." Doc. 76 at *11. They do not address—let alone substantively challenge—the *Monell* allegations asserted against the School District. Defendants cannot simultaneously posit that the claims against the District and the School Board are "redundant" or "duplicative" for purposes of dismissal, yet selectively analyze *Monell* liability solely as to the Board. Having

chosen to treat the entities as interchangeable for purposes of redundancy, Defendants cannot now ignore the District when attempting to defeat *Monell* liability. Their failure to address the District's independent liability is both inconsistent and fatal to their argument.

29. In any event, "The school district or school board must also know about the persistent abuse that led to the alleged constitutional violations in order to impose *Monell* liability. That knowledge may come from actual notice, or may be imputed via constructive notice under some circumstances through notice to an appropriate senior official." *Williams v. Fulton Cnty. Sch. Dist.,* 181 F. Supp. 3d 1089, 1122 (N.D. Ga. 2016); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 130 (1988) ("It would … be a different matter if a series of decisions by a subordinate official manifested a 'custom or usage' of which the supervisor must have been aware."); *Young v. City of Augusta, Ga. Through DeVaney,* 59 F.3d 1160, 1173 (11th Cir. 1995) ("City policymakers should have been aware" of a "pattern of deliberate indifference to the psychiatric needs of mentally ill inmates" at a city jail.").

30. Additionally, "Plaintiffs need not identify who precisely was the final policymaker in their Complaint, because that inquiry is 'fact sensitive' and requires development of the record. *Wiliams,* 181 F. Supp. 3d at 1124 (*citing Hoefling v. City of Miami,* 811 F.3d 1271, 1280 (11th Cir. 2016) ("We therefore believe that identifying and proving that. Final policymaker acted on behalf of a municipality is 'an evidentiary standard, and not a pleading requirement.'"). "The question of who has final policymaking authority in the context of the facts of this case is thus

much more appropriately resolved at summary judgment, not at the pleading stage. This alone is enough to counsel against dismissal …." *Id.*

### i. Plaintiffs allege multiple official policies enforced by the School Board and School District.

31.     *Monell* liability attaches where the constitutional violation flows from the "execution of a policy." The TAC identifies such policies, including the newly promulgated "Baseball Program Rules," which were created by Burchfield with the approval of Principal Butz and Athletic Director Cato, and enforced in the name of the School District and School Board. TAC ¶¶ 30–33, 155. These rules were never disseminated through proper procedures required by School Board policy, implemented only against Madrid and the only other Black athlete, repeatedly enforced in a racially disparate manner. TAC ¶¶ 30–33, 155. The TAC expressly alleges that the School Board and School District approved, implemented, and enforced these rules through their officials and agents. TAC ¶¶ 30-31, 155.

32.     Additionally, the School Board's and School District's decision to cancel the baseball season was an official policy decision that had a dramatic, foreseeable disparate impact on the only Black players, deprived Madrid of educational opportunities, and was made without any consideration of racial impact, despite full knowledge of the discrimination that led up to the walkout. TAC ¶¶ 70, 81, 91, 155. This decision was not a rogue act of staff; it was the School Board's and School District's formal institutional response.

33.     The District's Title VI investigation process itself "astonishingly attempted to justify" the use of the N-word and concluded that March was "quiet"

despite ongoing documented retaliation. TAC ¶¶ 39, 71. These investigative findings are official statements of the District reflecting an institutional policy of minimizing and normalizing racial harassment. These are official policies as *Monell* defines them, not violations of policy.

### ii. Plaintiffs allege a widespread and persistent custom of racial discrimination and retaliation.

34.     Even if no official written policy existed, *Monell* liability attaches when a municipality maintains a "longstanding and widespread practice" that is "so permanent and well settled as to constitute a custom." The TAC alleges precisely that. Examples from the TAC include:

- Tolerance and normalization of racial slurs by students and coaches without discipline, even during Board-sanctioned meetings, TAC ¶¶ 21–27;
- Selective enforcement of rules disproportionately against Black students, TAC ¶¶ 31–37;
- Fabrication of disciplinary incidents by coaches, known to administrators and never corrected, TAC ¶¶ 32–33;
- A whites-only booster culture, allowed to operate with Board and School District knowledge, deliberately excluding Madrid's parents, TAC ¶¶ 58–59);
- Deliberate orchestration and endorsement of the walkout, which the School Board and School District knew of in advance and did nothing to prevent, TAC ¶¶ 62–69;
- Repeated failures to act despite months of direct notice from parents, staff, and the District's own investigators, TAC ¶¶ 22–24, 45–50, 92.

35.     These allegations describe not isolated misconduct, but a systemic pattern of conduct tolerated, condoned, and perpetuated by Board and School District officials, including the final policymakers, with the School Board as final policymaker for the District, the Superintendent as the School Board's executive officer and final administrator, and the principal and athletic directors with final

policymaking authority in their spheres of delegated responsibility. The TAC specifically alleges:

- Superintendent Bernier attended meetings, knew of the discrimination, and ratified actions taken against Madrid, TAC ¶ 83;
- Principal Butz personally approved the discriminatory rules, enforced them, and made the decision to cancel the season, TAC ¶¶ 81–82;
- Athletic Director Cato knew the walkout was being planned, admitted so on body-cam, and "called the police" in anticipation—rather than preventing it, TAC ¶¶ 64, 72(a)(i).

36.   All three used their policymaking authority to endorse, perpetuate, or ratify the discrimination and retaliation. Under *Monell*, while "one or two incidents of abuse is generally insufficient … allegations of anything more than that are generally sufficient, even if the act were committed by one employee." *Williams*, 181 F. Supp. 3d at 1122.

37.   In addition, and though it is not necessary given the allegations, all of the conduct of the individually named defendants can be considered when assessing *Monell* liability. "A final decision maker enacting a policy or sanctioning a process that allows itself to be sued as a tool or conduit for a person or persons with discriminatory animus *is not respondeat superior liability at all. Monell* liability is entirely consistent with a 'cat's paw theory,' where the final decision maker…abdicated its role, sanctioned an outcome, or knowingly affixed its imprimatur to a process so infected by racial discrimination that the municipality itself was a 'but-for' cause of the unconstitutional deprivation." *Freeman v. Jupiter Inlet Colony*, 778 F.Supp.3d 1226, 1344 (S.D. Fla. 2025).

22

38.     *Monell* does not permit the School District or School Board to be placed on trial merely because a subordinate coach or staff member committed a tortious or racist act that was contrary to written policy. If all that Plaintiffs alleged were the rogue impulses of a few employees acting in defiance of district rules, *Monell* may bar the claim. But that is not this case. Here, Plaintiffs allege that the School District and School Board sanctioned, ratified, and acquiesced in an entire racist process—from the normalization of racial slurs, to the coercive "mediation,, to the selective enforcement of new rules, to the fabricated discipline, to the orchestrated walkout—that carried the School District's own imprimatur of legitimacy while producing a racially discriminatory result. Doc. 73., ¶¶ 20-22, 24-42, 49-52, 55-56, 60-83, 89-94, 181-184. The Complaint alleges that district officials and final policymakers knew of, approved, coordinated, and refused to correct practices that deprived Madrid of equal educational opportunity and instead allowed themselves to become the mechanism by which racial discrimination and retaliation were executed, including by planning for, preparing for, and allowing the public walkout to occur as Madrid stepped into the batter's box. Doc. 73., ¶¶ 20-22, 24-42, 49-52, 55-56, 60-83, 89-94, 181-184. In other words, Plaintiffs allege that the School District was not the victim of employee misconduct—it was the vehicle through which the discrimination happened, and its policies, customs, and deliberate choices made the unconstitutional result possible.

III.    **THE THIRD AMENDED COMPLAINT STATES SUFFICIENT FACTS AGAINST THE INDIVIDUAL DEFENDANTS.**

### A.    The Official Capacity Claims

39.    Defendants first contend that Claims III and IV should be dismissed as to the individual defendants in their official capacities because "Plaintiffs do not allege that any individual had final policymaking authority and thus fail to state a claim for relief against them in their official capacities." Doc. 76, *14. That argument is both legally wrong and factually unsupported. First, at the pleading stage, Plaintiffs are *not* required to identify with precision the ultimate final policymaker for each challenged action. *Williams* expressly holds that a plaintiff need not identify the final policymaker by name in order to survive a motion to dismiss. *Williams,* 181 F. Supp. 3d at 1124 (citing *Hoefling v. City of Miami*, 811 F.3d 1271, 1280 (11th Cir. 2016)). Second, Defendants cannot have it both ways: they cannot argue that official-capacity claims are "duplicative" because they are claims against the School Board itself—and then ignore the substance of the allegations describing how those very officials, acting in their official roles, executed, ratified, and perpetuated discriminatory policies and practices. Official-capacity claims *are*, by definition, claims against the entity. Thus, Defendants' effort to erase the detailed conduct pleaded against Bernier, Butz, and Cato simply by labeling the claims "duplicative" fails as a matter of law. Their actions, taken under color of state law in the scope of their authority, constitute municipal action for *Monell* purposes and cannot be disregarded.

40.    Moreover, contrary to Defendants' assertion, Plaintiffs explicitly allege that Superintendent Bernier, Principal Butz, and Athletic Director Cato exercised final policymaking authority within their respective domains. Doc. 73 ¶

24

154. Under binding precedent, where officials endowed with such authority act in their official capacities, their conduct **is the conduct of the School Board itself**. Whether the Court treats the official-capacity claims as claims directly against the Board is immaterial—the Board is liable either way. Every factual allegation describing discriminatory rulemaking, retaliatory discipline, ratification of misconduct, advance knowledge of the walkout, failure to intervene, and cancellation of the season must therefore be attributed to the Board as municipal action. Defendants cannot simultaneously collapse the entities for redundancy purposes and then ignore the policymaking actions of the Superintendent, Principal, and Athletic Director that, as pled, trigger liability.

**B.        The Individual § 1983 Claims**

41.    Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory constitutional rights[.]" *Ashcroft v. Iqbal,* 556 U.S. 662, 672 (2009). To be entitled to qualified immunity's protections, a government official must first demonstrate that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Carson v. McMillian,* 939 F.2d 1479, 1487 (11th Cir. 1991) (quotation marks and citations omitted). When a defendant acts within the scope of his discretionary authority, the burden "shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro,* 248 F.3d 1188, 1194 (11th Cir. 2002) (citation omitted), *abrogated in part on other grounds by Pearson,* 555 U.S. 223; *see also Corbitt v. Vickers,* 929 F.3d 1304, 1311 (11th Cir. 2019). A plaintiff can show qualified immunity is not appropriate by establishing that (1) the

defendant's conduct violated plaintiff's constitutional rights; and (2) the constitutional right was clearly established at the time. *See Keating v. City of Miami,* 598 F.3d 753, 762 (11th Cir. 2010) (quotation marks and citations omitted).

42.    In another lawsuit asserting similar claims from the same series of events, *T.R. v. The School District of Lee County, Florida, et al.,* No. 24-00321-CIV-ALTONAGA/Reid (M.D. Fla. 2024), another federal district court denied qualified immunity as to Defendants Carcioppolo and Chappell because the defendants failed to "make any other showing . . . [that defendants] were acting within their discretionary duties." *Id.* at Doc. 56, *6. Notably, defendants do not contest for Carcioppolo that all alleged conduct falls within his "discretionary authority," but only that "communicating with the team" falls within that purview. Defendants failed to meet their burden for all of the other actions that Plaintiffs alleged in the TAC that went unaddressed by Defendants.

### i.    Defendants' conduct violated Plaintiffs' constitutional rights.

43.    Defendants' conduct violated Plaintiffs' clearly established constitutional rights. The TAC's allegations plausibly show that each individual defendant personally participated in, or deliberately ignored, race-based unequal treatment of Madrid, in violation of the Equal Protection and Due Process Clauses of the Constitution. Each Defendant and their constitutionally violative conduct is detailed below.

44.    **Stephan Cato – Athletic Director, TAC ¶¶ 72(a)–(e), 21–27, 31–37, 32–33, 40–47, 49–52, 62–64):** Cato personally participated in race-based discrimination and retaliation, and the TAC alleges:

- He had advance knowledge of the racially charged walkout "designed to humiliate Madrid and T.R., the only two Black players," admitting on body camera: *"we knew the walkout was going to be bad… that's why we called the police"* (¶ 72(a)(i)), yet took no steps to stop it (¶ 72(a)).
- He repeatedly ignored reports of racial slurs and escalating hostility, responding that he "didn't notice" or "I'll talk to him" (¶¶ 21–27, 72(a)(ii)).
- He approved and enforced discriminatory "Baseball Program Rules" that were "selectively enforced against Madrid and another Black player" (¶¶ 31, 72(a)(iii)).
- He approved a six-game suspension of Madrid based on conduct white players routinely engaged in without punishment (¶¶ 40–47, 72(a)(iii)).
- He acted to manage optics—not discrimination—sending an email disavowing responsibility and shifting blame "above his head" (¶¶ 49–52, 72(a)(iv)).
- He was notified of the walkout by parents and staff (¶ 64) but "did nothing to stop its racially discriminatory impact" (¶ 72(a)(i)).

45.    In *Fennell v. Marion Independent School District,* 963 F. Supp. 2d 623 (W.D. Tex. 2013), the court held that administrators' repeated failures to interevent in known racial harassment permits an inference of discriminatory intent and violates the Equal Protection clause. Cato admitted that "we knew the walkout was going to be bad…that's why we called the police," yet took not steps to stop an orchestrated public humiliation of the only two Black players. That is more than the deliberate indifference found actionable in *Fennell.* Further, the repeated tolerance of the use of racial slurs, and the inaction on complaints related to same is actionable discriminatory intent. *Id.*

46.    **Kyle Burchfield – Head Coach (TAC ¶¶ 25–26, 30–38, 31–37, 32–33, 40–47, 53–55, 63–69, 73(i)–(vi)):** The TAC alleges that Burchfield:

- "Falsely blamed Madrid" for fallout from the racist text and launched a "campaign of retaliation" (¶¶ 25–26, 73(i)).
- Authored new rules "targeting Madrid and the other Black player, T.R." (¶ 30), and enforced them "considerably more severe[ly]" against Black players than white players (¶¶ 31–37, 73(ii)).

27

- Fabricated misconduct, including claiming Madrid disrespected an umpire—refuted by the umpire himself (¶¶ 32–33, 73(ii)).
- Publicly announced a six-game suspension "in front of a large audience," causing humiliation (¶¶ 40–47, 73(iii)).
- Told Madrid: *my life has been a living nightmare because of you* (¶ 53), demonstrating retaliatory intent (¶¶ 53–55, 73(iv)).
- Took part in planning the walkout with white parents (¶¶ 63–65, 73(v)) and timed the lineup so the walkout would occur when Madrid was batting (¶¶ 66–69).

47.    **Alex Carcioppolo – Assistant Coach (TAC ¶¶ 20–22, 75(i)–(iv), 63–**

**65, 68–69):** The TAC alleges Carcioppolo:

- Sent the racist team message: *Happy Valentine's Day niggas* (¶ 20), which "exacerbated racism" and led white teammates to blame Madrid (¶ 21).
- Reinforced a racist environment where slurs were "routinely used" (¶ 21, 75(ii)–(iii)).
- Encouraged students and staff to protest his firing, "mobilizing public sentiment against Madrid" (¶ 75(i)).
- On the day of the walkout, posted an Instagram message intended to "encourage the walkout" (¶ 65, 75(iv)).
- Played a direct role in the chain of events culminating in Black students being isolated and humiliated on the field (¶¶ 68–69).

48.    **Robert Hinson – Assistant Coach (TAC ¶¶ 21, 32–38, 36, 37, 63–69,**

**77(i)–(v)):** The TAC alleges Hinson:

- Falsely accused Madrid of disrespecting an umpire—a fabricated allegation used to urge his removal (¶¶ 32–33, 77(i)).
- Refused to collect Madrid's protective gear—the normal courtesy extended to "every player on the team except Madrid" (¶ 37, 77(ii)).
- Participated in unequal rule enforcement by punishing Madrid while "taking no action" against white players who threw equipment or attempted to charge the opposing dugout (¶¶ 35–36, 77(iii)).
- Planned the walkout with coaches and white parents (¶ 63) and personally "led the white players in walking out when Madrid stepped into the batter's box" (¶ 68, 77(iv)).
- Manipulated batting positions and team logistics to heighten humiliation (¶¶ 66–67, 77(v)).

49.     **Christopher Chappell – JV/Assistant Varsity Coach (TAC ¶¶ 29, 30–38, 63–69, 79(i)–(iii)):** The TAC alleges that Chappell:

- Enforced discriminatory rules "selectively and harshly against Madrid and the only other Black player, T.R." (¶¶ 30–38, 79(i)).
- Participated in parents-only meetings where racial slurs were defended and refused to allow discussion of racial hostility (¶ 29, 79(i)).
- Helped plan the walkout the night before (¶ 63, 79(ii)).
- Demoted JV players and rearranged lineups so the walkout would occur when Madrid batted (¶¶ 66–67, 79(ii)).
- Walked out with the white players, leaving Madrid and T.R. alone on the field (¶ 68, 79(ii)–(iii)).

50.     **Robert Butz – Principal (TAC ¶¶ 28–29, 30–31, 38, 40–47, 53, 57–59, 61, 70, 81(i)–(iv)):** The TAC alleges Butz:

- Approved discriminatory rules targeting Madrid and T.R. (¶ 30, 81(i)).
- Took no action to stop publicly unequal discipline, including standing by during Madrid's six-game suspension "while white players went unpunished" (¶¶ 40–47, 81(ii)).
- Excluded Madrid's father from team practice opportunities (¶ 57, 81(ii)).
- Attended meetings where racial hostility was defended and did nothing (¶¶ 24–29, 81(iii)).
- Cancelled the season without considering the "disproportionately negative impact" on Madrid, eliminating his recruiting opportunities (¶ 70, 81(iv)).

51.     **Christopher S. Bernier – Superintendent (TAC ¶¶ 13, 41, 83):** The TAC alleges Bernier:

- Was "aware of systemic racial issues" but "failed to act decisively," perpetuating a "hostile environment which targeted students of color" (¶ 83).
- Attended disciplinary meetings involving Madrid (¶ 41) and "failed to intervene or challenge the unjust suspension that followed."
- "Approved or implicitly ratified the actions" of other discriminatory actors (¶ 83), despite his statutory authority and obligation to enforce state and federal laws (¶ 13).

52.     Taken together, these allegations far exceed the threshold needed to defeat qualified immunity at the pleading stage. Defendants have not met their

29

initial burden to show that all of the challenged conduct was undertaken within their discretionary authority, and—as in *T.R. v. School District of Lee County*—their silence as to entire categories of conduct is itself fatal. Even if they had satisfied that burden, the TAC plausibly alleges widespread, intentional race-based discrimination and retaliation by each individual defendant, conduct that has been clearly unconstitutional for decades. By 2023, it was beyond dispute that government officials may not subject students to racially disparate treatment, orchestrate or permit public humiliation on the basis of race, selectively enforce rules against Black students, or ignore racial hostility and slurs. No reasonable official could have believed that the conduct alleged here was lawful. Because the TAC states constitutional violations of rights that were clearly established at the time, qualified immunity does not apply, and Defendants' motion should be denied.

### ii.     Plaintiffs' constitutional rights were clearly established.

53.    The allegations in the TAC establish intentional, race-based differential treatment of Black students—Madrid and T.R.—by every individual defendant. For more than three decades, it has been *clearly established* that the Equal Protection Clause prohibits intentional racial discrimination by school officials, coaches, administrators, and local government employees. No reasonable official could believe that orchestrating, endorsing, or tolerating race-based harassment, public humiliation, selective discipline, or retaliatory punishment is lawful.

54.     The Supreme Court has repeatedly emphasized that "the central purpose of the Equal Protection Clause…is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis,* 426 U.S. 229, 239 (1976). The Court has also confirmed that intentional unequal treatment based on race is inherently unconstitutional and triggers the most exacting scrutiny. *Id.*

55.     The Eleventh Circuit has likewise established comprehensive and clearly defined prohibitions against racial discrimination under 42 U.S.C. § 1983 that preclude qualified immunity defenses for government officials, like Defendants here. The foundation principle, established in *Brown v. City of Fort Lauderdale,* 923 F.2d 1474 (11th Cir. 1991), and reinforced in *Busby v. City of Orlando,* 931 F.2d 764 (11th Cir. 1991), holds that the equal protection right to be free from intentional racial discrimination was clearly established by 1991. "[I]t was clearly established at the time of the alleged violation that the Equal Protection Clause of the Fourteenth Amendment prohibits racial discrimination." *Fennell v. Marion Indep. Sch. Dist.,* 963 F. Supp.2d 623, 636 (W.D. Tex. 2013).

56.     It has been clearly established that treating similarly situated individuals differently based solely on race violates Equal Protection. *Id. Bowlby v. City of Aberdeen* reiterates that the Equal Protection Clause forbids "governmental action that works to treat similarly situated individuals differently" and that the "main purpose" of the Clause "is to prevent official conduct that discriminates on the basis of race." *Bowlby v. City of Aberdeen, Miss.,* 681 F.3d 215, 227 (5th Cir. 2012) (*citing Washington v. Davis,* 426 U.S. 229, 239 (1976); *see also Blackwell v. Laque,* 275 Fed. Appx. 363, 367-68 (5th Cir. 2008) (denying qualified immunity to defendant

31

who allegedly terminated African-American employees based on race because it was clearly established that the Equal Protection Clause prohibited racial discrimination). Similarly, the Eighth Circuit in *Mathers v. Wright,* 636 F.3d 396, 402 (8th Cir. 2011), held that school officials violate clearly established equal protection rights when they single out a student for disparate treatment that exceeds the scope of professional judgment and stems from an improper motive. The court held it was "clearly establishes that [a teacher] could not treat [a student] differently from her similarly situated peers" for improper reasons. *Mathers v. Wright,* 636 F.3d 396, 402 (8th Cir. 2011).

57.    The conduct here—including harsher discipline, fabricating misconduct, enforcing rules only against Black Players, excluding Black parents, publicly humiliating Black students, ignoring racial slurs, and coordinating an all-white walkout to humiliate Black athletes—far exceeds even the misconduct described in *Mathers, Blackwell,* or *Bowlby. See supra* ¶¶ 52-59.

58.    The law is also clearly established that retaliating against a student because he complained about racially discriminatory violates equal protection and § 1983. Courts repeatedly hold that intentional, punitive actions taken in response to race-based grievances reflect unconstitutional discriminatory intent. *See Blackwell v. Laque,* 275 Fed. Appx. 363, 367-68 (5th Cir. 2008) (no qualified immunity where official retaliated against protected complaints of discrimination). Defendants' alleged statements—e.g., Burchfield telling Madrid "my life has been a living nightmare because of you," fabricating misconduct, and drafting "Rules" that applied only to Black players after Madrid complained—are quintessential

evidence of discriminatory and retaliatory purpose. TAC ¶¶ 31-38, 53; *see also supra* ¶¶ 52-59.

59.    Organizing or condoning a racially motivated walkout designed to humiliate two Black players is unconstitutional under clearly established principles. *Washington v. Davis,* 426 U.S. 229, 239 (1976). *Washington v. Davis* makes clear that racially motivated official actions violate the Constitution and that discriminatory intent may be inferred from context, disparate treatment, and surrounding circumstances. *Id.; see also supra* ¶¶ 52-59.

60.    The law is also clearly established that repeated failure to act on known racial hostility and slurs constitutes unconstitutional selective non-enforcement. Multiple courts hold that refusal to protect minority students from racial harassment, while responding appropriately to white students, demonstrates intentional discrimination. *Mathers v. Wright,* 636 F.3d at 402; *Fennell v. Marion Independent School District,* 963 F. Supp. 2d at 639. Defendants Cato, Butz, and Chappel ignored repeated reports of racial slurs and hostility, while simultaneously enforcing rules only against Black players. *See supra* ¶¶ 52-59. That pattern is exactly what equal protection forbids.

61.    The TAC alleges intentional racial discrimination, selective enforcement, retaliatory punishment, and orchestrated public humiliation of Black students. For decades, it has been clearly established—in the Supreme Court, the Fifth Circuit, the Eighth Circuit, and every relevant circuit—that, at a minimum: (1) Race-based differential treatment is unconstitutional, (2) Selective rule enforcement based on race is unconstitutional, (3) Retaliating for race-related

33

complaints is unconstitutional, and (4) treating a student differently from peers for discriminatory reasons violates clearly established Equal Protection rights. *Mathers v. Wright,* 636 F.3d at 402. No reasonable official could believe the conduct alleged here was lawful. *See Anderson v. Creighton,* 483 U.S. 635, 638 (1987) (holding that government officials are entitled to qualified immunity *only if* their actions "could reasonably have been thought consistently with the rights they are alleged to have violated"). Qualified immunity therefore does not apply.

## IV.   PLAINTIFFS SUFFICIENTLY ALLEGE VIOLATIONS OF TITLE VI, EQUAL PROTECTION[3], AND THE EEOA.

62.   Defendants' attempt to characterize Plaintiffs' claims as "speculation," "innuendo," or mere "social grievances" fundamentally misstates the record and ignores the extensive well-pled facts in the TAC. The TAC pleads concrete, defendant-specific allegations showing: (1) intentional discrimination, (2) deliberate indifference, and (3) exclusion from an educational program, each of which is more than sufficient at the pleading stage.

### A.   Plaintiffs Plausibly Allege Intentional Racial Discrimination.

63.   Defendants wrongly assert there are "no facts showing intentional racial discrimination." To the contrary, the TAC alleges sustained, repeated, and targeted racialized conduct by coaches and administrators:

- **Racial slur normalization**: Coaches permitted white players to repeatedly use the word "nigga," defended its use during meetings, and required Madrid to justify why it was offensive—facts confirmed in Defendants' own investigative exhibit. See TAC ¶¶ 20–28; see also School Board Report at p. 31 (explicitly acknowledging "normalization" of the slur).

---

[3] There is ample discussion in Section III above regarding the Equal Protection claims.

- **Selective discipline**: White players who charged dugouts, threw helmets, or cursed loudly received no discipline, while Madrid was benched, suspended six games, and subjected to fabricated allegations. TAC ¶¶ 31–38, 40–47.
- **Manipulated lineups and staged events**: Coaches and senior staff manipulated batting order and game logistics to ensure that the planned walkout would occur at the exact moment Madrid—one of the only Black students—stepped into the batter's box. TAC ¶¶ 63–69.
- **Contemporary statements showing racial motive**: Burchfield told Madrid that his "life has been a living nightmare because of you," directly tying hostility to Madrid's objection to racist conduct. TAC ¶ 53.

64.     These are not conclusory assertions, they are detailed, specific factual allegations, exactly what *Twombly* and *Iqbal* require. And contrary to Defendants' claim, Plaintiffs are not required to prove discriminatory intent at this stage; they need only plausibly allege it. They have done so many times over.

### B.     Defendants Misstate the Comparator Requirement for Equal Protection.

65.     Defendants also argue the Equal Protection claim fails because Plaintiffs did not identify the "exact white student" who engaged in the "identical misconduct." But that is a summary judgment standard—not a pleading one. The Eleventh Circuit has repeatedly held that, while comparator specificity becomes crucial later, a plaintiff at the pleading stage need only allege disparate treatment of similarly situated individuals in "all relevant respects," not list names, birthdates, and jersey numbers. See e.g., *Arrington v. Cobb County*, 139 F.3d 865, 872 (11th Cir. 1998); *Alvarez v. Lakeland Area Mass Transit District,* 406 F. Supp. 3d 1348, 1354 (M.D. Fla. 2019) ("Determining whether a plaintiff and a comparator are similarly situated in all material respects is a fact-intensive inquiry better suited to summary judgment.") (citations omitted).

66.     Here, the TAC alleges that white players on the same team charged dugouts, threw helmets, cursed at umpires, and violated the very rules that applied only as to Madrid, yet received no discipline at all. TAC ¶¶ 20–28, 31-38, 40-47, 53 63-69; see also School Board Report at p. 31 (explicitly acknowledging "normalization" of the slur). But Madrid received suspensions, public humiliation, and fabricated write-ups. TAC ¶¶ 20–28, 31-38, 40-47, 53 63-69. That is more than adequate comparator pleading under Eleventh Circuit standards.

C.     **Plaintiffs Properly Allege Deliberate Indifference.[4]**

67.     Notably, this section of Defendants' motion to tailored only to the "school," "School Board," and "School District" and is not made with respect to any other Defendants. Doc. 76 at 18-19. The arguments as to the other Defendants are waived, and the arguments regarding the school, School Board, and School District's deliberate indifference are fully detailed above in Section II(A) above.

D.     **There are Sufficient Allegations for an EEOA Claim.**

68.     The EEOA prohibits educational agencies from denying an equal educational opportunity to any individual on account of race. 20 U.S.C. §§ 1701 *et seq.* The statute defines denial of equal educational opportunity to include "the failure of an educational agency which has formerly practiced . . . deliberate segregation to take affirmative steps . . . to remove the vestiges of a dual school

---

[4] Plaintiffs adopt and incorporate the argument detailed above in Section II, as it details the law and the specific knowledge, notice, and conduct of the Defendants.

system." 20 U.S.C. §§ 1701[5]; *see Virginia State Conference NAACP v. County School Board of Shenandoah County*, No. 5:24-cv-040, 2025 WL 271705, *17 (W.D. Va. Jan. 22, 2025), denied a motion to dismiss an EEOA claim when the plaintiffs alleged that "Black students are allegedly discouraged from participating in extracurricular activities," and that "Black students experience 'psychological harm' and are thus 'prevented from fully accessing the equal educational experience to which [they are] entitled.'" *Id.* at 2025 WL 271705 at *17. The plaintiffs there further alleged that "Confederate names plausibly have an impact on the racial composition of sports teams, school bands, and other extracurricular activities." *Id.* The court held: "Consistent with the Supreme Court's holdings in *Green* and *Freeman*, where the Court expressly directed district court to fashion remedies that address all these components of elementary and secondary school systems—including extracurricular activities, [thus] plaintiffs' allegations state a plausible EEOA claim." *Id. (citations omitted).*

69.     The allegations in the TAC more than satisfy this standard. Like in *Virginia State Conference NAACP v. County School Board of Shenandoah County*, the following actions discouraged the Black students from full participation in extracurricular activities and accessing the full education experience:

---

[5] Plaintiffs allege that the School Board and School District are bound by the provisions of 1703(b). TAC ¶ 176. Plaintiffs also discuss the long history of FMHS regarding segregation and integration. TAC ¶ 71. However, there can be no doubt that Fort Meyers High School and the Lee County public school system operated an unconstitutionally racially segregated school system—a fact this very Court has recognized. *See,* https://www.flmd.uscourts.gov/separate-and-unequal-fort-myers. This fact, if disputed, is also the proper subject of judicial notice under Federal Rule of Evidence 201.

- Coaches and administrators engineered a walkout that left the only two Black students—Madrid and T.R.—standing alone on the baseball field, isolated and publicly humiliated during a game attended by college recruiters. TAC ¶¶ 68–70;
- Defendants manipulated lineups, demoted players, and rearranged positions specifically to ensure the walkout would isolate the Black athletes. Doc. 63 ¶¶ 66–67;
- White players and parents formed a white-only booster club that intentionally excluded Madrid's parents with the District's and Board's knowledge and permission. TAC ¶¶ 58–59, 170;
- Students of color were repeatedly subjected to segregated treatment, including fabricated infractions and exclusion from team rituals that all white players participated in.  TAC ¶¶ 32–38, 171–178.

70.    Defendants' Motion to Dismiss should be denied on this ground.

## V.    PLAINTIFFS SUFFICIENTLY ALLEGE A PROTECTED INTEREST AND DUE PROCESS VIOLATION.

71.    Defendants' argument fails because it rests on a false premise: that Plaintiffs' due-process claims depend on a generalized "right to play baseball." They do not. Plaintiffs allege a constitutionally protected interest in (1) equal access to educational opportunities free from racial discrimination and retaliation, (2) freedom from arbitrary government action that shocks the conscience, and (3) the liberty interests that arise when state actors impose stigmatizing, fabricated, and reputation-damaging accusations without due process. Each of these interests is independently cognizable and has long been recognized by federal courts.

### A.    Plaintiffs' Due Process Claims are Not Predicated on a Standalone Right to Sports Participation.

72.    Defendants try to reduce the issue to whether participation in interscholastic athletics is a constitutional right. But that is not the right question. Plaintiffs do *not* allege a generic entitlement to a "full baseball season." They allege

the season was cancelled for racially discriminatory and retaliatory reasons (TAC ¶¶ 29(f), 70, 175); fabricated misconduct was used to publicly brand Madrid as insubordinate, disrespectful, and disruptive (TAC ¶¶ 25, 31033, 55, 111-113); school officials imposed severe discipline without any process, notice, or opportunity to respond (TAC ¶¶ 31-33, 40-42, 46-47, 125-129); Plaintiffs were excluded from educational decisions—violating statutory and constitutional safeguards (TAC ¶¶29, 57-59, 91, 144); and the deprivation of opportunities (including recruitment, coursework integration, and access to school-sponsored programs) was carried out through arbitrary and bad-faith state action (TAC ¶¶200-22, 29-38, 63-69, 91, 123, 146, 174-176).

73. Courts have long recognized that the Constitution protects individuals from arbitrary, irrational, or race-based government action, even when the interest at stake is not a traditional property right. See *County of Sacramento v. Lewis*, 523 U.S. 833, 846 n.8 (1998) (substantive due process prohibits conduct "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience"). The TAC alleges exactly that level of arbitrary and discriminatory misconduct.

**C. The TAC Alleges Protected Liberty Interests, which Defendants Fail to Address.**

74. Even if extracurricular participation were not itself a property interest, due process protections attach where government action imposes: a reputational injury accompanied by concrete harm imposed by the state, *Smith v. Siegelman*, 322 F.3d 1290 (11th Cir. 2003); fabricated disciplinary findings that affect

39

future educational opportunities, *Goss v. Lopez*, 419 U.S. 565 (1975); and a stigma plus an alteration of legal status, *Paul v. Davis*, 424 U.S. 693 (1976). Here, Plaintiffs allege: fabricated allegations of disrespecting umpires (TAC ¶¶32-33, 77); public announcements of discipline at games in front of peers and recruiters (TAC ¶¶42-44); accusations that Madrid was the cause of team conflict (TAC ¶¶21, 25, 53); targeted disciplinary notations and season-long penalties (TAC ¶¶31-38, 40-47, 55-56, 146); exclusion of parents from school-run decision making (TAC ¶¶29, 57-59, 91, 144); cancellation of a season in a manner that deprived Madrid of curricular and college-recruitment opportunities (TAC ¶¶ 63-70, 175, 176). These allegations satisfy the "stigma-plus" doctrine, especially where (as pled) the stigmatizing statements and discipline were publicly imposed and used to justify exclusion from educational programs. Defendants do not address these liberty interests at all. That silence is a concession.

> **D.** **Plaintiffs Plead Substantive Due Process Violations Because the Cancellation and Discipline Were Not Rational Educational Judgments, But Were Retaliatory, Racially Motivated, and Arbitrary.**

75. Defendants invoke *Ewing* to suggest unlimited deference to school decision making. *Mich. v. Ewing*, 474 U.S. 214 (1985). But *Ewing* protects academic judgment, not racially charged, pretextual, and retaliatory decision-making. *Id.* at 225. The Eleventh Circuit has repeatedly held that decisions infected by bad faith, discrimination, or retaliation are *not* entitled to deference and can violate substantive due process. *Mitchell v. Hillsborough County*, 468 F.3d 1276, 1283 (11th Cir. 2006); *Harris v. Birmingham Bd. of Educ.*, 817 F.2d 1525, 1528 (11th Cir. 1987).

76.     The TAC alleges, plainly and repeatedly, that the cancellation of the season and the preceding disciplinary events were: retaliatory—implemented days after Madrid complained of racial discrimination (TAC ¶¶22-25, 30-32, 53, 73, 91); pretextual—white players engaged in identical conduct without punishment (TAC ¶¶31038, 40-47, 55-56, 111, 112); racially motivated—explicit statements showing hostility tied to race (TAC ¶¶ 20-28, 53-54, 170-172, 111, 112); coordinated with parents and coaches to publicly humiliate the only Black athletes (TAC ¶¶62-69, 111, 112, 118); and executed with advance knowledge of the intended discriminatory effect (TAC ¶¶ 30-31, 63, 64, 66-67, 111). No court treats that conduct as a "garden-variety administrative decision" entitled to rational-basis deference.

### E.     Plaintiffs Plead Procedural Due Process Violations.

77.     Defendants assert that "new rules were communicated in advance" and "disciplinary actions were explained," but the TAC alleges the opposite:

- the rules were never properly issued under district policy (TAC ¶¶30-31);
- they were selectively enforced only against Black players (TAC ¶¶31-38, 55-56, 111, 118);
- discipline was imposed publicly without notice, hearing, or opportunity to respond (TAC ¶¶40-44, 125-127);
- parents were excluded from decision-making in violation of statutory mandates (TAC ¶¶29, 57-59, 91, 144);
- the season-cancellation decision was made without any hearing, process, or consideration of its disparate impact (TAC ¶¶70, 175-176),

78.     At the pleading stage, Plaintiffs need only allege a deprivation without constitutionally sufficient process. They have. Defendants' argument

41

ignores that the Constitution prohibits fabricated, discriminatory, and retaliatory processes, even when some "notice" is present.

79.     Even if no standalone property right exists, Plaintiffs state a valid § 1983 Due Process Claim because the deprivations were inextricably linked to racial discrimination. The Supreme Court has long held that where state actors impose a deprivation because of race, due process and equal protection concerns overlap. See *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989). The TAC alleges that Madrid's exclusion from the program, the cancellation of the season, and the discipline that undermined his educational opportunities were driven by race and retaliation. Defendants cannot use the "no property right" argument to shield racially motivated state conduct.

## VI.    PLAINTIFFS' PENDENT STATE-LAW CLAIMS ARE WELL-PLEADED AND NOT DUPLICATIVE OF FEDERAL CLAIMS.

80.     Defendants' pendent-state-law arguments ignore the numerous well-pled facts showing that Plaintiffs were denied equal access to educational programs and opportunities in violation of both the Florida Educational Equity Act and Article IX. The TAC does not rest on a generic "right to play sports"; it alleges that Madrid was excluded from school-sponsored programs, denied recruitment and development opportunities integral to his educational advancement, segregated and publicly humiliated in a school-run activity, and subjected to discriminatory rules, fabricated discipline, and a season-cancellation executed without any consideration of its disparate racial impact. Florida law squarely extends the FEEA's protections to *any* public K-20 educational "program

42

or activity," and athletics unquestionably fall within that category. Likewise, Article IX prohibits a racially hostile, unequal educational environment and requires the School Board to ensure uniform, nondiscriminatory access to all educational offerings. Plaintiffs' allegations easily satisfy these standards at the pleading stage.

81.     Defendants are also wrong that the parents lack standing or that Count VII is duplicative. The TAC alleges that Mom and Dad were personally excluded from school-sponsored parent programs, ostracized from decision-making processes, and retaliated against for reporting racial discrimination—all individualized injuries that fall squarely within the FEEA's protections and Florida's constitutional guarantees. And Count VII is not a repackaged version of Counts V and VI; it pleads the separate and essential *Monell* elements necessary to impose municipal liability. Counts V and VI establish the underlying constitutional violations; Count VII alleges that those violations stemmed from the School District's and School Board's own policies, customs, and ratification by final policymakers—an analytically distinct theory required to hold the entities liable under § 1983. Accordingly, neither the state-law claims nor the *Monell* claim fail as a matter of law.

## CONCLUSION

82.     For all the reasons set forth above, the Third Amended Complaint easily satisfies the pleading standards of Rules 8 and 12(b)(6). Plaintiffs allege detailed, defendant-specific facts demonstrating intentional racial discrimination, retaliation, deliberate indifference, unconstitutional policies and customs, and

43

deprivations of clearly established federal and state rights. Defendants' motion disregards these allegations, misstates the governing legal standards, and invites the Court to resolve factual disputes inappropriate at this stage. Taking the well-pleaded facts as true—as the Court must—Plaintiffs have more than plausibly stated claims under Title VI, § 1983, the EEOA, the Florida Educational Equity Act, and the Florida Constitution. Accordingly, Defendants' Motion to Dismiss should be denied in its entirety.

Respectfully submitted,

*/s/ Christopher O'Neal*
Christopher O'Neal, Esq
State Bar No. 910201
chris@bencrump.com
Natalie Jackson, Esq
State Bar No. 646075
Natalie@bencrump.com
**BEN CRUMP LAW PLLC**
122 S. Calhoun Street
TALLAHASSEE, FL 32301

**Marion M. Reilly, Esq**
Texas State Bar No. 24079195
Federal ID. No.  1357491
E-Mail:  marion@mrtrial.com
**MARTINEZ REILLY, PLLC**
3636 S. Alameda, Ste. B119
Corpus Christi, Texas 78412
Telephone:  361.273.6771
Facsimile:   361.704.8355
**Service Email address
Service1@mrtrial.com

**Joseph E. Hoffer, Esq**
State Bar No. 24049462
Federal ID No. 2006011
Email: jhoffer@slh-law.com
**SCHULMAN, LOPEZ, HOFFER &
ADELSTEIN, LLP**
845 Proton Road
San Antonio, Texas 78258
Telephone:  210-538-5385
Facsimile:  210-538-5384

**A. Vince Colella, Esq**
Federal ID No. P49747
Email: Vcolella@mosscolella.com
**MOSS & COLELLA**
28411 Northwestern Hwy, 11th FL
Southfield, MI 48034
Telephone:  248.945.0100
Facsimile:  248.945.1801

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 8, 2025, this document was electronically transmitted to the Clerk of Court via the CM/ECF system, which will send notice of electronic filing to all counsel of record.

<u>/s/ *Christopher O'Neal*</u>
Christopher O'Neal, Esq.

45