UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
Case No. 24-00142-CIV-DIMITROULEAS/HUNT

MICHAEL TUCKER,
AZUREE'D TUCKER, and
MADRID TUCKER,

     Plaintiffs,

v.

THE SCHOOL BOARD OF LEE COUNTY,
FLORIDA; THE SCHOOL DISTRICT OF
LEE COUNTY, FLORIDA; STEPHAN CATO;
KYLE  BURCHFIELD;  ALEX
CARCIOPPOLO; ROBERT HINSON;
CHRISTOPHER CHAPELL; ROBERT
BUTZ; and CHRISTOPHER S. BERNIER,
Ph.D.,

     Defendants.
_____/

## REPORT AND RECOMMENDATIONS

This matter is before this Court on a Motion to Dismiss by Defendants. ECF No. 76. The Honorable William P. Dimitrouleas, United States District Judge, previously referred this case to the undersigned for a Report and Recommendation. *See* 28 U.S.C. § 636(b). Having carefully reviewed the Motion, the Response, the entire case file, and applicable law, and being otherwise fully advised in the premises, the undersigned hereby RECOMMENDS that the Motion be GRANTED IN PART and DENIED IN PART for the reasons laid out below.

 I. Background

Plaintiffs' Third Amended Complaint alleges in relevant part that Plaintiff Madrid Tucker, an African American student-athlete at Fort Myers High School ("FMHS") in Lee

County, Florida, was subjected to race-based discrimination, during both extracurricular activities and the school period, while participating as one of only two non-white players on the school's baseball team.

The alleged harassment began with a February 14, 2023, text message from Defendant Alex Carcioppolo, an assistant coach on the baseball team, which read: "Happy Valentine's Day niggas."  The message was sent to both the team and coaching staff.  Defendant Carcioppolo later deleted the message following complaints, claiming that he sent it to the wrong group.  Team members were split as to whether the message was problematic, and some blamed Tucker for the backlash against the assistant coach, despite Tucker never making a formal complaint about the incident.

Following the incident, a meeting was held with the team, the high school's Athletic Director, coaches, and school assistant principals.  Students on the team reported they regularly heard racial slurs being used among team members and that this was known by staff.  The Complaint alleges students directly reported the use of derogatory racial slurs to Defendants Carcioppolo and Kyle Burchfield, head coach for the baseball team, but were told to stop "acting like a sissy" for being "bothered" by the slurs.  Ultimately, Carcioppolo was removed from his coaching position.  Plaintiffs allege Tucker then experienced retaliation from the coaching staff, particularly Burchfield and fellow defendant Robert Hinson, because they believed he had voiced concerns of the racist environment.

A series of meetings followed, but Defendants allegedly refused to allow discussion of Defendant Carcioppolo or directly address harassment the African American teammates experienced.  Tucker's parents, Michael Tucker and Azuree'd Tucker, got

2

involved following a series of confrontations, both during team activities and during the school day.  Plaintiffs allege Defendants engaged in retaliation against Tucker and his parents to force Tucker off the team, including enforcing new so-called Baseball Rules that Plaintiffs allege was targeted at Tucker.  The Complaint further alleges that Defendants subjected Tucker to ostracization and race-based commentary by students and staff at games, team dinners, and school events.

Tucker's parents were likewise targeted for speaking out about the alleged discrimination and prejudice.  Defendants allegedly deliberately failed to include Tucker's parents in educational decisions regarding their son.  Defendants also allowed parents of Tucker's teammates to directly provide financial benefits to the baseball program, skirting the official Athletic Booster Club and allowing them to sponsor events for the team privately to avoid including Tucker and his parents.

On April 5, 2023, Principal Robert Butz removed Defendant Burchfield from his coaching duties.  The following day, the baseball team played a game at which Defendant Stephan Cato (FHMS Athletic Director) was present and where college scouts and recruiters attended to watch and evaluate the players for future scholarships and university recruitment.  However, unbeknownst to Tucker, the FMHS coaches and staff, FMHS students, and other FMHS parents allegedly planned a "walk out" in response to the coaches' termination.  Defendants are alleged to have known the walkout was going to occur as early as March 9, 2023.

When it was Tucker's turn at bat, a group of FMHS players began to walk out of the dugout, leaving only Tucker and another non-white student on the field.  Parents, staff, and administrators allegedly cheered the players on, while school district faculty and staff,

3

including Defendants Hinson and Christopher Chappell, joined the players walking out. Kids and parents allegedly began to yell at one another, and some yelled at Plaintiffs, with racial slurs being thrown around.  Following the walkout, all the remaining games of the season were cancelled.

This Court dismissed Plaintiffs' prior Complaint as a shotgun pleading on a Motion to Dismiss.  Plaintiffs have now re-filed their Third Amended Complaint, and Defendants again seek to have the Complaint dismissed on multiple grounds.  ECF No. 76.  The Motion has been fully briefed and is now ripe for determination.

II.    Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "To meet this 'plausibility standard,' a plaintiff must 'plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Arias v. Integon Nat'l Ins. Co.*, No. 18-22508-CIV-ALTONAGA/GOODMAN, 2018 WL 4407624, at *2–3 (S.D. Fla. Sept. 17, 2018) (quoting *Iqbal*, 556 U.S. at 678).  "A complaint may be dismissed for failure to state a claim if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Reilly v. Herrera*, 622 F. App'x 832, 833 (11th Cir. 2015).

"On a motion to dismiss, a court construes the complaint in the light most favorable to the plaintiff and accepts its factual allegations as true."  *Arias*, 2018 WL 4407624, at *3 (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir.

1997)).  "Unsupported allegations and conclusions of law, however, will not benefit from this favorable reading."  *Id*. (citing *Iqbal*, 556 U.S. at 679).

III.    Discussion

Defendants make several arguments as to why Plaintiffs' Third Amended Complaint should be dismissed.  The undersigned first addresses Defendants' allegation that Plaintiffs have again filed a so-called shotgun pleading.  The undersigned agrees that, once again, the pleadings could certainly be clearer.  But it is also true, as Plaintiffs argue, that each count identifies the specific Defendants to whom it applies and limits incorporation to the general Factual Background and the allegations relevant to that claim. The Complaint contains detailed, defendant-specific allegations that clarify their respective roles, responsibilities, and actions.  In short, it is adequate "to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."  *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321–23 (11th Cir. 2015).

The undersigned therefore addresses the Complaint on its merits.  The Complaint alleges ten counts for relief as follows:  (I) Title VI of the Civil Rights Act of 1964 on behalf of Tucker against the School District of Lee County, Florida ("School District") and the School Board of Lee County, Florida ("School Board"); (II) Title VI of the Civil Rights Act of 1964 on behalf of Tucker's parents, Michael Tucker and Azuree'D Tucker, against the School District and School Board; (III) 42 U.S.C. § 1983 Race-Based Discrimination in Violation of the Equal Protection Clause of the Fourteenth Amendment against Cato, Burchfield, Carcioppolo, Hinson, Chappell, Butz, and Lee County Schools Superintendent Christopher Bernier; (IV) 42 U.S.C. § 1983 Deprivation of Property Interest in Violation of

the Due Process Clause of the Fourteenth Amendment Against Cato, Burchfield, Carcioppolo, Hinson, Chappell, Butz, and Bernier; (V) 42 U.S.C. § 1983 Race-Based Discrimination in Violation of the Equal Protection Clause of the Fourteenth Amendment against the School District and School Board; (VI) 42 U.S.C. § 1983 Deprivation of Property Interest in Violation of the Due Process Clause of the Fourteenth Amendment against the School District and School Board; (VII) 42 U.S.C. § 1983 Municipal Liability under *Monell v. Department of Social Services* against the School District and School Board; (VIII) Florida Educational Equity Act, Fla. Stat. §§ 1000.05 *et seq.*, and Fla. Admin. Code Ann R. 6A-19.001 *et seq.* 1983 against the School District and School Board; (IX) Equal Educational Opportunities Act of 1974 ("EEOA") against the School District and School Board; and (X) Violation of Article IX, ¶ 1 of the Florida Constitution against the School District and School Board.[1]

There are two clear divisions in Plaintiffs' Complaint. Namely, counts against the School Board and the School District and counts against the individual Defendants. Given this clear division, the undersigned will first address those counts against the governmental entities, those concerning Title VI, 28 U.S.C. § 1983, and the EEOA, and then turn to the allegations against the individuals.

---

[1] Defendants argue that any claims against the "School District" are improper and duplicative because the School District has no independent legal existence under Florida law. *See Teets v. Hillsborough Cty. Sch. Bd.*, No. 8:15-cv-0094, 2016 WL 7115981, at *1 n.1 (M.D. Fla. Nov. 7, 2016); *Lee v. Pierre*, 19-81631-CIV-ROSENBURG/REINHART, 2020 WL 13847521, at *3 (S.D. Fla. Jan. 28, 2020); Fla. Stat. §§ 1001.40, 1001.41(4), 1001.32. It is true that the Complaint does little to separate the claims alleged against the entities but given the undersigned's ultimate findings, the issue need not be resolved.

1. **The School Board and School District**

   a. <u>Title VI</u>

Title VI of the Civil Rights Act of 1964 states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. "[P]rivate individuals may sue to enforce [Title VI]," but "Title VI itself directly reaches only instances of intentional discrimination." *Middlebrooks v. Kasmar*, No. 25-11949, 2026 WL 560300, at *3 (11th Cir. Feb. 27, 2026) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001)). "[I]in the educational setting, a school district is liable for intentional discrimination when it has been 'deliberately indifferent' to teacher or peer harassment of a student." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 665 (2d Cir. 2012) (citing *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999)).[2] Such intent "may be established by evidence of a history of discriminatory official actions." *Adams v. Demopolis City Schs.*, 80 F.4th 1259, 1273 (11th Cir. 2023) (internal quotation omitted).

Plaintiffs[3] allege that the School District and the School Board through their officials and agents, knew, for months, that Tucker was the target of racially motivated attacks and

---

[2] *Zeno* concerned a Title IX claim, but Courts have applied the same standard to a Title VI analysis. *See, e.g., Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty., OK*, 334 F.3d 928, 934 (10th Cir. 2003) ("On remand, the district court is directed to apply to the Plaintiffs' Title VI deliberate indifference claims the standard for a Title IX deliberate indifference claim as previously articulated and applied by the [United States] Supreme Court.").

[3] Although the Complaint asserts a Title VI claim on behalf of Tucker's parents, "[p]arents may not assert Title VI claims because they do not attend public schools—their children do." *Ervins v. Sun Prairie Area Sch. Dist.*, 609 F. Supp. 3d 709, 721 (W.D. Wis. 2022).

harassment, including the continued use of racial slurs, disparate application of rules and codes, threatening behavior at school, and a staged walkout, but did not take prompt or effective steps reasonably calculated to end the harassment, eliminate the hostile environment, prevent its recurrence, or remedy its effects.

It is uncontested that Butz, the principal of FMHS, was aware of the problems underlying the Complaint. A principal is undoubtedly "high enough on the chain-of-command" to impute liability to the School Board. *Doe v. Sch. Bd. of Broward Cnty., Fla*., 604 F.3d 1248, 1255 (11th Cir. 2010).[4] Still, "[t]o hold a supervisory official or government entity liable, a plaintiff must show that the violation resulted from a custom or policy put in place by the supervisor or the entity." *Adams*, 80 F.4th at 1273 (citing *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1442–43 (11th Cir. 1985)).

Plaintiff has not adequately pled such a custom or policy instituted by anyone high enough in the chain of command. The entire course of the events underlying Plaintiffs' claims took place between February and April 2023. During that time, a Title VI investigation occurred, multiple interventions and meetings happened, and multiple coaches were terminated. Far more significant delays in updating policies in the face of significant racial problems have been found to not state a valid claim under Title VI. *See e.g., Adams*, 80 F.4th at 1259 (concluding that school system's eight-month delay in implementing anti-bullying plan consistent with state law did not evince deliberate indifference to white male student's bullying of Black female student.).

---

[4] *Doe* concerned a Title IX claim, as explained *supra* n.1, the analysis remains the same.

It is true that Butz and Cato[5] implemented a complained-about rule change that was allegedly unfairly enforced against Tucker.  But the School Board quickly abolished that rule change once it became known its implementation was problematic, and it appears that no actual suspension took place.  Plaintiff also acknowledges that school officials attempted to mediate racial issues multiple times over the course of those two months.  "A school district is not deliberately indifferent simply because the measures it takes to stop the harassment or discrimination ultimately are ineffective."  *Id. at* 1270.  While those mediations may not have accomplished all that Plaintiff would have liked, they do not demonstrate a custom or policy tolerating racism, particularly when taken together with the firing or suspension of multiple problematic coaches.

This leaves the walkout issue.  Although not directly pled, the Complaint does offer enough to confer a reasonable inference that Butz knew about the walkout, and certainly that Cato knew, but did nothing stop it.  However, "[a] school is deliberately indifferent only where its response, or lack thereof, to . . . harassment or discrimination is 'clearly unreasonable' in the light of known circumstances."  *Id.* (citing *Davis*, 526 U.S. at 648).  While officials did not stop the walkout, it is undisputed that officials removed Hinson from both teaching and coaching duties immediately following the incident.  ECF No. 75-1 at

---

[5] Although it is unclear whether Cato was high enough in the chain to impute liability, the undersigned assumes for the sake of argument that he may also impute liability on the municipality.

24.[6] Although such measures may not have been enough for Plaintiffs, they do not demonstrate that officials condoned or were deliberately indifferent to the incident.[7]

For all these reasons, Plaintiffs' Title VI claims against the School Board and School District fail.

b.   28 U.S.C § 1983

Counts V, VI, and VI, argue that the School Board and School District are liable under 28 U.S.C. § 1983, for civil rights violations against Plaintiffs.[8]  A local government body may be held liable under § 1983 only when the constitutional deprivation was undertaken pursuant to a policy or custom.  *See Pembaur v. Cincinnati*, 475 U.S. 469, 478–81 (1986); *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 694 (1978).  To succeed on a so-called *Monell* claim, a plaintiff must show (1) an express policy, (2) a widespread practice that is so well-settled and permanent as to constitute a custom, or (3) the act or decision of an official with final policymaking authority.  *Cuesta v. Sch. Bd.*

---

[6] This refers to the Title VI investigation report filed with Defendant's Motion.  "When resolving a motion to dismiss, a court may consider a document not referred to or attached to a complaint under the incorporation-by-reference doctrine if the document is (1) central to the plaintiff's claims; and (2) undisputed and its authenticity is not challenged." *Middlebrooks*, 2026 WL 560300 at *1 (citing *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024)).  Both factors are met here.

[7] Plaintiffs also complain that the decision to cancel the baseball season "minimized [Tucker's] playing time but also significantly reduced his opportunities to be scouted by college coaches.  The abrupt end to the season deprived Plaintiff [Tucker] of crucial exposure and development in his sport, thereby hindering his athletic and academic prospects." ECF No. 73 at 62.  Defendants correctly point out that these effects occurred to all players on the baseball team regardless of race.

[8] Defendant alleges that Count VII is duplicative of Counts V and VI, while Plaintiff contends that Count VII "pleads the separate and essential *Monell* elements necessary to impose municipal liability."  All the Counts are subject to the same *Monell* analysis and are therefore considered together.

*of Miami-Dade Cnty*., 285 F.3d 962, 966–68 (11th Cir. 2002).  Plaintiffs contend that all the *Monell* prongs apply.

Plaintiffs have failed to state a claim for *Monell* liability.  As an initial matter, Plaintiffs have failed to allege any improper act or decision by a final policymaker.  To be sure, Plaintiffs allege that Tucker, an African-American student, was targeted by school officials following a racial incident.  But for the actions of a government official to be deemed "representative" of the municipality, the acting official must be imbued with final policymaking authority.  *Denno v. Sch. Bd. of Volusia Cnty., Fla*., 218 F.3d 1267, 1276 (11th Cir. 2000) (citing *Pembaur,* 475 U.S. at 481).   "The determination of whether or not a particular official has final policymaking authority is governed by state law."  *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty., Fla*., 48 F.4th 1222, 1230 (11th Cir. 2022) (quoting *Martinez v. City of Opa-Locka*, 971 F.2d 708, 713 (11th Cir. 1992)).  "Florida law ha[s] long concluded: 'By statute, *the school board is the policy-making body for the school district*, while the superintendent is the chief executive officer of the school board and the chief administrator of the school district.'"  *Chabad*, 48 F.4th at 1230 (quoting *Greene v. School Bd. of Hamilton Cnty.*, 444 So.2d 500, 501 (Fla. 1st DCA 1984)) (emphasis in original).   Under Florida law, neither Bernier, Butz, nor Cato were final policymakers.

Affirming this conclusion is the fact that the School Board did, in fact, overrule various decisions by the trio, including the so-called new Baseball Rules and the decision to suspend Tucker from baseball.  Plaintiff states in the Third Amended Complaint that "Defendant Cato, at the direction of the School District and School Board, sent an email to parents and players informing them that there was a Title VI investigation underway,

11

that the 'rules for teamplay' established at the beginning of the season would remain in effect *without* the additions made targeting [Tucker] announced [by Burchfield earlier] and that 'consequences associated with actions related to this investigation will be held in abeyance until its conclusion.'" ECF No. 73 at 21. Both the rules promulgated under Cato and ratified by Butz were subject to review, and indeed, were abolished by the higher powers. Further, throughout the Complaint, Plaintiffs acknowledge an ongoing investigation by the School Board and School District, an investigation that resulted in the overturning of the very policies Plaintiff complains about. This is a far cry from demonstrating that there was either an official policy or a pervasive practice condoning racism within the municipality.

A "plaintiff must prove the existence of such a policy, not through one incident, but by evidence of a 'long-standing and widespread practice . . . deemed authorized by the policy-making officials because they must have known about it but failed to stop it.'" *Middlebrooks*, 2026 WL 560300, at *4 (quoting *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991)). The Complaint is replete with interventions by the School Board attempting to mitigate harm caused by the clear crisis happening at the school. Plaintiffs argue that these measures were mere attempts at saving face. But while the Court must resolve all reasonable inferences in Plaintiffs' favor, it is "not required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Nilhan Devs.*, LLC, 631 B.R. 507, 518 (Bankr. N.D. Ga. 2021) (quoting *Deerpoint Grp., Inc. v. Agrigenix*, LLC, 393 F. Supp. 3d 968, 974 (E.D. Cal. 2019)). Plaintiff has not pled any facts that would lead to a

12

reasonable inference that the School Board condoned the alleged racist behavior. To find so would require the Court to completely discount all the School Board and School District's actions and read them as intending the opposite of the actual effect. This is beyond what is required under the standard of review, and Plaintiff's claims against the School Board and School District under § 1983 fail accordingly.

c. EEOA

"The EEOA prohibits educational agencies from denying an equal educational opportunity to any individual on account of race." *Virginia State Conf. NAACP v. Cnty. Sch. Bd. of Shenandoah Cnty.*, No. 5:24-CV-040, 2025 WL 271705, at *17 (W.D. Va. Jan. 22, 2025) (citing 20 U.S.C. §§ 1701 *et seq.*). The United States Supreme Court has stated that extracurricular activities are included in the EEOA's ambit. *See id.* (citing *Freeman v. Pitts*, 503 U.S. 467, 486 (1992)). However, as demonstrated *supra*, Plaintiffs have not shown that the School Board or the School District has acted in any manner as to deny Tucker an educational opportunity because of his race.

Indeed, as pled, Plaintiff has shown the School Board and School District repeatedly intervened to ensure fair treatment. Plaintiff continued to play on the team throughout the term of the alleged incidents and was indeed identified as a "star" player. The only deprivation plausibly alleged is the cancellation of the baseball season, and that denied the same opportunities to all students regardless of race. Plaintiffs' EEOA claims must therefore be dismissed.[9]

---

[9] Defendants argue that the state law claims against the municipalities fail for similar reasons as the federal claims. However, because none of Plaintiffs' federal claims survive against the entities charged in these counts, the undersigned recommends that this Court decline to exercise supplemental jurisdiction over the state law claims. 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction

## 2. Individual Claims[10]

### a. Qualified Immunity

Before digging into the merits of Plaintiffs individual claims, the Court must address Defendants' qualified immunity arguments. Such immunity is appropriate to consider at this stage of the proceedings. *See T.R. v. School Bd. of Lee Cnty., Fla.*, No. 24-00321-CIV-ALTONAGA/REID, ECF No. 56 at 8 (M.D. Fla. Oct. 2, 2024) (citing *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002)). To be entitled to its protections, a government official must first demonstrate that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (quotation marks and citations omitted). If defendant makes a successful showing, the burden "shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation omitted), *abrogated in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009); *see also Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019).

The undersigned first finds the individual Defendants were acting within the scope of their discretionary authority. Implementing codes of conduct, acts in furtherance of coaching, and student discipline all fall within the discretionary duties of the individuals at issue. *See, e.g., Kubany v. Sch. Bd. of Pinellas Cnty.*, 839 F. Supp. 1544, 1550 (M.D.

---

over a claim [if] . . . the district court has dismissed all claims over which it has original jurisdiction.").

[10] As Plaintiffs acknowledge, "[o]fficial-capacity claims *are*, by definition, claims against the entity." ECF No. 79 at 24; *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent."). The official capacity claims fail for the same reasons as those against the School District and School Board.

Fla. 1993) (stating a principal's "implementing" of the "[c]ode of [s]tudent [c]onduct so as to maintain discipline at all school functions" is a discretionary function (alterations added)); *Davis v. Carter*, 555 F.3d 979, 981 n.1 (11th Cir. 2009) (stating it was "undisputed" that school coaches acted in their discretionary authority during a football practice); *J.V. v. Seminole Cnty. Sch. Bd.*, No. 04-cv-1889, 2007 WL 7261470, at *7 n.14 (M.D. Fla. Mar. 21, 2007) ("Disciplining children certainly falls within the job description of a teacher, and so discipline is usually a discretionary function entitling the teacher to raise the qualified immunity defense." (citing *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265–67 (11th Cir. 2004))).  We therefore address whether qualified immunity is appropriate.

Beginning with athletic director Cato, Plaintiffs allege that Cato had advance knowledge of the racially charged walkout designed to humiliate the only two players of color on the team; repeatedly ignored reports of racial slurs and escalating hostility, responding only that he "didn't notice" or "I'll talk to him"; approved and enforced discriminatory "Baseball Program Rules" that were selectively enforced against Black players; approved a six-game suspension of Tucker based on conduct white players routinely engaged in without punishment; acted to manage optics by sending an email disavowing responsibility and shifting blame "above his head"; and was notified of the walkout but did nothing to stop it.

The undersigned finds that none of these acts, singularly or taken together, are so obviously wrong as to defeat qualified immunity.  "[T]he principle must be established with 'obvious clarity' by the case law so that 'every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law

15

when the official acted.'"   *Terrell v. Smith*, 668 F.3d 1244, 1256 (11th Cir 2012).   We therefore address whether qualified immunity is appropriate.   To do so, we consider whether each individual Defendant's conduct violated Tucker's clearly established right to equal protection in school.   *See Wilson v. City of St. Petersburg*, No. 8:19-CV-1868-TPB-SPF, 2021 WL 307380, at *5 (M.D. Fla. Jan. 29, 2021) ("The Equal Protection Clause's protection against race discrimination is clearly established."); *see also Whitcomb v. Sumter Cnty. Bd. of Educ.*, 453 F. App'x 879, 881 (11th Cir. 2011) ("We have clearly established a person's right to be free from retaliation after complaining of racial discrimination.").

It is uncontested that, over the course of the incidents in question, school officials, including Cato, were attempting to mitigate the situation.   While such mitigation may have ultimately been ineffective, it nonetheless occurred.   Although the Baseball Rules may have been selectively enforced by the coaches (Burchfield and Hinson in particular) there was nothing inherently race-based in their promulgation, Cato is not alleged to have himself enforced the rules, and all the effects of the rules were nullified by Cato himself by email before they were enforced.

The walkout, which was surely a terrible experience for Tucker and his teammate, sticks out as a significant incident.   Although reasonable minds may strongly disagree with allowing such a protest to go forward, that does not defeat qualified immunity.   As another court stated in similar circumstances, "[t]he fact that actions are morally reprehensible cannot, without more, establish a rebuttal to a qualified immunity defense." *T.R.,* No 24-00321-CIV, at 9.   Instead, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions."

16

*Foster v. Echols Cnty. Sch. Dist*., 169 F.4th 1291, 1301 (11th Cir. 2026) (citing *Ashcroft v. al-Kidd,* 563 U.S. 731, 743 (2011)).  Student protests encompass myriad issues, not least of which are thorny First Amendment issues.  *See, e.g., Tinker v. Des Moines Indep. Cmty. Sch. Dist*., 393 U.S. 503 (1969)); s*ee also Kestenbaum v. President & Fellows of Harvard Coll.,* 743 F. Supp. 3d 297, 307 (D. Mass. 2024) (students failing to state a Title VI claim based on protests, including walkouts).  To deny qualified immunity, a plaintiff must affirmatively demonstrate that "no reasonably competent officer would have" acted as the public official did.  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  The ambiguity surrounding the issue, and the hard choice facing school officials regarding the walkout, is precisely the kind of situation qualified immunity is meant to encompass.

Next up is head coach Kyle Burchfield.  Plaintiff alleges that Burchfield falsely blamed Tucker for fallout from the racist text and launched a campaign of retaliation, authoring new Baseball Rules unfairly targeting and enforced against Black players; fabricated misconduct in order to suspend Tucker, and announcing that suspension publicly; told Tucker that his "*life has been a living nightmare because of you,"* and took part in planning the walkout with white parents, timing the lineup so the walkout would occur when Tucker was batting.

It is uncontested that Burchfield was no longer coach when the walkout occurred. "To prevail on a civil rights action under 42 U.S.C. § 1983, a plaintiff must establish that she was deprived of a federal right by a person acting under color of state law." *Middlebrooks*, 2026 WL 560300, at *1 (citing West *v. Atkins*, 487 U.S. 42, 48 (1988)). The walkout therefore does not rise to the level of a § 1983 violation, and the undersigned need not consider it in assessing whether qualified immunity applies to Burchfield.

17

Further, merely telling Tucker that he is making Burchfield's life difficult is not enough to defeat qualified immunity.

The remaining actions are more problematic. Accepting the facts contained in Plaintiff's Complaint as true, as we must, Burchfield actively engaged in a seemingly racist campaign of retaliation against Tucker. Such retaliation is clearly against the law. *See Farrukh v. Univ. of S. Fla. Bd. of Trs.*, No. 21-13345, 2022 WL 3973703, at *3 (11th Cir. Sept. 1, 2022) ("Title VI's prohibition on racial discrimination is also construed as prohibiting retaliation for complaining about discrimination."). Such a campaign, as alleged, would be so obviously wrong that only a plainly incompetent school official, or one who was knowingly violating the law, would have engaged in it. Burchfield is therefore not entitled to qualified immunity.

Turning to Alex Carcioppolo, the assistant coach who kicked off the situation, Plaintiffs allege that he sent the racist team message; led white teammates to blame Tucker, reinforced a racist environment where slurs were "routinely used;" encouraged students and staff to protest his firing, and played a direct role in the chain of events that led to this lawsuit.

Like Burchfield, Carcioppolo was fired prior to the walkout. Plaintiff sums up the allegations against Carcioppolo as follows:

> In essence, Carcioppolo's use of a racial slur was the flashpoint for a deeply troubling sequence of events. His unapologetic behavior and the community's reaction to his suspension exposed and inflamed systemic racism within the FMHS baseball program. His conduct not only violated professional and ethical standards but also directly contributed to the racially hostile and retaliatory environment that followed.

ECF No. 73 at 35.

18

Thus, the only real allegation against Carcioppolo that would subject him to liability was the text message containing a racial slur, which was deleted when flagged as problematic. While perhaps reprehensible and certainly misguided, Plaintiff cites no authority demonstrating that a one-time, deleted use of a racially insensitive word was blatantly unlawful. Carcioppolo is therefore entitled to qualified immunity.

Assistant Coach Robert Hinson is accused of falsely accusing Tucker of disrespecting an umpire; refusing to collect Tucker's protective gear; participating in unequal, racially biased rule enforcement against Tucker; and planning and leading the walkout. While, again, perhaps reprehensible, childish tantrums such as a refusal to collect an athlete's equipment would not rise to the level necessary to defeat qualified immunity. However, read together, Plaintiffs plausibly allege a retaliation campaign against Tucker like that employed by Burchfield. For the same reasons outlined above, qualified immunity does not apply to Hinson.

Finally,[11] we turn to Principal Butz, who Plaintiffs allege approved discriminatory rules targeting Tucker; took no action to stop publicly unequal discipline; excluded Tucker's father from team practice opportunities, attended meetings where racial hostility was defended and did nothing; and cancelled the season without considering the impact on Tucker. The undersigned has already addressed the issue of cancelling the season; such action equally impacted all players, and given the prior two months was not so obviously wrong as to overcome a qualified immunity defense. As for the remaining

---

[11] Although Superintendent Christopher S. Bernier and Assistant Varsity Coach Christopher Chappell are named as individual defendants, they are sued only in their official capacities. ECF No. 73 at 7-8. For the reasons stated *supra* n.10, the claims against those Defendants fail.

19

allegations, even taken as true the remaining behaviors show, at worst, a principal out of his depth who was attempting to mitigate—albeit poorly—a tense, difficult, rapidly escalating situation.  Such mistakes are again the kind of judgments qualified immunity is meant to protect.

Accordingly, Butz, Cato, and Carcioppolo benefit from qualified immunity, and the claims against them in their individual capacity must be dismissed.

Thus, only claims under § 1983 against Defendants Burchfield and Hinson survive the qualified immunity analysis.  Plaintiffs bring two counts against the two Defendants, one alleging deprivation of property interest, brought under the Due Process Clause of the Fourteenth Amendment, and one alleging race-based discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment.

As far as deprivation of a property interest, it has been long held in this Circuit that "[t]he privilege of participating in interscholastic athletics . . . fall(s) . . . outside the protection of due process." *Mitchell v. Louisiana High School Athletic Association*, 430 F.2d 1155, 1157–58 (5th Cir. 1970)[12], see also *McGhee v. Talladega City Bd. of Educ.*, No. 1:18-CV-1554, 2020 WL 6384428, at *8 (N.D. Ala. Oct. 30, 2020); *Marner ex rel. Marner v. Eufala City School Board*, 204 F. Supp. 2d 1318, 1324 (M.D. Ala. 2002). Plaintiffs nonetheless argue that Plaintiffs have alleged deprivation of an adequate "liberty interest" that justifies a due process claim.  *See Smith v. Siegelman*, 322 F.3d 1290 (11th Cir. 2003) (due process claim arises where reputational injury is accompanied by concrete harm imposed by the state); *Goss v. Lopez,*  419 U.S. 565 (1975) (due process claim

---

[12] The Eleventh Circuit has adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the Eleventh Circuit's establishment on October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

20

arises where fabricated disciplinary findings affect future educational opportunities); *Paul v. Davis*, 424 U.S. 693 (1976) (due process claim arises where there is a stigma plus an alteration of legal status).

However, neither of the surviving Defendants' actions can be said to have risen to such a violation. Ultimately, Tucker was only briefly suspended for a few innings, and none of the more draconian punishments were enforced. Neither Hinson nor Burchfield were behind the cancellation of the season or the exclusion of Tucker's parents, and any effect on future educational opportunities is speculative at best. Nothing in the pleadings gives rise to a reasonable inference that the remaining Defendants' actions rose to the level of a due process violation. Accordingly, this claim must be dismissed.

This leaves only whether Plaintiffs have adequately alleged race-based discrimination in violation of the Equal Protection Clause against Burchfield and Hinson. Both Burchfield and Hinson are alleged to have committed these acts against Tucker alone.[13] As Plaintiffs point out, "the central purpose of the Equal Protection Clause . . . is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis,* 426 U.S. 229, 239 (1976). "Title VI and equal protection claims are considered under the same analytical framework." *Methelus v. Sch. Bd. of Collier Cnty.*, Fla., 243 F. Supp. 3d 1266, 1280 (M.D. Fla. 2017).

Unlike above, where the question was whether the municipality could be held responsible for the actions of the individual Defendants, the question now before the

---

[13] Plaintiffs allege that Burchfield forbade Tucker's father from participating in practices but does not appear to allege this gave rise to a claim on the father's behalf. Instead, it is framed as "cutting off support and mentorship" for Tucker in violation of the Equal Protection Clause.

21

Court is whether Plaintiffs have alleged a plausible claim against the remaining defendants themselves.  The undersigned finds that they have.  As previously stated, accepting the facts contained in Plaintiff's Complaint as true, as we must, Burchfield and Hinson both actively engaged in a seemingly racist campaign of retaliation against Tucker, a campaign that, if true, would violate Tucker's rights under the Equal Protection Clause.  Accordingly, only this claim—Count III, a § 1983 claim for race-based discrimination in violation of the Equal Protection Clause against Burchfield and Hinson—survives Defendants' Motion to Dismiss.

RECOMMENDATION

For the foregoing reasons, the undersigned respectfully RECOMMENDS Defendants' Motion to Dismiss, ECF No. 76, be GRANTED IN PART.  It is granted to the extent that all claims against the School Board, School District, Bernier, Butz, Cato, Carcioppolo, Chappell and Butz should be dismissed.  Further, all claims against Burchfield and Hinson, save Count III: 42 U.S.C. § 1983 Race-Based Discrimination in Violation of the Equal Protection Clause of the Fourteenth Amendment, should be dismissed.  The Motion should otherwise be DENIED.

Within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections to any of the above findings and recommendations as provided by the Local Rules for this district.  28 U.S.C. § 636(b)(1); S.D. Fla. Mag. R. 4(b).  Any response shall be filed within three (3) days of the objections.  The parties are hereby notified that a failure to timely object waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions contained in this Report and Recommendation.  11th Cir. R. 3-1 (2016); see Thomas v. Arn, 474 U.S. 140 (1985).

DONE and SUBMITTED at Fort Lauderdale, Florida, this 29th day of May 2026.

_____
PATRICK M. HUNT
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
The Honorable William P. Dimitrouleas
All counsel of record

23