**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**FORT MEYERS DIVISION**

MICHAEL TUCKER, Individually &          §
AZUREE'D TUCKER, Individually & on      §
behalf of M.T., a Minor Child           §
    *Plaintiffs,*                §
                                        §
V.                                      §    CIVIL ACTION NO. <u>2:24-cv-142</u>
                                        §
                                        §
THE SCHOOL                              §
BOARD OF LEE COUNTY, FLORIDA;           §    <span style="color:red">JURY DEMANDED</span>
STEPHAN CATO; KYLE BURCHFIELD;          §
ALEX CARCIOPPOLO; ROBERT                §
HINSON; CHRISTOPHER CHAPELL;            §
ROBERT BUTZ; and CHRISTOPHER S.         §
BERNIER, Ph.D.                          §
    *Defendants.*                §

**<u>PLAINTIFFS' OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND</u>**
**<u>RECOMMENDATIONS</u>**

TO THE HONORABLE JUDGE OF SAID COURT:

Pursuant to 28 U.S.C. § 636(b)(1) and S.D. Fla. Mag. R. 4(b), Plaintiffs Michael Tucker,

Azuree'd Tucker, and M.T., a Minor, hereby file the following specific, timely objections to the

Report and Recommendations (ECF No. 80, "Report") issued by United States Magistrate Judge

Patrick M. Hunt on May 29, 2026. Plaintiffs respectfully object to the recommendation that

Defendants' Motion to Dismiss be granted in part and respond as set forth below. Plaintiffs

additionally respectfully request leave to amend their Complaint due to statements made in the

Report.

1

**OBJECTION NO. 1:**   **The Magistrate Applied the Incorrect Pleading Standard.**

Plaintiffs specifically objects to page 4 of the Report, and its reliance on *Reilly v. Herrera*, 622 F. App'x 832, 833 (11th Cir. 2015) for the proposition that: "A complaint may be dismissed for failure to state a claim if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." (Report at 4).

That formulation derives from *Conley v. Gibson*, 355 U.S. 41 (1957), and is no longer the governing pleading standard. The Supreme Court expressly retired *Conley*'s "no set of facts" formulation in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 562-63 (2007), explaining that the phrase had "earned its retirement." *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 563.  The Court subsequently clarified in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), that a complaint survives dismissal when it contains sufficient factual matter, accepted as true, to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. at 678. Under the governing Rule 12(b)(6) standard, courts must accept well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Iqbal*, 556 U.S. at 678; *Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010).

To the extent the Report relies upon the superseded "no set of facts" formulation, Plaintiffs respectfully object because that standard is no longer controlling. More importantly, under the controlling plausibility standard, the Report repeatedly searches out and resolves factual disputes drawing competing inferences in Defendants' favor and thereby failing take as true and draw all reasonable inferences in favor of Plantiffs as required. For example, the Report characterizes Defendants as "attempting to mitigate" the situation, describes and excuses certain officials as merely exercising "poor judgment", and repeatedly credits Defendants' explanations for disputed events rather than accepting Plaintiffs' allegations as true. Those determinations are inconsistent

2

with the pleading standards established by *Twombly* and *Iqbal*, necessitating the Court to sustain Plaintiffs' Objection No. 1.

At this stage, the question is not whether the Court ultimately finds Plaintiffs' allegations persuasive, probable, or even likely to be proven (though Plaintiffs adamantly maintain the allegations will ultimately be proven). The question is whether the Complaint plausibly alleges facts which, if accepted as true, entitle Plaintiffs to relief. As the Eleventh Circuit has recognized, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010). Because the Report repeatedly weighs competing factual inferences and credits Defendants' version of disputed events, rather than accepting Plaintiffs' allegations as true, the Report's analysis is inconsistent with the governing Rule 12(b)(6) standard. Accordingly, the Court should review the challenged portions of the Report *de novo* under the proper Rule 12(b)(6) framework and reject any analysis that fails to draw reasonable inferences in Plaintiffs' favor, and sustain the Objection.

**OBJECTION NO. 2:**     **The Magistrate Improperly Resolved Factual Inferences Against Plaintiffs.**

Plaintiffs specifically object to the Magistrate's Report in that it repeatedly weighs competing inferences rather than accepting Plaintiffs' allegations as true. At the Rule 12(b)(6) stage, the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in Plaintiffs' favor. *Ashcroft v. Iqbal,* 556 U.S. 662, 672 (2009). Instead, the Report repeatedly concludes:

- The School Board was "attempting to mitigate" harm (Report at 12, 16, 20);

- Actions were merely "ineffective" (Report at 16);

- Butz was merely "out of his depth" (Report at 20);

- Butz was "attempting to mitigate" a "tense, difficult, rapidly escalating situation." (Report at 20).

Plaintiffs also specifically object to the Magistrate's Report improperly resolving factual inferences against Plaintiffs in its analysis of the Title VI claim (and, at times, completely ignoring the pled facts).

For instance, the Report concludes: "**<u>Although not directly pled</u>**, the Complaint does offer enough to infer a reasonable inference that Butz knew about the walkout, and certainly that Cato knew, but did nothing to stop it." (Report at 9). This conclusion is impossible to reconcile with the express allegations of paragraph 64 of the Complaint, which clearly and directly pleads Butz and Cato's knowledge:

> Before the April 6, 2023 game, Defendants Butz and Cato were informed by parents and staff that a walkout was planned during the game. Defendant Cato was captured on body camera, effectively admitting the same to the Ft. Myers police officers who responded to the post walkout melee. While he stated he didn't know how bad the walkout would be, Defendant Cato was so worried about the impending walkout that he took it upon himself to pre-notify a former FMHS School Resource Officer [who had been previously removed for conduct issues] and ask him to attend the game.

(ECF No. 73, Plaintiffs' Third Amended Complaint, "TAC or the Complaint", at ¶ 64). Thus, Plaintiffs did not merely plead facts from which knowledge could be inferred, Plaintiffs expressly alleged that both Butz and Cato were informed before the game that a walkout was planned and further alleged that Cato's own conduct, contacting a former School Resource Officer and asking him to attend the game because of concerns regarding the impending walkout, demonstrated actual advance knowledge of the event.

The Report's characterization of these allegations as merely supporting a "reasonable inference" of knowledge materially understates and misrepresents what was expressly plead. More

4

importantly, the Report subsequently relies upon that diminished characterization to conclude that Defendants' response was not deliberately indifferent. This again violates Rule 12 where at the Rule 12(b)(6) stage, the Court was required to accept as true Plaintiffs' allegations that Defendants possessed actual advance notice of the walkout and nevertheless permitted it to proceed.

The error is particularly significant because Plaintiffs alleged not merely that Defendants knew a walkout would occur, but that they knew the walkout would occur in a manner that would isolate and humiliate the only two players of color on the team. The Complaint alleges that Defendants were informed of the planned walkout in advance, that lineup changes were made to position Madrid and T.R. in prominent roles immediately before the walkout, that Defendants took steps to prepare for the anticipated fallout, and that no action was taken to prevent the event from occurring. Taking each of those allegations as true, as the Court was required to do, the Complaint plausibly alleges actual knowledge and deliberate indifference to a racially charged event directed at Madrid and T.R.

The Report's analysis is particularly problematic because it effectively treats and trivializes the planned and deliberate walkout as just a difficult student-expression issue entitled to substantial administrative deference. In doing so, the Report appears to rely upon the notion that school officials require "breathing room" when confronting rapidly developing student conduct. (Report at 17). However, even assuming such principles apply in the ordinary student-speech context, Plaintiffs' allegations remove this case from the realm of passive student expression and place it squarely within the realm of active governmental involvement. Unlike the independent student speech protected by *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), the Complaint alleges that school officials and coaches were aware of the planned walkout beforehand, permitted it to proceed, and, in some instances, actively facilitated the circumstances

5

under which it occurred. The Complaint alleges that Defendants Butz and Cato were informed before the game that a walkout was planned. (TAC ¶ 64). It further alleges that the lineup was manipulated to place Madrid and T.R.—the only two players of color—in positions that would maximize the impact and humiliation of the walkout. (TAC ¶¶ 68-69). The Complaint also alleges that Defendants knowingly allowed the walkout to occur despite advance notice and despite understanding who would be targeted. (TAC ¶¶ 64, 68-69, 72). Thus, this is not a case where school officials merely failed to predict or prevent student speech. According to the Complaint, there was advance notice, administrative awareness, and an affirmative decision to permit the walkout to proceed. Indeed, the allegations support the inference that there was at least principal-level agreement—and potentially broader administrative agreement—to allow the walkout to occur despite its foreseeable impact on Madrid and T.R.

Nor does any notion of administrative "breathing room" justify qualified immunity where the alleged conduct is motivated by race. As recognized in *Foster v. Echols*, the existence of discretion does not insulate officials from liability for race-based conduct. *Foster v. Echols County School Dist.,* 169 F.4th 1291, 1301 (11th Cir. 2026) (breathing room "does not give them a license to 'knowingly violate the law'…every reasonable official would have understood that conduct to be unlawful, and that conclusion forecloses the school officials' request for qualified immunity."). Accepting Plaintiffs' allegations as true, the issue is not whether Cato made a difficult judgment call. The issue is whether, despite advance notice, he knowingly permitted a racially charged walkout directed at the only two players of color on the team. At the Rule 12(b)(6) stage, that inference must be drawn in Plaintiffs' favor.

Because the Report improperly minimizes express allegations of actual knowledge and resolves disputed factual inferences in Defendants' favor, contrary to the governing Rule 12(b)(6)

6

standard, it should not be adopted. There are other examples, which Plaintiffs also specifically object to, of the Report improperly resolving factual inferences against Plaintiffs in its analysis of Title VI claim.  The Report concludes: "While those mediations may not have accomplished all that Plaintiff would have liked, they do not demonstrate a custom or policy tolerating racism" and further concludes that "officials did not stop the walkout" but nevertheless "they do not demonstrate that officials condoned or were deliberately indifferent to the incident." (Report at 9-10). At the Rule 12(b)(6) stage, the Court must accept Plaintiffs' allegations as true, and included in those allegations are that:

- Defendants were told racial slurs were routinely used among team members. (TAC ¶ 21);

- A student reported racial slurs directly to Defendants Carcioppolo and Burchfield and was told to stop "acting like a sissy" for being bothered by them. (TAC ¶ 22);

- During meetings attended by administrators, white players defended the use of the word "nigga," and "none of the named Defendants—adults in a room full of teenagers—intervened to state the obvious." (TAC ¶ 26);

- Defendants knew a walkout was planned before it occurred. (TAC ¶ 64);

- Defendants nevertheless permitted the walkout to occur when Madrid stepped into the batter's box. (TAC ¶¶ 68-69).

The Report's conclusion that these allegations do not plausibly demonstrate deliberate indifference improperly weighs competing factual inferences against Plaintiffs.  The Court must sustain Objection No. 2.

**OBJECTION NO. 3:**  **The Magistrate Misapplied the Legal Standard Under Title VI.**

Plaintiffs specifically object to pages 7-8 of the Report for applying a deliberate indifference standard to the Title VI claim at issue. To establish that a defendant is liable under Title VI of the Equal Protection Clause, a plaintiff must prove discriminatory intent. *Burton v. City*

*of Belle Glade,* 178 F.3d 1175, 1202 (11th Cir. 1999). In *Adams v. Demopolis City Schools,* 80 F.4th 1259, 1273 (11th Cir. 2023), the Court recognized that "[w]hether deliberate indifference is the standard applicable to a Title VI claim is a question of first impression in our circuit." The court then went on to apply the standard in "student-on-student race-based harassment" claims. *Adams v. Demopolis City Schools,* 80 F.4th 1259 at 1273.  Importantly, this is not just a case of *student-on-student* race-based harassment, and is not limited to allegations that the School Board and School District failed to respond adequately to peer harassment. Rather, the Complaint alleges systemic discriminatory actions that were carried out by school officials, coaches, administrators, and agents of the School Board and School District acting under color of state authority. Namely, the Complaint alleges repeated acts of direct, intentional discrimination by the School District employees and officials themselves, including:

- A school coach sending a text message to the team that stated, "Happy Valentine's Day niggas." (TAC ¶ 20);

- Coaches and administrators allowing students to openly defend use of the N-word during school-sponsored meetings while failing to condemn the conduct. (Complaint ¶¶ 24, 25, 26);

- Defendants Burchfield, Hinson, Cato, and Butz selectively enforcing disciplinary rules against Madrid and the only other Black player on the team while white players committing similar or more serious conduct were not disciplined. (Complaint ¶¶ 31-36);

- Defendant Burchfield publicly suspending Madrid while similarly situated white players received no punishment. (Complaint ¶¶ 40-43);
- Defendants knowingly permitting and facilitating a walkout that left only the two Black players isolated on the field in front of scouts, recruiters, parents, and spectators. (Complaint ¶¶ 63-70); and

- Defendants repeatedly retaliating against Madrid and his parents because of complaints concerning race discrimination. (Complaint ¶¶ 22, 53, 57-59).

These allegations do not merely describe a failure to respond to race-based harassment by students. They describe affirmative discriminatory conduct by government actors themselves.

8

Indeed, the Report itself acknowledges that Plaintiffs alleged "retaliation from the coaching staff," that Defendants implemented allegedly discriminatory "Baseball Rules," and that Defendants knew about the walkout and failed to stop it. (Report at 2-3, 9).

By treating this case as if it involved only a deliberate-indifference claim arising from peer harassment, the Report never meaningfully analyzes whether Plaintiffs plausibly alleged intentional discrimination by school officials and employees. That omission is significant because direct intentional discrimination by state actors presents a materially different Title VI theory than the student-on-student harassment claim discussed in *Adams*. 80 F.4th at 1273.

Moreover, even if deliberate indifference were the applicable standard, the Report improperly focuses on remedial measures taken after certain events occurred while disregarding allegations that District officials themselves participated in, approved, ratified, encouraged, or facilitated the discriminatory conduct at issue. The Complaint does not merely allege that Defendants failed to stop discrimination; it alleges that Defendants were active participants in it.

Accordingly, Plaintiffs object because the Report analyzes the wrong claim under the wrong framework. The Complaint plausibly alleges intentional race discrimination by school officials and employees acting on behalf of the School District and School Board. The Report's application of a deliberate-indifference framework designed for student-on-student harassment claims fails to address the actual allegations pled and therefore applies an incorrect legal standard to Plaintiffs' Title VI claim. The Court must therefore sustain Plaintiffs' Objection No. 3.

## 4

**OBJECTION NO. 4:**       **The Report Erroneously Concludes that Plaintiffs Failed to Allege Facts Supporting Institutional Liability for Title VI.**

Plaintiffs specifically object to page 8 of the Report concluding that the Title VI claim fails because Plaintiffs purportedly failed to allege facts demonstrating a custom, policy, or institutional

9

practice sufficient to support liability against the School District and School Board. The Report states: "To hold a supervisory official or government entity liable, a plaintiff must show that the violation resulted from a custom or policy put in place by the supervisor or the entity." (Report at 8). The Report then concludes that: "Plaintiff has not adequately pled such a custom or policy instituted by anyone high enough in the chain of command." (Report at 8).

Even assuming such a showing is required under the circumstances presented here, the Complaint contains extensive factual allegations demonstrating a persistent pattern, practice, and institutional tolerance of race-based discrimination and retaliation extending far beyond an isolated incident. First, Plaintiffs alleged that racial slurs were not isolated or sporadic, but were routinely used within the baseball program and known to school officials. Specifically, Plaintiffs alleged that: "Students on the team reported they regularly heard racial slurs being used among team members and that this was known by staff." (TAC ¶ 21). Plaintiffs further alleged that: "Before the season even began, at least one student (not Madrid or T.R.) directly reported the use of derogatory racial slurs lodged against him to Defendants Carcioppolo and Burchfield but were told to stop 'acting like a sissy' for being 'bothered' by the use of the slurs." (TAC ¶ 22). Thus, the Complaint alleges not merely notice of racial harassment, but affirmative discouragement of complaints about racial harassment by school personnel.

Second, Plaintiffs alleged that multiple administrators and coaches attended meetings where racial slurs were openly defended and normalized, yet no corrective action was taken. The Complaint alleges: "In one such meeting, organized by the School Board and School District through Defendants Butz, Cato, Burchfield, and Henson (who were in attendance), players were asked to raise their hand if they had ever used the word 'nigga.' Most of the players, all but two of them white, raised their hands." (TAC ¶ 26). The Complaint further alleges: "The Defendants

10

present then asked the players whether they thought their use of the word 'nigga' was appropriate. Many of the white players defended their use of the word on the bases that 'rappers use it all the time' and that it was okay to use amongst friends." (TAC ¶ 26). And critically: "None of the named Defendants—adults in a room full of teenagers—intervened to state the obvious: that any use of the 'n-word' is wholly unacceptable." (TAC ¶ 26).

Plaintiffs likewise alleged that during a separate parent meeting: "Many of the parents admitted that their kids used the word 'nigga' regularly, defended their use of the word at length, and questioned whether Defendant Carcioppolo's use of the word was worthy of his suspension." (TAC ¶ 29). These allegations support an inference of institutional tolerance and normalization of race-based conduct, not merely isolated misconduct.

Third, Plaintiffs alleged repeated disparate treatment and selective enforcement of discipline against Madrid and the only other Black player on the team. The Complaint alleges: "Defendants Burchfield, Cato, and Butz in their official capacities and on behalf of the School District and School Board, inconsistently and unfairly implemented the new Baseball Program Rules against Madrid in retaliation..." (TAC ¶ 31). Plaintiffs further alleged: "The new rules were inconsistently applied against Madrid and the other student of color, causing Madrid and the other student of color to be subjected to more infractions and stiffer consequences." (TAC ¶ 31). The Complaint also alleges that white players engaged in more serious conduct but received no discipline: "Neither was removed from the game nor punished in any way in stark contrast both to how Defendant Burchfield's email stated such incidents would be handled and to the action Defendant Hinson demanded be taken out against Madrid." (TAC ¶ 35).

Fourth, Plaintiffs alleged that senior administrators repeatedly received complaints and repeatedly failed to take effective corrective action. The Complaint alleges that Madrid's parents

11

complained directly to Defendant Cato, who responded that he: "didn't notice" Hinson's conduct and would "talk to him" about the incident. (TAC ¶ 33). The Complaint further alleges: "Defendant Cato failed to take any remedial action, failed to discuss the issue with Defendants Hinson, and failed to inquire about the impact of the treatment on Madrid." (TAC ¶ 33).

Fifth, Plaintiffs alleged advance knowledge of the April 6 walkout and institutional acquiescence to it. Specifically: "Before the April 6, 2023 game, Defendants Butz and Cato were informed by parents and staff that a walkout was planned during the game." (TAC ¶ 64). Plaintiffs further alleged: "Defendant Cato was so worried about the impending walkout that he took it upon himself to pre-notify a former FMHS School Resource Officer ... and ask him to attend the game." (TAC ¶ 64). Despite that advance knowledge, Plaintiffs allege that no action was taken to prevent the walkout from occurring.

Finally, Plaintiffs alleged that the events were consistent with a broader pattern of racial issues within the school itself. The Complaint alleges: "FMHS has a long history associated with resistance to integration, which included a riot at the school in 1969 and long-standing and widely known ongoing racial tensions." (TAC ¶ 71).

Accepting these allegations as true and drawing all reasonable inferences in Plaintiffs' favor, as required at the Rule 12(b)(6) stage, Plaintiffs alleged far more than an isolated incident involving a single coach. The Complaint alleges repeated racial slurs, repeated complaints to administrators, repeated failures to intervene, repeated disparate discipline, repeated retaliatory actions, advance knowledge of the walkout, and participation by multiple school officials over an extended period of time. Accordingly, even under the Report's policy-or-custom analysis, Plaintiffs plausibly alleged facts supporting an inference of an institutional custom, practice, or policy of tolerating and perpetuating race-based discrimination and retaliation. The Report's conclusion to

12

the contrary improperly disregards numerous well-pleaded factual allegations and fails to draw reasonable inferences in Plaintiffs' favor. The Court must sustain Plaintiffs' Objection No. 4.

**OBJECTION NO. 5:** **The Report Improperly Relies on Defendants' Investigative Report to Resolve Factual Disputes and Draw Inferences Against Plaintiffs.**

Plaintiffs specifically object to pages 8-10 of the Report and the Report's repeated reliance on the School District Defendant's own internal Title VI investigation and the conclusions drawn from that biased self-serving internal investigation. The Report expressly relied on the Title VI investigation report that the Defendant School District conveniently commissioned, not prepared by any disinterested independent third-party, but by its own personnel and attached to Defendants' Motion to Dismiss and invokes the incorporate-by-reference doctrine as authority for doing so. (ECF 80 at n. 6). Plaintiffs do not dispute that the Title VI report exists. Nor do Plaintiffs dispute that the Court may consider the existence of the document. Plaintiffs do, however, object to the Report's use of that Title VI report to resolve disputed factual issues, to draw inferences in Defendants' favor in violation of the governing standard at the 12(b)6 stage, and effectively credit the School District's version of events over the well-pleaded allegations of the Complaint.

This is particularly problematic where the report itself was prepared by School District employees Charles Bradley and Clara Diaz on School District letterhead and submitted through the School District's chain of command to the Superintendent and School Board. The report constitutes the School District's internal self-assessment of the events at issue clearly prepared specifically for a defense and was not independent or inherently reliable. The existence of such a report does not permit the Court to accept the report's conclusions as true while disregarding contrary factual allegations contained in the Complaint. The Report repeatedly does precisely that.

13

Plaintiffs' must be given an opportunity to challenge the veracity of the internal investigation through discovery.

**A.      The Report Relies on the Investigation and Subsequent Corrective Measures to Conclude that No Custom or Policy Existed.**

The Report concludes: "During that time, a Title VI investigation occurred, multiple interventions and meetings happened, and multiple coaches were terminated." (Report at 8). The Report then reasons: "While those mediations may not have accomplished all that Plaintiff would have liked, they do not demonstrate a custom or policy tolerating racism, particularly when taken together with the firing or suspension of multiple problematic coaches." (Report at 9). In reaching that conclusion, the Report credits the existence of the investigation and subsequent discipline while disregarding numerous allegations that the investigation itself was inadequate, biased, and failed to address the harm inflicted upon Madrid.

Plaintiffs specifically alleged: "The ensuing investigation deliberately failed to address the damaging impact of the text on students of color, particularly those like Plaintiff Madrid." (TAC ¶ 4). Plaintiffs further alleged: "Instead of conducting an investigation that considered the harm and trauma engendered by the objectively racist text, the School District and School Board 'circled the wagons.'" (TAC ¶ 5). Plaintiffs also alleged: "Failing to investigate incidents of racism at all and when they did investigate some incidents of racism, they did so without interviewing Plaintiffs or the other student of color who were directly and traumatically impacted by the incidents." (TAC ¶ 90(d)).

**B.      The Report Uses the Title VI Report to Characterize the Post-Walkout Discipline as "Undisputed."**

The Report states: "While officials did not stop the walkout, it is undisputed that officials removed Hinson from both teaching and coaching duties immediately following the incident."

14

(Report at 10). The word "undisputed" is significant. Plaintiffs do not dispute that discipline may have occurred. Plaintiffs do dispute the legal significance of that discipline and whether it negates deliberate indifference. The Complaint alleges that Defendants had advance notice of the walkout and failed to stop it. Specifically: "Before the April 6, 2023 game, Defendants Butz and Cato were informed by parents and staff that a walkout was planned during the game." (TAC ¶ 64). The Complaint further alleges: "Defendant Cato was so worried about the impending walkout that he took it upon himself to pre-notify a former FMHS School Resource Officer ... and ask him to attend the game." (TAC ¶ 64). And Plaintiffs alleged: "The walkout proceeded as engineered by Defendants Burchfield, Hinson, Chappel, and Carcioppolo." (TAC¶ 69). Thus, the relevant question is not whether Hinson was later disciplined. The relevant question is whether Defendants knowingly permitted the walkout to occur despite advance notice. The Report improperly uses the investigation's findings regarding subsequent discipline to minimize or negate allegations concerning Defendants' conduct before and during the walkout.

**C.    The Report Draws an Inference in Defendants' Favor that Officials Did not Condone the Conduct.**

After citing the investigation report, the Report concludes: "Although such measures may not have been enough for Plaintiffs, they do not demonstrate that officials condoned or were deliberately indifferent to the incident." (Report at 10). That conclusion directly conflicts with numerous allegations that must be accepted as true. Plaintiffs alleged: "

- None of the named Defendants—adults in a room full of teenagers—intervened to state the obvious: that any use of the 'n-word' is wholly unacceptable." (TAC ¶ 26).

- Administrators allowed meetings where white students openly defended use of the N-word. (TAC ¶¶ 24, 26, 29).

- "Defendant Cato failed to take any remedial action." (TAC ¶ 33).

- "The School District and School Board again failed to investigate the impact of the events on the Plaintiffs." (TAC ¶ 70).

- "The School District and School Board did not consider the impact of this decision on Plaintiffs." (TAC ¶ 70).

Construing those allegations in Plaintiffs' favor, a reasonable inference exists that officials did, in fact, condone or tolerate race-based conduct. The Report instead adopts the competing inference urged by Defendants.

### D. The Report Relies on the Investigation to Characterize the School Board as Attempting to Mitigate Harm.

The Report later states: "The Complaint is replete with interventions by the School Board attempting to mitigate harm caused by the clear crisis happening at the school." (Report at 12). Again, that is one possible inference. It is not the only inference—nor is it the one construed most favorably for the Plaintiffs as is required at this stage in light of the pleaded allegations. Plaintiffs expressly alleged: "The School District and School Board subscribed to and encouraged the view that ignoring endemic racism would allow the team to resume baseball as if nothing were amiss." (TAC ¶ 91). Plaintiffs further alleged: "Plaintiff Madrid and his parents were viewed as impediments to this narrative." (TAC ¶ 91). And Plaintiffs alleged: "The School District and School Board acted knowingly, intentionally, recklessly, and with deliberate indifference." (TAC ¶ 91). The Magistrate was required to accept those allegations as true and draw reasonable inferences in Plaintiffs' favor. Instead, the Report repeatedly accepts the School District's characterization of its own investigation and remedial efforts while discounting contrary allegations contained in the Complaint.

For all of these reasons, the Report improperly relies on the Title VI investigation report not merely as a document whose existence may be considered, but as substantive evidence

16

establishing that Defendants responded appropriately, did not condone discrimination, and attempted to mitigate harm. Those are disputed factual issues that cannot be resolved on a Rule 12(b)(6) motion and must instead be construed in Plaintiffs' favor, Plaintiff's Objection No. 5 must be sustained.

**OBJECTION NO. 6:**    **The Report Erroneously Dismisses the *Monell* Claim by Disregarding Well-Pleaded Allegations of Widespread Practice, Ratification, and Deliberate Indifference.**

Plaintiffs specifically object to pages 11-12 of the Report concluding that Plaintiffs "have failed to allege any improper act or decision by a final policymaker" and that the Complaint fails to allege "either an official policy or a pervasive practice condoning racism within the municipality." (Report at 11-12).

The Report improperly narrows Plaintiffs' Monell theory to whether Plaintiffs identified a single final policymaker who personally adopted an expressly discriminatory policy. That is not the theory alleged in the Complaint. The Complaint expressly alleges that the School District and School Board maintained: "a widespread, persistent custom or practice of discrimination and retaliation against African American students and their families." (TAC ¶ 154(b)). The Complaint further alleges: "The decision or deliberate indifference of final policymakers—including the Superintendent, Principal, and Athletic Director—who had actual or constructive knowledge of the misconduct but failed to take corrective action." (TAC ¶ 154(c)). The Complaint also specifically alleges that the School District and School Board maintained or permitted unconstitutional practices including:

- "Tolerating and excusing the use of racial slurs by students and staff." (TAC ¶ 155(a)); "Selectively enforcing disciplinary policies to target African American students." (TAC ¶ 155(b));

17

- "Failing to intervene or protect Madrid from repeated racial harassment and retaliation." (TAC ¶ 155(c));

- "Planning, permitting, and endorsing a racially motivated 'walkout.'" (TAC ¶ 155(d)); and

- "Failing to implement meaningful training, supervision, or discipline to prevent race-based discrimination or retaliation." (TAC ¶ 155(f)).

The Report never meaningfully addresses these allegations. Instead, the Report repeatedly relies upon the existence of a Title VI investigation, the rescission of certain disciplinary measures, and the eventual removal of coaches to conclude that the School Board could not have condoned the conduct. (*See* Report at 8-12). That analysis improperly resolves factual disputes against Plaintiffs.

The Complaint expressly alleges that the investigation itself was inadequate and failed to address the harm suffered by Madrid. Plaintiffs alleged:

- "The ensuing investigation deliberately failed to address the damaging impact of the text on students of color." (TAC ¶ 4).

- "The School District and School Board 'circled the wagons.'" (TAC ¶ 5); and

- "Failing to investigate incidents of racism at all and when they did investigate some incidents of racism, they did so without interviewing Plaintiffs or the other student of color who were directly and traumatically impacted by the incidents." (TAC ¶ 90(d)).

The Report also overlooks allegations that multiple District officials repeatedly received complaints concerning racial slurs, disparate discipline, retaliatory treatment, and the planned walkout. For example, Plaintiffs alleged: "Students on the team reported they regularly heard racial

18

slurs being used among team members and that this was known by staff." (TAC ¶ 21). Plaintiffs alleged that Defendants attended meetings where students openly defended use of the word "nigga" and: "None of the named Defendants—adults in a room full of teenagers—intervened." (TAC ¶ 26). Plaintiffs further alleged: "Before the April 6, 2023 game, Defendants Butz and Cato were informed by parents and staff that a walkout was planned during the game," and that Defendants nevertheless permitted the walkout to occur. (TAC ¶ 64). When these allegations are accepted as true and viewed collectively—as they must be at the pleading stage—they plausibly support an inference of a widespread practice of tolerating race-based conduct, deliberate indifference to repeated complaints of discrimination, and ratification of unconstitutional conduct through repeated failures to intervene.

The Report improperly analyzes each incident in isolation and repeatedly credits Defendants' purported remedial efforts while discounting allegations that those efforts were ineffective, pretextual, or themselves evidence of institutional indifference. In effect, the Magistrate essentially concludes that because there was an investigation and some coaches were removed, there could not have been a custom. This is not a proper Rule 12(b)(6) inference and a jury could readily conclude the opposite from the facts pled. At the Rule 12(b)(6) stage, Plaintiffs were not required to prove *Monell* liability. They were required only to plead sufficient facts to plausibly support it. The Complaint does so repeatedly. Accordingly, dismissal of Counts V and VII is improper. Plaintiffs' Objection No. 6 must be sustained.

**OBJECTION NO. 7:**　　**The Report Improperly Granted Qualified Immunity to Defendant Cato.**

Plaintiffs specifically object to pages 15-17 of the Report regarding Defendant Cato and the Report's conclusion that Defendant Cato is entitled to qualified immunity.

19

The Report acknowledges that Plaintiffs alleged Cato: "had advance knowledge of the racially charged walkout designed to humiliate the only two players of color on the team;" "repeatedly ignored reports of racial slurs and escalating hostility;" "approved and enforced discriminatory 'Baseball Program Rules' that were selectively enforced against Black players;" "approved a six-game suspension of Tucker based on conduct white players routinely engaged in without punishment;" and "was notified of the walkout but did nothing to stop it." (Report at 15).

Nevertheless, the Report concludes: "none of these acts, singularly or taken together, are so obviously wrong as to defeat qualified immunity." (Report at 15). In reaching that conclusion, the Report repeatedly draws factual inferences in Defendants' favor rather than Plaintiffs' favor. For example, the Report states: "It is uncontested that, over the course of the incidents in question, school officials, including Cato, were attempting to mitigate the situation." (Report at 16). But that is not an allegation contained in the Complaint. The Complaint alleges precisely the opposite.

Indeed, Plaintiffs alleged: "Upon learning that Plaintiff Madrid was targeted and subjected to racist treatment, the School District and School Board, acting through its agents, not only failed to take any remedial action, but also overtly sent out the message that Plaintiff Madrid was a problem because he was bothered by such treatment." (TAC ¶ 22). Plaintiffs further alleged that Cato "failed to take any remedial action, failed to discuss the issue with Defendants Hinson, and failed to inquire about the impact of the treatment on Madrid." (TAC ¶ 33). Plaintiffs alleged that Cato attended meetings where students openly defended use of the N-word and: "None of the named Defendants—adults in a room full of teenagers—intervened." (TAC ¶ 26). Plaintiffs further alleged that before the walkout: "Defendants Butz and Cato were informed by parents and staff that a walkout was planned during the game" and that "Defendant Cato was so worried about the impending walkout that he took it upon himself to pre-notify a former FMHS School Resource

20

Officer ... and ask him to attend the game." (TAC ¶ 64). The Complaint further alleges that Cato had advance knowledge that the walkout would target: "the only two Black players." (TAC ¶ 72(a)(i)).

At the Rule 12(b)(6) stage, those allegations must be accepted as true. The Report instead repeatedly substitutes a competing narrative that Cato was attempting to "mitigate the situation" and merely exercised poor judgment. Moreover, the Report improperly separates Cato from the discriminatory conduct while simultaneously recognizing allegations that Cato approved the very disciplinary actions that Plaintiffs allege were discriminatorily imposed. The Complaint alleges: "Cato stood by or approved multiple acts of retaliation against Madrid." (TAC ¶ 72(a)(iii)). That included "approv[ing] a six-game suspension of Madrid based on conduct that white players were not punished for." (TAC ¶ 72(a)(iii)).

The right to be free from intentional race discrimination and retaliation for complaints concerning race discrimination was clearly established long before the events at issue. Indeed, the Report itself recognizes: "The Equal Protection Clause's protection against race discrimination is clearly established" and "[w]e have clearly established a person's right to be free from retaliation after complaining of racial discrimination." (Report at 16). Accepting the Complaint's allegations as true, Plaintiffs alleged that Cato had actual knowledge of race-based misconduct, approved discriminatory discipline, repeatedly ignored complaints of racial hostility, knew about the planned walkout, and failed to prevent it. Those allegations plausibly state violations of clearly established constitutional rights and preclude dismissal on qualified-immunity grounds at the pleading stage. Notably, the Magistrate accepted Plaintiffs' allegations as sufficient to deny qualified immunity to Burchfield and Hinson, but then improperly recharacterized nearly identical allegations as to Cato as merely ineffective attempts to manage a difficult situation.

21

Accordingly, the Report improperly grants qualified immunity to Defendant Cato by resolving disputed facts and drawing infer ences in Defendants' favor rather than accepting Plaintiffs' allegations as true. Plaintiffs' Objection No. 7 must be sustained.

**OBJECTION NO. 8:**     **The Report Improperly Granted Qualified Immunity to Defendant Carcioppolo.**

Plaintiffs specifically object to pages 18-19 of the Report regarding Defendant Carcioppolo and the Report's conclusion that Defendant Carcioppolo is entitled to qualified immunity. The Report erroneously grants qualified immunity to Defendant Carcioppolo by mischaracterizing the allegations of the complaint and failing to accept those allegations as true.

The Report concludes: "Thus, the only real allegation against Carcioppolo that would subject him to liability was the text message containing a racial slur, which was deleted when flagged as problematic." (Report at 18). The Report further concludes: "While perhaps reprehensible and certainly misguided, Plaintiff cites no authority demonstrating that a one-time, deleted use of a racially insensitive word was blatantly unlawful." (Report at 18). That is not the claim pled in the Complaint. The Complaint does not allege merely that Carcioppolo sent a single text message. Rather, the Complaint alleges that Carcioppolo's conduct initiated, fueled, and contributed to an ongoing course of race-based discrimination and retaliation directed at Madrid.

The Complaint specifically alleges: "The racial discrimination at issue began on February 14, 2023, when one of Madrid's assistant baseball coaches, Alex Carcioppolo, sent a disturbing text message to the Fort Myers High School baseball players and coaches that read: 'Happy Valentine's Day niggas.'" (TAC ¶ 3). The Complaint further alleges that this was not an isolated event but instead: "reveals and perpetuates a culture of long-seated biases on the basis of race and color, which permeated the educational environment in the School District." (TAC ¶ 3). Plaintiffs further alleged that after the message was sent: "The incident exacerbated racism among team

22

members, leading white athletes to unjustly and falsely blame Madrid for reporting the incendiary text to school authorities." (TAC ¶ 21). The Complaint further alleges: "Team members disclosed to the Athletic Director, coaches, and school administration that racial slurs were routinely used among team members." (TAC ¶ 21). Thus, the Complaint expressly alleges that the text message exposed and reinforced a broader racially hostile environment already known to coaches and administrators.

The Complaint additionally alleges that Carcioppolo participated in suppressing complaints concerning racial slurs. Specifically: "Before the season even began, at least one student (not Madrid or T.R.) directly reported the use of derogatory racial slurs lodged against him to Defendants Carcioppolo and Burchfield but were told to stop 'acting like a sissy' for being 'bothered' by the use of the slurs." (TAC ¶ 22). The Report does not address this allegation at all.

The Complaint further alleges that Carcioppolo's conduct extended beyond the text message itself and continued after his removal from the coaching staff. Specifically, Plaintiffs alleged: "Defendant Carcioppolo actively engaged in efforts both online and in other forums to encourage students and staff to protest his removal, contributing to a divisive and hostile environment within the school community." (TAC ¶ 75(i)). The Complaint further alleges: "These actions were intentionally designed to mobilize public sentiment against Madrid with the specific intent to harm Plaintiff Madrid." (TAC ¶ 75(i)). The Complaint also alleges: "His suspension prompted protests by white players and parents, and he became a symbol of white grievance within the team and community, fostering further hostility toward Madrid and T.R." (TAC ¶ 75(iii)). And Plaintiffs further alleged: "Though no longer actively coaching, Carcioppolo remained in communication with players and parents." (TAC ¶ 75(iv)).

23

The Complaint alleges that on the day of the walkout: "Carcioppolo made a cryptic Instagram post, which, in context, was likely intended to encourage the protest in support of his firing." (TAC ¶ 75(iv)). Thus, Plaintiffs alleged continuing conduct by Carcioppolo that contributed to the retaliatory and racially hostile events that followed. The Report's characterization of the allegations as involving only "a one-time, deleted use of a racially insensitive word" therefore disregards substantial portions of the Complaint and improperly narrows the factual allegations that must be accepted as true at the Rule 12(b)(6) stage.

Moreover, the Report acknowledges that: "The Equal Protection Clause's protection against race discrimination is clearly established." (Report at 16; *see also Whitcomb v. Sumter Cnty. Bd. of Educ.*, 453 F. App'x 879, 881 (11th Cir. 2011)). The Complaint alleges intentional race-based conduct by a state actor directed toward a team that included only two players of color, suppression of complaints regarding racial slurs, and subsequent conduct intended to mobilize hostility toward Madrid following Carcioppolo's removal. At this stage, the Court's task is not to determine whether Plaintiffs will ultimately prove those allegations. The Court must determine whether the Complaint plausibly alleges a violation of clearly established constitutional rights. Because the Report improperly disregards numerous well-pleaded allegations and evaluates qualified immunity based on a materially narrower version of the facts than those alleged in the Complaint, the grant of qualified immunity to Defendant Carcioppolo should be rejected. Plaintiffs' Objection No. 8 must be sustained.

**OBJECTION NO. 9:**     **The Report Improperly Granted Qualified Immunity to Defendant Butz.**

Plaintiffs specifically object to pages 19-20 of the Report regarding Defendant Butz and the Report's conclusion that Defendant Butz is entitled to qualified immunity. The Report erroneously grants qualified immunity to Defendant Butz by disregarding well-pleaded

allegations of personal participation, actual knowledge, and deliberate indifference to race-based discrimination.

The Report summarizes the allegations against Butz as follows: "Principal Butz, who Plaintiffs allege approved discriminatory rules targeting Tucker; took no action to stop publicly unequal discipline; excluded Tucker's father from team practice opportunities, attended meetings where racial hostility was defended and did nothing; and cancelled the season without considering the impact on Tucker." (Report at 19). The Report nevertheless concludes: "even taken as true the remaining behaviors show, at worst, a principal out of his depth who was attempting to mitigate—albeit poorly—a tense, difficult, rapidly escalating situation." (Report at 19-20). That conclusion improperly resolves factual disputes and draws inferences in Defendants' favor.

The Complaint does not allege that Butz merely failed to appreciate the seriousness of the situation. Rather, the Complaint alleges repeated personal involvement in discriminatory and retaliatory conduct. The Complaint specifically alleges that Butz attended meetings in which racial slurs were openly discussed and defended. Plaintiffs alleged:

> Following the meeting between Defendant Burchfield and Madrid on or about February 16, 2023, the Defendants held a series of meetings with FMHS baseball players. In one such meeting, organized by the School Board and School District through Defendants Butz, Cato, Burchfield, and Henson (who were in attendance), players were asked to raise their hand if they had ever used the word 'nigga.'

(TAC ¶ 26). The Complaint further alleges: "Many of the white players defended their use of the word" and "None of the named Defendants—adults in a room full of teenagers—intervened." (TAC ¶ 26). The Complaint additionally alleges that Butz blamed Madrid rather than addressing the racial conduct at issue. Specifically: "Defendant Butz told Madrid's parents that he was 'disappointed' that Madrid did not 'stand up for himself' during the meeting." (TAC ¶ 28). The

25

Complaint further alleges that Butz approved disciplinary rules that were discriminatorily enforced against Madrid and the only other Black player on the team.

Plaintiffs alleged: "Defendant Burchfield sent an email, with the approval of Defendants Cato and Butz, purporting to be a new set of "Baseball Program Rules." (TAC ¶ 30). The Complaint further alleges: "Defendants Burchfield, Cato, and Butz in their official capacities and on behalf of the School District and School Board, inconsistently and unfairly implemented the new Baseball Program Rules against Madrid." (TAC ¶ 31). The Complaint expressly alleges that: "There exists no other explanation for the disparate application of the new rules other than racial bias, discrimination, and retaliation." (TAC ¶ 31). The Complaint also alleges actual advance knowledge by Butz concerning the walkout. Specifically: "Before the April 6, 2023 game, Defendants Butz and Cato were informed by parents and staff that a walkout was planned during the game." (TAC ¶ 64). The Complaint further alleges that the walkout ultimately left: "the only two students of color alone on a baseball field" and that "[t]he walkout proceeded as engineered by Defendants Burchfield, Hinson, Chappel, and Carcioppolo, leaving Madrid and T.R. – the only players of color on the team – stunned and humiliated on the field." (TAC ¶¶ 68-69).

The Complaint additionally alleges that Butz participated in retaliatory actions directed at Madrid and his family: "On or about April 4, 2023, Defendant Butz called Madrid's father and informed him that he was no longer welcome to come to the field and throw BP for any player other than Madrid." (TAC ¶ 57). The Complaint further alleges that Butz later cancelled the remainder of the baseball season and: "did not consider the impact of this decision on Plaintiffs." (TAC ¶ 70). Most importantly, the Complaint specifically alleges that Butz: "played a critical role in enabling, endorsing, and sustaining the racially discriminatory and retaliatory treatment of Madrid." (TAC ¶ 81). "Rather than intervening to protect Madrid or uphold school policies,

26

Principal Butz used his authority to reinforce and legitimize the misconduct of subordinate coaches and staff." (TAC ¶ 81). The Report never explains why those allegations must be disregarded at the pleading stage. Instead, the Report substitutes a competing narrative that Butz was merely attempting to manage a difficult situation. That is not the Rule 12(b)(6) standard.

Again, the Report itself recognizes that: "The Equal Protection Clause's protection against race discrimination is clearly established." (Report at 16; *see also Whitcomb v. Sumter Cnty. Bd. of Educ.*, 453 F. App'x 879, 881 (11th Cir. 2011)). There is no doubt that this freedom includes the freedom against retaliation: "We have clearly established a person's right to be free from retaliation after complaining of racial discrimination." (Report at 16; *see also Whitcomb v. Sumter Cnty. Bd. of Educ.*, 453 F. App'x 879, 881 (11th Cir. 2011)). Accepting the Complaint's allegations as true, Plaintiffs alleged that Butz approved discriminatory rules, attended meetings where racial slurs were defended, possessed advance knowledge of the walkout, failed to intervene despite that knowledge, participated in retaliatory actions directed at Madrid and his family, and ultimately enabled conduct that isolated and humiliated the only two players of color on the team. Those allegations plausibly allege violations of clearly established constitutional rights and are sufficient to defeat qualified immunity at the motion-to-dismiss stage. Accordingly, the Report's recommendation that Defendant Butz be dismissed on qualified-immunity grounds should be rejected. Plaintiffs' Objection No. 9 must be sustained.

> **OBJECTION NO. 10:** **The Report Improperly Dismisses Plaintiffs Due Process Claim by Failing to Accept the Complaint's Allegations as True and by Improperly Resolving Factual Issues at the Pleadings Stage.**

Plaintiffs specifically object to pages 20-21 of the Report's conclusion regarding the due process claim. Specifically, the Report determines that "Ultimately, Tucker was only briefly suspended for a few innings, and none of the more draconian punishments were enforced. Neither

27

Hinson nor Burchfield were behind the cancellation of the season or the exclusion of Tucker's parents, and any effect on future educational opportunities is speculative at best." (Report at 21). This analysis suffers from two fundamental flaws.

First, the Report improperly minimizes the allegations contained in the Complaint by reducing the challenged conduct to a brief suspension lasting only a few innings. The Complaint alleges substantially more. Plaintiffs alleged that Madrid was publicly suspended from the team, required to write an apology letter, repeatedly subjected to fabricated disciplinary accusations, publicly humiliated in front of teammates, isolated from opportunities available to white players, and ultimately deprived of the opportunity to complete the season after the walkout. Plaintiffs further alleged that the cancellation of the season: "deprived him of the opportunity to play baseball that year, hindered his development as a player, and eliminated his chance to showcase his talents to college scouts and recruiters." (TAC ¶ 70). Plaintiffs specifically alleged: "The abrupt end to the season deprived Plaintiff Madrid of crucial exposure and development in his sport, thereby hindering his athletic and academic prospects." (TAC ¶ 81(iv)). The Report characterizes these allegations as "speculative," but at the Rule 12(b)(6) stage the Court was required to accept those allegations as true and draw reasonable inferences in Plaintiffs' favor.

Second, the Report contains an internal inconsistency. The Report dismisses Defendants Cato and Butz, despite allegations that they approved disciplinary actions, approved or implemented the Baseball Program Rules, knew of the walkout beforehand, and participated in decisions affecting Madrid's educational and athletic opportunities. Yet the Report then dismisses the due process claim against the remaining Defendants because: "Neither Hinson nor Burchfield were behind the cancellation of the season or the exclusion of Tucker's parents." (Report at 21). The Complaint, however, alleges that all of these actions were part of a broader course of conduct

28

carried out by multiple Defendants acting together. For example, Plaintiffs alleged: "Defendants Cato, Burchfield, Carcioppolo, Hinson, Chappell, Butz and Bernier acted pursuant to a custom, de facto policy, and practice in depriving Plaintiffs of educational services, programs and activities directly sponsored by the School District and its component schools." (TAC ¶ 126). Plaintiffs further alleged that Defendants deprived Madrid of educational opportunities by:

- "Removing him from baseball games and suspending him from the team without formal notice or explanation;" (TAC ¶ 144(a));

- "Enforcing selectively applied and discriminatorily implemented disciplinary rules targeting Madrid and other Black athletes;" (TAC ¶ 144(b)); and

- "Canceling the remainder of the baseball season in retaliation for Madrid's protected conduct and without considering the impact on his educational trajectory." (TAC ¶ 144(d)).

The Complaint therefore alleges a collective course of conduct involving multiple actors, not a series of isolated events attributable to only one defendant.

At a minimum, the Complaint plausibly alleges that Madrid suffered reputational harm, public humiliation, exclusion from educational opportunities, loss of recruiting exposure, and adverse consequences affecting future educational opportunities. Whether those allegations ultimately establish a protected liberty or property interest is a question that should be resolved on a developed factual record rather than on a motion to dismiss. Accordingly, the Report improperly construes the allegations narrowly, resolves factual issues against Plaintiffs, and recommends dismissal of Count IV based upon factual determinations that cannot properly be made at the pleading stage. Plaintiffs' Objection No. 10 must be sustained.

**OBJECTION NO. 11:**     **The Report Erroneously Dismisses the Parents' Claims.**

Plaintiffs specifically object to footnote 3 on page 7 of the Report, wherein the Report relies upon a single district court decision from Wisconsin to conclude that "[p]arents may not assert Title VI claims because they do not attend public schools—their children do." (Report at 7 n.3) (citing *Ervins v. Sun Prairie Area School District*, 609 F. Supp. 3d 709, 721 (W.D. Wis. 2022)). The Report's conclusion is inconsistent with the text of Title VI and the allegations of the Third Amended Complaint. Title VI provides that: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d (emphasis added). The statute does not limit its protections solely to enrolled students. Rather, it protects "persons" from discrimination under federally funded programs and activities.

More importantly, Plaintiffs do not allege merely derivative injuries flowing from discrimination directed at Madrid. The Complaint alleges direct discriminatory and retaliatory conduct directed at Michael Tucker and Azuree'd Tucker because they complained about race discrimination and advocated on behalf of their son. For example, Plaintiffs allege that Defendants excluded Mr. Tucker from baseball activities in which he had previously participated, refused to include the parents in educational decisions concerning Madrid, retaliated against the family after complaints regarding racial discrimination, and treated the parents as obstacles to Defendants' preferred narrative regarding the events at issue. (TAC ¶¶ 57, 70, 91). Thus, the issue is not whether parents may recover merely because their child allegedly suffered discrimination. The issue is whether parents who themselves are allegedly subjected to discriminatory or retaliatory treatment arising from complaints about race discrimination may seek relief under Title VI.

Neither the text of Title VI nor binding Supreme Court or Eleventh Circuit precedent supports the categorical rule adopted by the Report that parents can never assert Title VI claims because they do not attend the school. At a minimum, the allegations of the Complaint plausibly establish that the Parent-Plaintiffs were themselves subjected to adverse treatment allegedly motivated by race and by their opposition to race discrimination. Accordingly, dismissal of the Parent-Plaintiffs' Title VI claims is unwarranted. Plaintiffs' Objection No. 11 must be sustained.

**OBJECTION NO. 12:        The Report Erroneously Dismisses the EEOA Claim.**

Plaintiffs specifically object to page 13 of the Report and the dismissal of the EEOA claim. The Report concludes: "Plaintiff continued to play on the team throughout the term of the alleged incidents and was indeed identified as a 'star' player." (Report at 13). The Complaint alleges far more than mere continued participation. Plaintiffs allege: differential discipline; fabricated misconduct allegations; public humiliation; exclusionary treatment; a walkout specifically engineered to isolate the only two Black players; and cancellation of the season that deprived Madrid of recruiting opportunities. (TAC ¶¶ 165-184). Accepting those allegations as true, Plaintiffs plausibly alleged denial of equal educational opportunity on account of race. Plaintiffs' Objection No. 12 must be sustained.

**OBJECTION NO. 13:        Treatment of State Law Claims.**

The Report recommended that "the Court decline to exercise supplemental jurisdiction over the state law claims." (Report at 13, n. 9). Plaintiffs contend that the federal law claims against the municipalities should survive and consideration of the state law claims supplemental to those makes practical and logistical sense. Therefore, Plaintiffs specifically object to the recommendation to not consider those claims. Alternatively, Plaintiffs would specifically object

31

to the dismissal of the state law claims with prejudice, as they should still be considered by a court, even if not this one.  Plaintiffs' Objection No. 13 should be sustained.

### PLAINTIFFS' ALTERNATIVE MOTION FOR LEAVE TO AMEND

Plaintiffs respectfully submit that the Third Amended Complaint already pleads more than sufficient factual allegations to state each of the claims challenged by Defendants and addressed in the Report and Recommendation. Indeed, many of Plaintiffs' objections arise not because the Complaint lacks factual allegations, but because the Report repeatedly characterizes expressly pled facts as though they were absent. For example, the Report states that certain allegations were "not directly pled" or "not specifically pled" even where the Complaint expressly alleges the very facts at issue. The Court need look no further than the Report's discussion of advance notice of the walkout, where the Complaint expressly alleges: "Before the April 6, 2023 game, Defendants Butz and Cato were informed by parents and staff that a walkout was planned during the game." Yet the Report characterizes such allegations as not directly pled. (Report at 9: "Although not directly pled…"). Plaintiffs therefore maintain that dismissal is unwarranted because the Complaint already satisfies Rule 8 and plausibly alleges each challenged claim. However, should the District Court conclude that additional factual specificity is required, Plaintiffs respectfully request leave to amend.

Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend should be "freely give[n] when justice so requires." The Eleventh Circuit has repeatedly recognized that leave to amend should be liberally granted, particularly where a more carefully drafted complaint could state a claim. Rule 8 requires a short and plain statement—not an evidentiary presentation. The Third Amended Complaint already spans approximately eighty-two pages and contains extensive factual allegations. Yet even that lengthy pleading represents only a fraction of the facts known to

32

Plaintiffs. Indeed, many of the objections raised herein arise not because the Complaint lacked factual support, but because the Report repeatedly characterized expressly pleaded allegations as inferential, insufficiently detailed, or not directly pleaded. For example, although the Complaint expressly alleges that Defendants Butz and Cato were informed before the April 6, 2023 game that a walkout was planned, the Report nevertheless referred to certain aspects of that knowledge as "not directly pled."

If the Court concludes that additional factual specificity is required, Plaintiffs can readily provide it. The Hinson Professional Standards Investigation File, attached hereto as Exhibit A, alone contains substantial additional factual detail concerning confusion in the Report. *See* Hinson Professional Standards Investigation File, attached as Exhibit A (documenting witness accounts regarding advance notice of the walkout, administrative awareness of the possibility of a walkout, reports that school officials received warnings before the event occurred, and statements concerning the planning and execution of the walkout). For example, the Hinson investigative materials contain witness statements that, after learning of the planned walkout, the witness "called Coach Cato" and that Cato responded, "if they walkout to let them go." Ex. A at 22. The same witness further stated: "I told Cato because chain of command. He said if they decide to walk to let them go." Ex. A at 22. The Hinson investigative file also contains witness accounts describing reports of parent discussions concerning a planned walkout, communications regarding the anticipated walkout before the game, and discussions concerning the lineup used during the game in which the walkout occurred. Ex. A. These are precisely the types of factual details that appear to underlie several of the concerns identified in the Report and would further support Plaintiffs' allegations regarding advance notice, administrative awareness, and the planning and execution of the walkout. Indeed, the Hinson investigative file alone spans nearly two hundred pages and

33

contains numerous witness statements, administrative interviews, emails, text communications, and documentary materials. Plaintiffs have not attempted to convert their pleading into an evidentiary record by incorporating every available fact, witness statement, or investigative finding. If Plaintiffs were required to plead every available fact known to them, the Complaint could easily be several times its present length.

Accordingly, Plaintiffs respectfully submit that the Third Amended Complaint already pleads more than sufficient facts to survive dismissal. However, should the Court determine that any claim requires additional factual specificity, justice would favor amendment rather than dismissal. The materials already developed during the underlying investigations demonstrate that Plaintiffs can allege substantially more detail concerning the events at issue, including facts directly responsive to several of the concerns expressed in the Report.

## **CONCLUSION AND PRAYER FOR RELIEF**

For the foregoing reasons, Plaintiffs respectfully request that the Court sustain these objections, reject the portions of the Report and Recommendation challenged herein, deny Defendants' Motion to Dismiss as to the challenged claims, and permit this action to proceed on the merits.

At this stage, Plaintiffs are not required to prove their claims. They are required only to plead sufficient facts to state claims that are plausible on their face. Plaintiffs have done so. The Third Amended Complaint spans more than eighty pages and alleges, in substantial detail, a pattern of race-based discrimination, retaliation, disparate treatment, deliberate indifference, and constitutional violations by multiple school officials and entities. The Report repeatedly resolves factual disputes, draws competing inferences in Defendants' favor, and, in several instances, characterizes expressly pleaded allegations as though they were absent. Those determinations are

34

inappropriate at the Rule 12(b)(6) stage, where all well-pleaded allegations must be accepted as true and all reasonable inferences must be drawn in Plaintiffs' favor.

Accordingly, Plaintiffs respectfully request that the Court sustain each of Plaintiffs' Objections and reject the Report and Recommendation to the extent it recommends dismissal of Plaintiffs' Title VI, Equal Protection, *Monell*, Due Process, and related claims, deny Defendants' Motion to Dismiss as to those claims, and grant such other and further relief to which Plaintiffs may be justly entitled.

In the alternative, should the Court determine that any portion of the Third Amended Complaint requires additional factual specificity, Plaintiffs respectfully request leave to amend pursuant to Rule 15(a)(2). Fed. R. Civ. P. 15(a)(2).  Plaintiffs firmly believe that the allegations presently pleaded are more than sufficient to withstand dismissal.  However, if the Court concludes otherwise, justice would favor amendment rather than dismissal. As demonstrated by the materials referenced by Plaintiffs—including the extensive Hinson investigative file and other investigative materials—Plaintiffs possess substantial additional factual allegations that could be pleaded if necessary. While Rule 8 does not require Plaintiffs to convert an eighty-two-page complaint into an evidentiary record, Plaintiffs can readily provide additional factual detail should the Court deem it appropriate. Leave to amend should therefore be freely granted if any pleading deficiency is found.

WHEREFORE, Plaintiffs respectfully request that the Court reject the challenged portions of the Report and Recommendation, deny Defendants' Motion to Dismiss to the extent set forth herein, or alternatively grant Plaintiffs leave to amend, and award such other and further relief as the Court deems just and proper.

35

Respectfully submitted,

 /s/ Christopher O'Neal
Christopher O'Neal, Esq
State Bar No. 910201
chris@bencrump.com
Natalie Jackson, Esq
State Bar No. 646075
Natalie@bencrump.com
Precious Chavez, Esq
State Bar No. 1040700
Precious@bencrump.com
**BEN CRUMP LAW PLLC**
122 S. Calhoun Street
TALLAHASSEE, FL 32301

    **-AND-**


**Marion M. Reilly, Esq** *(Pro Hac Vice)*
Texas State Bar No. 24079195
Federal ID. No.  1357491
E-Mail:  marion@mrtrial.com
**MARTINEZ REILLY, LLP**
3636 S. Alameda, Ste. B119
Corpus Christi, Texas 78412
Telephone:  361.273.6771
Facsimile:  361.704.8355
**Service Email address
Service@mrtrial.com

    **-AND-**


**Joseph E. Hoffer, Esq (***Pro Hac Vice***)**
State Bar No. 24049462
Federal ID No. 2006011
Email: jhoffer@slh-law.com
**SCHULMAN, LOPEZ, HOFFER & ADELSTEIN, LLP**
845 Proton Road
San Antonio, Texas 78258
Telephone:  210-538-5385
Facsimile:  210-538-5384

    **-AND-**

36

**A. Vince Colella, Esq (*Pro Hac Vice*)**
Federal ID No. P49747
Email: Vcolella@mosscolella.com
**MOSS & COLELLA**
28411 Northwestern Hwy, 11th FL
Southfield, MI 48034
Telephone:  248.945.0100
Facsimile:  248.945.1801

**ATTORNEYS FOR PLAINTIFFS**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 12, 2026, this document was electronically transmitted to the Clerk of Court via the CM/ECF system, which will send notice of electronic filing to all counsel of record.

/s/ Marion M. Reilly
Marion M. Reilly

37